# Exhibit K

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| PAPAYA GAMING, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **1:25-CV-00470-MSN-IDD** |
| | ) | |
| FAIR PLAY FOR MOBILE GAMES, | ) | |
| JOSH LEVIN, | ) | |
| SQUARE STRATEGIES LLC, | ) | |
| LACIE NEWTON, | ) | |
| ASSEMBLE THE AGENCY LLC, | ) | |
| **MAVAN GROUP, INC., and** | ) | |
| **VALOR PUBLIC STRATEGIES LLC** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **AMENDED COMPLAINT**

Plaintiff Papaya Gaming, Ltd. ("Papaya"), by and through its undersigned counsel, brings this action against Fair Play for Mobile Games ("4 Fair Play"); Josh Levin; Square Strategies LLC ("Square Strategies"); Lacie Newton; Assemble the Agency LLC ("Assemble"); **Mavan Group, Inc. ("Mavan"); and Valor Public Strategies LLC ("Valor")** (collectively, "Defendants"), seeking relief for injuries caused by Defendants' tortious and unlawful acts.

## INTRODUCTION

1.     Papaya is an industry-leading developer of mobile games.  Since 2019, Papaya's games have offered customers the opportunity to earn rewards, including cash prizes, through their skill at gameplay.  Papaya provides skill-based games to allow players to compete against each other in an environment where ability, not luck or chance, determines the victor.

2.      Defendants, ~~in league with~~ a competitor mobile gaming company, ~~Skillz Platform Inc. ("Skillz"),~~ embarked on a fraudulent crusade to smear Papaya and other mobile gaming

companies while positioning Skillz Platform Inc. ("Skillz"), a competitor mobile gaming company, as the only company that can be trusted to provide players with a fair mobile gaming experience.

3.      Defendants carried out this deceptive scheme in several ways, including by (a) soliciting, manipulating, and fabricating customer "complaints" about Papaya's and other mobile gaming companies' alleged bot use via the website 4fairplay.org (the "4FairPlay Website"); (b) seeking to provoke investigations of Skillz's competitors by disseminating these false or misleading complaints to state and federal officials; and (c) presenting false data and testimonials on the 4FairPlay Website to deliberately mislead consumers regarding the existence and magnitude of supposed bot-related complaints against Papaya and other mobile gaming companies; and (d) luring former Papaya employees to reveal Papaya's business secrets in violation of their confidentiality agreements so that Skillz could use the information for its own competitive advantage.

4.      In particular, 4 Fair Play, Levin, Square Strategies, Newton, Assemble, and Mavan (collectively, "Complaint Scheme Defendants") instituted an online campaign to convince mobile gaming customers to submit complaints about three mobile gaming companies—competing with Skillz (including Papaya and excluding Skillz  ) through the 4FairPlay Website, ostensibly for direct submission to state attorneys general, to directly and surreptitiously target Papaya.

5.      But when viewers visited and submitted complaints through the 4FairPlay Website, the 4FairPlay Website failed to inform them that their personal identifying information and complaints would be shared with Skillz and its agents used for purely competitive purposes.

6. Most importantly, **Complaint Scheme** Defendants deliberately concealed from viewers ~~submitting complaints through~~**of** the 4FairPlay Website that they had manipulated the submission process and, upon information and belief, systematically altered and fabricated the contents of the complaints ~~themselves~~**submitted through the website** to damage Papaya's reputation and business relationships.

**7.** **Complaint Scheme Defendants added stock language to all of the complaints submitted through the 4FairPlay Website, regardless of the content of complaints, and otherwise altered the complaints. The stock language denounced specific** mobile gaming companies**' alleged bot use and urged government investigation**. For example, **if an individual submitted a complaint about a Skillz game, Complaint Scheme Defendants would intentionally falsify that submission so that it appeared to complain about bots in Papaya's games (or the games of other mobile gaming companies).**

**8.** ~~7.~~Upon information and belief, after altering the complaints, **Complaint Scheme** Defendants then submitted these false and misleading complaints to government officials to further Skillz's competitive agenda **without informing the officials that Complaint Scheme Defendants had manipulated and altered the form and contents of the complaints**.

**9.** **Complaint Scheme Defendants also published statistics about the falsified complaints** on the 4FairPlay Website**, characterizing the fabricated complaints as complaints about alleged bot use.**

**10.** 8. The 4FairPlay Website ~~itself~~ was replete with false representations designed to strike at Papaya's reputation and ruin Papaya's standing among mobile gaming customers under the guise of an independent advocacy organization.

**11.** 9. Everything about the 4FairPlay Website was consciously designed by **Complaint Scheme** Defendants to provide a false sense of legitimacy and impartiality to the fraudulent website.

**12.** 10. Among other fraudulent activity, the 4FairPlay Website featured, upon information and belief, fake customer testimonials and statistics based on the fabricated customer complaints to create the illusion of widespread customer discontent with Papaya about alleged bot usage, and to induce 4FairPlay Website visitors to submit complaints about Papaya that were then **altered and** sent to state attorneys general.

**13.** 11. The 4FairPlay Website's home page also displayed a fake tracker, or counter, that purported to show the volume of complaints about Papaya and other**the targeted** mobile gaming companies (except Skillz)**' alleged bot use** that customers had submitted to law enforcement agencies.

**14.** 12. The counter initially presented a very specific and non-round number (12,594), and the counter continued to increase in number as a visitor stayed on the page, at a pace of one additional complaint every three seconds**, "so it feels like [complaints are increasing in] real time."** When read in conjunction with other fake data posted on the 4FairPlay Website, the counter falsely indicated that consumers were submitting eight complaints about Papaya**Papaya's alleged bot use** every minute around the clock.

**15.** 13. The false presentation of the increasing number of complaints was followed by the phrase "and Counting!" to further indicate to consumers visiting the 4FairPlay Website that the counter was tied to an active database of customer complaints.

**16.** 14. But the counter was not tied to an active database of complaints. By displaying the same inaccurate number each time a visitor opened the 4FairPlay Website, and showing the number

continually increasing at the same rate while the visitor stayed on the page, the counter

unambiguously and falsely represented that the website received a score of new complaints **about bot use** each minute.

**17.** 15. **Complaint Scheme** Defendants published the fake counter to deliberatively deceive viewers of the 4FairPlay Website with content that they knew was likely to, and did, mislead viewers about the number of complaints about alleged bot use submitted through the 4FairPlay Website.

**18.** 16. Finally, upon information and belief, the 4FairPlay Website displayed **to consumers** other fake content, including, as referenced above, false customer testimonials, a pie chart that purported to convey the percentages of complaints submitted per game— **(**with Papaya's games supposedly the subject of a plurality of all complaints— **),** and a supposed map of "Complaints by [U.S.] state."

**19.** 17. Doubtless recognizing the legal exposure, **Complaint Scheme** Defendants deliberately obscured Skillz's and their connection to the 4FairPlay Website.

**20.** 18. Levin—an individual with a history of incorporating entities in the Commonwealth of Virginia on behalf of unnamed parties—created 4 Fair Play, a front company that served as the public sponsor of the 4FairPlay Website.

**21.** 19. Levin then served as Director of 4 Fair Play and hired his firm, Square Strategies, to perform consulting work for the entity, including establishing email service, using web engine hosting, and facilitating Google advertisements.

**22.** 20. Upon information and belief, Assemble, a political strategy firm, and Newton, a communications strategist at Assemble who has a similar history of running public perception campaigns on behalf of anonymous parties, developed the public communications strategy and

facilitated the complaint submission process, among other things.

**23.** **Mavan, a digital advertising firm, designed, created, and ran a digital advertising campaign calling on mobile gaming customers to file complaints against "shady mobile games" through** the 4FairPlay Website,

**24.** 21. **Complaint Scheme** Defendants Levin and Newton, with the support of their respective firms Square Strategies and Assemble, thus orchestrated and executed a smear campaign against Papaya **by way of the 4FairPlay Website**.

**25.** **Beyond** the 4FairPlay Website, **Defendants** 4 Fair Play, **Levin, Square Strategies, Newton, Assemble, and Valor (collectively "Interview Scheme Defendants") fraudulently obtained Papaya's proprietary and confidential business information by deliberately targeting former Papaya employees and inducing them to violate their contractual confidentiality obligations to enable Skillz to unfairly compete with Papaya.**

**26.** **Specifically, the Interview Scheme Defendants engaged Valor to induce former Papaya employees to participate in purported "industry interviews."**

**27.** **Representatives of Valor posed as impartial industry consultants interested in speaking with former Papaya employees about** the mobile gaming industry. **After compiling an extensive list of Papaya employees who might possess the type of information Skillz was seeking, Valor, holding itself out as a "public policy group conducting research," contacted over forty former Papaya employees through LinkedIn, offering each $300 for participating in interviews designed to "better understand the mobile gaming industry."**

**28.** **But this was no earnest effort to "better understand the mobile gaming industry." Instead, the interview scheme was designed to obtain proprietary and confidential business information from Papaya that Skillz could use for its own competitive ends and to Papaya's detriment.**

29.     Interview Scheme Defendants envisioned the effort as a means to obtain highly sensitive information about Papaya's business practices that could be used to harm Papaya's market standing. Indeed, the guide outlining the interview scheme emphasized that questions concerning Papaya's matchmaking practices constituted "the CORE reason we are interviewing this person." The guide further instructed the interview team to "look into using different approaches to get him/her to say what we need them to say (and feel comfortable doing so)."

30.     Interview Scheme Defendants knew, or should have been aware, that the former Papaya employees whom Valor contacted were subject to confidentiality agreements with Papaya that barred them from providing the information that Valor requested. Nevertheless, Interview Scheme Defendants barreled forward with their efforts to obtain highly sensitive information about Papaya from these individuals, notwithstanding these contractual prohibitions.

31.     Valor served as the public face of the operation—coordinating the outreach, messaging, and interviews—and obscured 4 Fair Play, Levin, Square Strategies, Newton, Assemble, and Skillz's connection. Even when asked by one former Papaya employee during an interview to confirm that they were not representing competitors, Valor and Levin denied they had a business connection with Skillz.

32.     Lured by Valor's false statements and easy cash, at least two former Papaya employees ultimately participated in interviews.

33.     Through this deception, Interview Scheme Defendants intentionally induced former Papaya employees to disclose information regarding Papaya's matchmaking and customer outreach and thereby breach the confidentiality provisions contained within their validly executed employment agreements.

**34.** **Upon information and belief, Interview Scheme Defendants then shared Papaya's proprietary and confidential information with Skillz, which used the information to plot its business strategy and inform its advertising and marketing efforts, including in conversations with reporters in which Skillz denigrated Papaya and touted itself as the only honest gaming company.**

**35.** **In reality, Skillz intentionally controls outcomes of games played on its platform by unevenly matching players in matchups that are called "hard win(s)," "hard loss(es)," "soft win(s)," and "soft loss(es)" and collectively referred to as "determined outcome[s]."**

**36.** ~~22.~~ All along, Defendants' objective, upon information and belief, was to use illicit means to allow Skillz to gain an unfair competitive advantage over Papaya and improve Skillz's dire financial condition.  Skillz has been unable to keep pace with Papaya's player-friendly games and stands on the cusp of financial ruin~~; Skillz's fiscal condition is deteriorating, and its leadership faces significant exposure from a shareholder lawsuit~~.

**37.** ~~23.~~ **Complaint Scheme** Defendants' creation, operation, and control of the fraudulent 4FairPlay Website, as well as their knowing dissemination of fabricated customer complaints to government officials and the public, caused substantial and ongoing harm to Papaya.

**38.** ~~24.~~ The 4FairPlay Website's false statements, backed up by fabricated or misleading data, suggested to the public that Papaya was a bad actor bent on scamming innocent customers for economic profit **and that consumers were widely upset with Papaya's alleged bot use**.  The resulting damage to Papaya's reputation, goodwill, and revenue has been significant. **Beginning in September 2023, the first full month** of the 4FairPlay Website's **operation, Papaya was forced to devote additional resources to rehabilitating its image, retaining existing customers, and attracting new customers.** Papaya also has incurred legal fees related

to the 4FairPlay Website's false representations and the dissemination of complaints to third parties.

**39.    The interview scheme injured Papaya by causing it to lose the benefit of the confidentiality provisions contained within its employment agreements, which are intended to protect Papaya's business investments, goodwill, and reputation.  Papaya has suffered harm from the disclosure of its proprietary and confidential information to Skillz, which Skillz used for its own competitive benefit and as a result caused damages to Papaya's reputation, goodwill, and revenue.**

40.    Papaya brings this Complaint to recoup its losses.

## PARTIES

**41.**    ~~25.~~ Plaintiff Papaya Gaming, Ltd. is ~~a mobile gaming company~~ incorporated and ~~with~~**has** its principal place of business in Israel.  Its registered office is located at HaMasger Street 35, Tel Aviv-Yafo, 6721407, Israel.

**42.**    ~~26.~~ Defendant Fair Play for Mobile Games is ~~a 501(c)(4) corporation created to spearhead the campaign against Skillz's competitors.  The entity was~~ incorporated in Virginia ~~on August 8, 2023 and dissolved on March 1, 2024.  On August 23, 2023, Fair Play for Mobile Games~~ **with its principal place of business located at** ~~registered the fictitious name "4 Fair Play."  The corporation's registered address is~~ 1501 Wilson Boulevard, Suite 1050, Arlington, VA 22209.

**43.**    ~~27.~~ Defendant Josh ~~Levin is a consultant who facilitated the creation, operation, and maintenance of 4 Fair Play and the 4FairPlay Website.  Levin was the Director of 4 Fair Play and is the current or former director of other entities in the Commonwealth.  Levin, through his company Square Strategies, also contracted to provide consulting services for 4 Fair Play.~~ Levin is domiciled in Illinois.

**44.**    ~~28.~~ Defendant Square Strategies LLC is ~~a consulting firm, hired by 4 Fair Play, to perform a variety of services related to the 4FairPlay Website.  Square Strategies is~~ incorporated

in Illinois with its principal place of business located at 2741 W. Logan Boulevard, Chicago,

Illinois, 60647.

**45.** ~~29.~~ Defendant Assemble the Agency LLC is ~~a political strategy firm, hired by 4~~
~~Fair Play, to perform a variety of services related to the 4 Fair Play campaign and website.~~
~~Assemble is~~ incorporated in Delaware, with its principal place of business located at 310 E 46th
Street #4E, New York, New York 10017.

**46.** ~~30.~~ Defendant Lacie ~~Newton is a communications strategist at Assemble, hired by 4 Fair Play, to~~
~~consult on the 4 Fair Play campaign and website.~~ Newton is domiciled in New York.

**47.** **Defendant Mavan Group, Inc. is incorporated in California with its principal**
**place of business located at 608 San Benito Avenue, Menlo Park, California 94205.**

**48.** **Defendant Valor Public Strategies LLC is incorporated in Illinois with its**
**principal place of business located at 535 N. Marion Street, Oak Park, Illinois 60302.**

## JURISDICTION AND VENUE

**49.** ~~31.~~ This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ ~~§ 1331 and~~ 1332.

**50.** ~~32.~~ This Court has personal jurisdiction over Defendants pursuant to Va. Code Ann.

§ 8.01-328.1 because Defendants transacted business in the Commonwealth, contracted to supply

services in the Commonwealth, caused tortious injury by an act or omission in the Commonwealth,

and participated in a conspiracy in which co-conspirators' activities in furtherance of the

conspiracy within the Commonwealth are imputed to each co-conspirator.

**51.** ~~33.~~ Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

~~I. Skillz's Business and Financial Condition Are Deteriorating~~

**I.     Defendants Attack Papaya's Reputation, Manipulate Law Enforcement, and Steal Papaya's Confidential Information**

**52.     Defendants carried out a** campaign of deception and fraud intended to position Skillz's mobile gaming platform as uniquely free from reproach, and inherently more "fair" and trustworthy than those of other mobile gaming companies like Papaya**, all the while misappropriating Papaya's confidential information for Skillz's benefit.**

**53.     Specifically, Defendants manipulated and fabricated** "complaints" about Papaya and other mobile gaming companies' alleged bot use; **disseminated** these false and misleading complaints to law enforcement in Virginia and elsewhere; **presented fabricated testimonials and** data regarding the complaints to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints**; and induced former Papaya employees to disclose**

information about Papaya's matchmaking and customer management practices in violation of confidentiality provisions contained in their employment agreements.

**54.** **Defendants' objective was to boost Skillz's failing business by taking out Skillz's competition.**

**55.** ~~34.~~ Skillz is in the midst of a financial downturn that has lasted for over three years.[1]

~~35. Skillz's earnings reports have demonstrated a persistent drop in Skillz's year-over-year revenue.~~

**56.** ~~36.~~ Skillz's revenue totaled $44.4 million in the first quarter of 2023,[2] but fell to only $25.2 million in the first quarter of 2024.[3]

**57.** ~~37.~~ Skillz's second quarter sales in 2024 fell 37% compared to 2023.[4]

**58.** ~~38.~~ Skillz again missed revenue estimates in the third and fourth quarters of 2024, with revenue down 32.6% year-over-year in Q3 and 35% year-over-year in Q4.[5]

**59.** Skillz has lost nearly half of the average monthly paying users active on its platform in the same time span.

---

[1]   StockStory, *Skillz (NYSE: SKLZ) Misses Q1 Sales Targets*, Globe and Mail (May 9, 2024), https://www.theglobeandmail.com/investing/markets/indices/TXCX/pressreleases/26100097/skillz-nysesklz-misses-q1-sales-targets/.

[2]   *Skillz Announces First Quarter 2023 Results*, Skillz (May 9, 2023), https://investors.skillz.com/news/news-details/2023/Skillz-Announces-First-Quarter-2023-Results/.

[3] *Skillz Announces First Quarter 2024 Results*, Skillz (May 9, 2024), https://investors.skillz.com/news/news-details/2024/Skillz-Announces-First-Quarter-2024-Results/.

[4]   *Skillz Inc. Reports Earnings Results for the Second Quarter and Six Months Ended June 30, 2024* (Aug. 1, 2024), https://www.marketscreener.com/quote/stock/SKILLZ-INC-105997961/news/Skillz-Inc-Reports-Earnings-Results-for-the-Second-Quarter-and-Six-Months-Ended-June-30-2024-47540462/.

[5]   *Skillz Misses Q3 Revenue Estimates*, The Motley Fool (Feb. 26, 2025), https://www.fool.com/data-news/2024/11/07/skillz-misses-q3-revenue-estimates/#:~:text=Revenue%20for%20Q3%202024%20fell,than%20the%20expected%20%2D%241

.1126; *Earnings Call Transcript: Skillz Q4 2024 Sees Revenue Drop, Stock Dips*, Investing.com (Mar. 13, 2025), https://www.investing.com/news/transcripts/earnings-call-transcript-skillz-q4-2024-sees-revenue-drop-stock-dips-93CH-3928260.

39. Skillz has lost nearly half of the average monthly paying users active on its platform in

the same time span.

**60.** ~~40.~~ In July 2024, Moody's Investor withdrew all credit ratings of Skillz, affecting $130 million in outstanding debt.[6]

~~41. Skillz~~ and/or its senior executives ~~also face significant exposure from, among other legal issues, a shareholder derivative action filed in Delaware state court: *Hanna v. Paradise*, No. 2024-0228 (Del. Ch. filed Mar. 8, 2024).~~

### ~~II.~~ **A. Complaint Scheme** Defendants~~, at Skillz's Behest, Attack~~ **Fabricated Complaints About** Papaya's ~~Reputation and Manipulate~~ **Alleged Bot Use to Deceive the Public and** Law Enforcement

~~42. Rather than address its serious corporate, financial, and operational issues head-on or seek to improve its own product, Skillz has resorted to misguided, underhanded, and unlawful tactics to try to save its failing operations.~~

~~43. Those tactics include a multi-faceted campaign of deception and fraud intended to position Skillz's mobile gaming platform as uniquely free from reproach, and inherently more "fair" and trustworthy than those of other mobile gaming companies like Papaya.~~

~~44. Defendants played an integral role in this campaign by manipulating and fabricating "complaints" about Papaya and other mobile gaming companies' alleged bot use; disseminating these false and misleading complaints to law enforcement in Virginia and elsewhere; and presenting fabricated data regarding the complaints to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints.~~

---

[6] ~~*Moody's Ratings withdraws Skillz's ratings*, Moody's Investor (July 1, 2024), https://ratings.moodys.com/ratings-news/424237.~~

**61.** ~~45.~~ From approximately September 2023 through at least late February 2024, the 4FairPlay Website was active, displayed content to the public, and provided for the submission of customer complaints about certain mobile games.[7]

**62.** **During this time, Mavan ran a digital advertising campaign promoting the**

**4FairPlay Website that multiple advertising networks refused to run for fear of "legal exposure."**

**63.     Mavan's advertising campaign deliberately hid its connection to Skillz, so as not to "out Skillz "as the company behind the media buy," partly because Skillz knew that Mavan's advertising risked crossing the line of lawfulness.**

**64.**     46. The 4FairPlay Website ~~included~~**contained** at least three sub-pages, including: (a) a home page purporting to display data related to the submission of customer complaints to state law enforcement agencies and encouraging visitors to file a complaint; (b) a "File a Complaint" page urging visitors to use a pre-populated form to submit a complaint against three companies, including Papaya, to a state law enforcement agency; and (c) a Frequently Asked Questions ("FAQs") page providing information about submitting a complaint to state law enforcement agencies and lauding companies that supposedly provide fair gaming experiences.

~~47. Referring specifically to "fraudulent games" from mobile gaming operators Papaya, Avia Games, and Acerena—but *not* Skillz—the 4FairPlay Website implored visitors to "Act now" and "Fight back against scam games" to prevent operators from "steal[ing] your money and get[ting] away with it."~~

> **Which companies are behind these fraudulent games?**          ⌄
>
> Papaya Gaming owns and operates Solitaire Cash, Bubble Cash, and Bingo Cash – as well as dozens of other mobile "cash" app games. Avia Games owns and operates Solitaire Clash, Bingo Clash and Bingo Tour as well as other similar games. Acerena Inc. owns and operates Solitaire King, Bingo King and Battle Bingo.

---

[6]  *Moody's Ratings withdraws Skillz's ratings,* Moody's Investor (July 1, 2024). https://ratings.moodys.com/ratings-news/424237.

[7]  Although the 4FairPlay Website is no longer accessible, its contents were archived on several dates throughout its lifespan.  This Complaint describes the contents of the 4FairPlay Website as they existed on February 28, 2024.  Based on a review of the 4FairPlay Website as archived, the contents of the 4FairPlay Website were substantially similar from the date of the first archive (November 7, 2023) through the remainder of its existence.  Screenshots of the contents of the February 28, 2024 archive are attached as Ex. 1.

65. Referring specifically to "fraudulent games" from mobile gaming operators Papaya, **AviaGames**, and Acerena—but *not* Skillz—the 4FairPlay Website implored visitors to "Act now" and "Fight back against scam games" to prevent operators from "steal[ing] your money and get[ting] away with it."





66. ~~48.~~ Visitors were invited to submit complaints to the attorney general in their state of residence. They were told that they "may be entitled to compensation."



**67.** ~~49.~~ The 4FairPlay Website further promised that "[w]ith enough claims, the state attorney general will investigate the scam companies," and that "[a] successful investigation could force the companies to pay consumers for damages."

**How it works**

| | | |
|---|---|---|
| You file a complaint here, and it's sent to the consumer protection authority in your state. This is the best way to ensure your claim gets noticed. | With enough claims, the state attorney general will investigate the scam companies. If you have family or friends who have been impacted, they can also file their own claim. | A successful investigation could force the companies to pay consumers for damages. Make sure you are one of them! |

**68.** ~~50.~~ **Complaint Scheme** Defendants, at the suggestion of a Skillz ~~official~~**representative** named "Andrew," designed the 4FairPlay Website "to feel more legal firm" to lend credibility to the

complaint submission process and the statements made on the website.[8]  Upon information and belief, "Andrew" was Skillz's CEO and founder, Andrew Paradise.



---

[8]  ~~See Ex. 2 (Figma Screenshot).~~

**69.** ~~51.~~ To target only Skillz's chief competitors (not Skillz), generate as many complaints as possible, and route complaints to state attorneys general, the 4FairPlay Website auto-populated the complaint forms.

**70.** ~~52.~~ The auto-populated forms listed only games developed by Papaya, AviaGames, or Acerena.

[8]  *See* Ex. 2 (Figma Screenshot).



**71.** ~~53.~~ The auto-populated forms did not list games developed or hosted by Skillz. **because Skillz "d[id]n't want people complaining about [Skillz]."**

**72.** ~~54.~~ A visitor who sought to submit a complaint about a game developed or hosted by another company (such as Skillz) was not presented with any option to do so.

**73.** ~~55.~~ **Complaint Scheme** Defendants took additional steps to ensure that the 4FairPlay Website would not impugn games on Skillz's platform.

**74.** ~~56.~~ For example, one of the 4FairPlay Website's FAQs indicated that not "all" mobile cash-entry games are a "scam," preserving the possibility that Skillz—the company conspicuously absent from the 4FairPlay Website—is not "taking advantage of players by withholding money and creating unfair playing environments."



**75.** ~~57.~~ If a visitor to the 4FairPlay Website sought to complain about one of the games listed in the auto-populated complaint form, they provided their personal identifying information, identified the specific pre-selected games about which they wished to complain, and indicated how much money they had spent playing the mobile games. ~~Customers were then provided the opportunity to describe their~~**They then drafted a** complaint ~~in their own words~~**about the games they selected, in an open-ended submission box similar to the one shown below**.

**76.** **In this process, Complaint Scheme Defendants deliberately concealed from** **viewers of the 4FairPlay Website that, regardless of** the content of **their drafted complaint** **submissions, Complaint Scheme Defendants would add stock language to their complaints** **denouncing the relevant mobile gaming company's alleged bot use and would also otherwise** **alter the complaints.**

**77.** **The auto-populated complaint form did not show viewers the boilerplate** **language that would be added to their complaints before they clicked "submit,"** and the 4FairPlay Website **did not provide any indication to viewers** submitting complaints **that** **Complaint Scheme Defendants would alter their complaints to complain of alleged bot use.**

**78.** **After customers clicked "submit," Complaint Scheme Defendants added stock** **language to the customers' complaints reading, "I'm a resident of your state and I would**

like to

make you aware of a mobile game that is defrauding consumers like me out of their hard-earned money.  I strongly believe the following games use AI or 'bots' to scam players by pretending that those are real players."

79.     Comparing each of the complaint submissions drafted by customers against the complaints ultimately submitted to law enforcement reveals how Complaint Scheme Defendants deliberately misled customers into unknowingly submitting complaints about mobile games' alleged bot use to law enforcement.

80.     A player named "Sharon Bryce," for instance, ostensibly made three separate complaints on the website.  She first noted that she "ha[s] lost winnings on every game I downloaded.  Too many games to send in a message.  Skillz don't honor any winnings that individuals win.  So I wonder who's actually getting the winnings."[9]  The second submission stated,  "Ello   Jump   $1,689.   Amazon   $4,179.,   Dice   King   $14,999.   $19,999, $29,999.$49,999.,$89,999.  Amazon  $9,999.,  $19,000.,  $29,999.,  $49,999.,  Solitaire Craft $1,522.03."[10]  The final submission stated, "[t]here are too many games and I still play the games because I enjoy them."[11]

81.     The letter generated for "Sharon Bryce," however, did not accurately reflect those submissions.

---

[9]   Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab – Row 2).

[10]   Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab – Row 66).

[11]   Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab –

SHARON BRYCE

Email Address: karaokemamma48@gmail.com

Date of Submission: Mon, 10/09/2023 - 20:40

Dear ,

Submission Letter:
I'm a resident of your state and I would like to make you aware of a mobile game
that is defrauding consumers like me out of their hard-earned money.

I strongly believe the following games use AI or "bots" to scam players by
pretending that those are real players:

- Solitaire Cash
- Bingo Cash
- Solitaire Clash
- Bingo Clash
- Bingo Tour
- Solitaire King
- Bingo King
- Battle Bingo

I would like to request that you investigate the company or companies that operate
the above games as soon as possible. Millions of people across the country play
their games, including from this state.

We can't stand by and let them get away with it. Every time they announce a new
game, it's the same message. Download game and receive cash to either PayPal or
Cash App and when you win you never receive a dime. That's fraud advertising.

Sincerely,
SHARON BRYCE
karaokemamma48@gmail.com

82.     Not only did the letter allege bot use, which was notably absent from Bryce's

three submissions, it neglected to include any mention of Skillz or games on the Skillz

platform.

83.     In another instance, a player stated in his complaint submission that he "ear[n]ed

$1,000 and [] they told [him] to pay[] $2 to withdraw it and never sent it."[12]  He did not

mention alleged bot use in his complaint submission.

---

[12]  Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab –

84.     When Complaint Scheme Defendants altered his complaint with their preferred boilerplate language, however, the complaint stated, "I strongly believe the following games use AI or 'bots' to scam players by pretending that those are real players."

85.     Another player's complaint submission merely said, "Enjoy."[13]

86.     Again, when this player's one-word "complaint," which simply read "[e]njoy," was altered, it included the same language, "I strongly believe the following games use AI or 'bots' to scam players by pretending that those are real players."

87.     Although none of these submissions to the website made any mention of bot use or AI, the 4FairPlay Website published statistics about these altered complaints that characterized them as customer complaints complaining about mobile games' alleged bot use.

88.     58. The Website claimed that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money."



89.     But the majority of the complaints customers submitted through the 4FairPlay Website did not mention bot use at all until Complaint Scheme Defendants altered the complaints to add language complaining of mobile games' alleged bot use.

---

[13]     Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab –

**90.** **Complaint Scheme Defendants were aware that the majority of the submissions received by the website were unrelated to bot use.  In correspondence between Skillz and Complaint Scheme Defendants, Newton noted that, "most [players] just complained about not getting paid and didn't mention bots or unfair play."**

**91.** ~~59. But~~**Further,** a spreadsheet of around 12,000 purported complaints provided by ~~website~~**the** developer **of the 4FairPlay Website,** Adam Shen**,** shows that **only** a tiny proportion ~~included free-form comments at all, only a few of those free-form~~**of complaint** comments mentioned bots~~, and some free-form comments even complained about Skillz~~.

~~60. For example, one player stated, "I have lost winnings on every game I downloaded. Too many games to send in a message. Skillz don't honor any winnings that individuals win. So I wonder who's actually getting the winnings."[9]~~

~~61. Another player simply wrote, "Enjoy."[10]~~

**92.** ~~62.~~Upon information and belief, the 4FairPlay Website's statement that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money," was premised on the complaints contained within this spreadsheet. Because the vast majority of submissions in the spreadsheet did not mention bots, ~~it follows that~~**Complaint Scheme** Defendants deceived visitors of the 4FairPlay Website**, at least some of whom were potential or current Papaya customers,** by falsely stating that ~~around~~**approximately** 12,000 complaint submissions complained of alleged bot use in mobile games.

**93.** **Upon information and belief, visitors of the 4FairPlay Website did not file complaints about Papaya's alleged bot use because they did not consider bot use to significantly detract from mobile games; the large majority of complainants were not attempting to persuade law enforcement to take action against Papaya and other mobile**

**gaming companies' alleged bot use.**

**94.** **Complaint Scheme Defendants did not inform visitors to the 4FairPlay Website that the majority of individuals who submitted complaints did not mention bot use or unfair play.**

---

[9] ~~Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table"—"Working data" Tab—Row 2).~~

[10] ~~Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table"—"Working data" Tab—Row 13).~~

**95.** ~~63.~~ Upon information and belief, **Complaint Scheme** Defendants altered the contents of the customers' complaint submissions to ~~align with the statements on the website~~**complain about mobile games' alleged bot use** before

sending the complaints to law enforcement and without telling complainants that they would modify their complaints in any way before passing them along to state attorneys general.

**96.** 64. Upon information and belief, after altering the complaints, **Complaint Scheme** Defendants turned over the fabricated and misleading complaints to state and federal law enforcement, including the attorney general in**Attorney General of** Virginia.

**97.** 65. Upon information and belief, state and federal government officials thus received thousands of complaints ostensibly accusing Papaya of using bots in its games. Upon information and belief, at least some**most** of those complaints were fabricated. All of the complaints were the product of an intentionally skewed solicitation and transmission process that **Complaint Scheme** Defendants designed to leave government officials with the **false** impression that thousands of customers wanted the government to take action against Papaya over its alleged bot use.

**98.** 66. Upon information and belief, **Complaint Scheme** Defendants did not disclose to government officials the ways in which they manipulated the complaint submission process and complaints to ensure a critical mass of ostensible complaints alleging bot use in Papaya's games.

**99.** In addition, beyond "spot-check[ing]" the complaints, Complaint Scheme Defendants' only vetting of the complaints prior to distribution to state and federal law enforcement was to remove any complaints that concerned games on the Skillz platform.

**100.** Complaint Scheme Defendants could not and did not vet the complaints that they turned over to law enforcement to ensure they were genuine, setting aside the issue of their deliberate alteration of the complaints. Levin admitted that there was "no way to stop fake names
/ locations" from ending up in the complaints submitted to law enforcement, and, thus, Complaint Scheme Defendants altered and then submitted all complaints to state and federal

**law enforcement as long as they did not concern games on the Skillz platform.**

**101.** Upon information and belief, the false information presented on the 4FairPlay Website and disseminated to government officials drew the attention of government agencies.

**102.** For instance, one state's gaming control board issued a cease-and-desist letter to Papaya in October 2024, not long after 4 Fair Play dissolved and the 4FairPlay Website went offline. The 4FairPlay Website represented that between 201 and 1000 complaints had been submitted to that state's Attorney General. Upon information and belief, those false and manipulated complaints contributed to the state board's investigation and cease-and-desist letter.

### ~~III.~~ **B.** The 4FairPlay Website Featured Fabricated Testimonials and Data Intended to Harm Papaya and Deceive the Public

**103.** ~~67.~~ Complaint Scheme Defendants used the 4FairPlay Website as the hub of their campaign to collect, fabricate, and disseminate complaints and associated data to government officials and the public at large.

**104.** ~~68.~~ From its inception, when it bore the working title "Fight Fraud For Papaya Games," the 4FairPlay Website targeted Papaya.

**105.** ~~69.~~ As explained below, the 4FairPlay Website~~, upon information and belief,~~ posted fake testimonials and false data to harm Papaya and boost Skillz's competitive standing.

**106.** ~~70.~~ *First*, ~~upon information and belief,~~ the home page and File a Complaint page featured ~~at least some~~ phony customer testimonials in which fake customers complained about Papaya's games.





**107.** ~~71.~~ The testimonials do not match free-form comments included in the spreadsheet of purported complaints~~.~~

~~72.~~ **because** ~~Upon information and belief, some~~ ~~or all of~~ these testimonials were not genuine statements made by real customers; they were fabricated and entirely contrived by **Complaint Scheme** Defendants.

**108.** **Complaint Scheme Defendants knew that Skillz drafted half of the testimonials that appeared on the 4FairPlay Website** long before the **4FairPlay Website launched.**

**109.** **Complaint Scheme Defendants also knew that Skillz deliberately falsified the**

remainder of the testimonials.   Skillz sifted through the customer complaints submitted

through

the 4FairPlay Website, **edited them to suit Skillz's preferences, and then arranged for Complaint Scheme Defendants to post them to the 4FairPlay Website as apparently genuine statements.**

**110.**    73. The website**Ultimately, Complaint Scheme Defendants** unambiguously presented the testimonials **to consumers** as real complaints in the words of real individuals.

**111.**    74. **Complaint Scheme** Defendants, upon information and belief, posted the fake customer testimonials to intentionally mislead viewers of the 4FairPlay Website to believe that real customers submitted complaints about alleged bot use in Papaya games to 4 Fair Play.

**112.**    **The fake customer testimonials constituted material misrepresentations to 4FairPlay Website visitors, including because customer reviews often affect consumers' purchasing decisions.**

**113.**    75. **Complaint Scheme** Defendants intentionally paired the fabricated customer testimonials with the fake counter on the 4FairPlay Website, described further below, to cause viewers of the website to believe that a massive number of customers submitted complaints about Papaya that were similar in content to the testimonials featured on the website**, meaning they also complained about Papaya's alleged bot use**.

**114.**    76. *Second*, the home page displayed **to consumers** a banner with an increasing tracker, or counter, purporting to show the number of complaints allegedly submitted to state law enforcement agencies about ~~Papaya~~**Papaya's** and two other mobile gaming companies**' alleged bot use**. Accompanying text stated that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money," followed by a button that visitors could click to "File A Complaint."



**115.** ~~77.~~ The counter was a deliberate fabrication.  It did not reflect an actual number of complaints **about bots** filed against mobile games or mobile gaming operators.

**116.** ~~78.~~ Each time a visitor navigated to the 4FairPlay Website, no matter the date or time, the counter presented the same fixed, specific number at the outset:  12,594 ("and Counting!").

**117.** ~~79.~~ The counter was literally false.

**118.** ~~80.~~ The counter unambiguously represented that exactly 12,594 complaints had been submitted as of the time of the opening of the webpage.  That number was false.

**119.** ~~81.~~ The counter unambiguously represented that the number of complaints continued to increase at a rate of one every three seconds (between the combination of the phrase "and Counting!" and the addition of one complaint to the counter every three seconds).  That representation was false.  Complaints were not submitted at a metronomic rate of one every three seconds.

**120.** ~~82.~~ The counter unambiguously represented that it was connected to a live database (between the combination of the phrase "and Counting!" and the addition of one complaint to the counter every three seconds).  That representation was false.  The counter was not tied to an active database.

**121.** ~~83.~~ The 4FairPlay Website represented that approximately eight new complaints

against Papaya were being submitted every minute, around the clock.  (The counter represented that twenty new complaints were submitted each minute, and the pie chart, described below, represented that over 40% of the total complaints were submitted against Papaya.)  That representation was literally false.  The website was not receiving at least eight complaints about ~~Papaya~~**Papaya's alleged bot use** each minute.

**122.**  ~~84.~~ The source code of the 4FairPlay Website shows that the initial complaint figure and the rate of the increase were chosen by **Complaint Scheme** Defendants.

~~85. Skillz identified and publicized the 12,000 figure long before the website launched and complaints supposedly were collected.~~

~~86. A Skillz official drafted, or at minimum contributed to and helped place for publication, a March 2023 article about bot use by mobile gaming companies.  The March 2023 article reported that "[p]resently, over 12,000 folks have filed a grievance towards cellular video games over being deceived by AI bots, with on-line gamer safety platform 4 Honest Play."[11]~~

~~87. There does not appear to be a website or other platform named "4 Honest Play," and, upon information and belief, the "over 12,000" figure was made up.~~

**123.**  ~~88.~~ Skillz has conceded that the specific number and rate of increase of the counter did not reflect actual data.~~[12]~~[14]

**124.**  ~~89.~~ The 4FairPlay Website itself ~~provided no indication~~**failed to disclose** that the counter did not reflect actual

data.

**125.**  ~~90.~~ Reasonable consumers visiting the 4FairPlay Website thus would have been deceived into believing that the reason the counter was increasing during their visit to the website was that actual complaints were being submitted in real time by other visitors.

**126.**  ~~91.~~ That was the purpose of the counter~~.~~**.  Shen, the developer** of the 4FairPlay

Website, **coded the counter such that "it feels like it [is counting in] real time"** to deliberately deceive viewers of the 4FairPlay Website to believe that customers were filing thousands of complaints against Papaya **about alleged bot use**.

---

[11]  ~~Gaming News, *This Gaming Firm Takes an Anti-AI Stance in Newest Advert*, AIWorkTime (Mar. 12, 2023), https://web.archive.org/web/20240701203701/https://www.aiworktime.com/2023/03/12/this-gaming-firm-takes-an-anti-ai-stance-in-newest-advert/.~~

[12]  ~~Ex. 4 (Skillz Motion to Dismiss at 16, *Skillz Platform Inc. v. Papaya Gaming, Ltd., et al.*, No. 24-cv-01646 (S.D.N.Y. October 11, 2024), ECF No. 76.~~

**127.**  ~~92.~~  The 4FairPlay Website's use of a fictitious counter purporting to show the complaints filed by users in real time is a paradigmatic example of an online deceptive and unfair practice termed by the Federal Trade Commission as a "False Activity Message"—that is, "

---

[14]  Ex. 4 (Skillz Motion to Dismiss at 16, *Skillz Platform Inc. v. Papaya Gaming, Ltd., et al.*, No. 24-cv-01646 (S.D.N.Y. October 11, 2024), ECF No. 76.

"[m]aking false claims about others' activity on a site or interest in a product; Example: '24 other people are viewing this.'"[15]

**128.** 93. ***Third***, the home page of the 4FairPlay Website featured a pie chart and map purporting to show the proportion of **bot-related** complaints submitted by game and state, respectively.

**129.** 94. A note accompanying the pie chart stated that "Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far followed by Solitaire Clash from Avia Games."



---

[15] *See Bringing Dark Patterns to Light*, Federal Trade Commission Staff Report (Sept. 2022), at 21 (https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.20 22%20-%20FINAL.pdf).

**130.** ~~95.~~ Papaya developed three of the games on the pie chart, listed as representing a total of 40.2% of all complaints, with the remaining games developed by Acerena and AviaGames.

**131.** ~~96.~~ Like the counter, however, the pie chart was literally false.

**132.** ~~97.~~ The pie chart unambiguously represented that 40.2% of all complaints submitted through the 4FairPlay Website complained about **alleged bot use in** Papaya games. Upon information and belief, that representation was false because 40.2% of all complaints submitted through the website did not concern **alleged bot use in** Papaya games.

**133.** ~~98.~~ The pie chart unambiguously represented that it was connected to a live database when it was introduced by the statement: "Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far."  The statement indicates that the pie chart represented a

current tally of complaints submitted through the 4FairPlay Website and would be updated over time ~~as it was connected to~~ **based on** an active database of complaint submissions.

**134.** ~~99.~~ But **Complaint Scheme** Defendants' representation that the pie chart was tied to a live database was false and made, upon information and belief, with the deliberate intention of misleading visitors to the website.

**135.** ~~100.~~ The pie chart was not tied to any live database.

**136.** ~~101.~~ The figures in the pie chart remained static throughout the 4FairPlay Website's existence and were not linked to any live database.

**137.** ~~102.~~ Thus, as **Complaint Scheme** Defendants intended, a reasonable consumer would have been deliberately deceived into believing that 40.2% of all **bot-related** complaints submitted through the 4FairPlay Website complained about Papaya games.

**138.** ~~103.~~ The map featured on the home page was also literally false.

**139.** ~~104.~~ Accompanying the map was a statement that "[s]cam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions."



**140.** ~~105.~~ Like the counter and pie chart, the map unambiguously represented that it was connected to a live database when it was introduced by the statement: "Scam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions."  The statement indicates that the map represented a current categorization of complaints submitted through the 4FairPlay Website, including approximately 100–200 complaints submitted by Virginia residents.

**141.** ~~106.~~ But the representation that the map was tied to a live database was false and, upon information and belief, intended to deliberately mislead viewers.

**142.** ~~107.~~ The composition of the map remained static throughout the 4FairPlay Website's existence and was not linked to any live database.

**143.** ~~108.~~ Further, featuring the pie chart and map on the home page of the 4FairPlay Website below the banner reading, "[t]housands of players are filing complaints against mobile games who

use bots to deceive them out of their hard-earned money," unambiguously represented to viewers of the website that 40.2% of thousands of complaints submitted across the country complained about Papaya's alleged bot use.  This representation was false.

**144.** ~~109.~~ As explained above, **Complaint Scheme** Defendants, upon information and belief, deceptively altered complaints submitted through the 4FairPlay Website.  Thus, even if the counter, pie chart, and map could be interpreted to reflect data from complaints outside of a live database, the data incorporated complaints that were fabricated or misleading.

**145.** ~~110.~~ Presentation on the 4FairPlay Website of the **false customer testimonials and the** counter, pie chart, and map representing the database of fabricated complaints deliberately deceived viewers of the website into believing that thousands of complaints had been submitted about Papaya's alleged bot use.

**146.** ~~111.~~ A reasonable consumer visiting the 4FairPlay Website would have been deceived into believing that thousands of complaints around the country had been submitted about Papaya's alleged bot use.

**147.** **And consumers in fact submitted complaints to Papaya that referenced the 4FairPlay Website.**

**148.** ~~112.~~ **Complaint Scheme** Defendants, upon information and belief, deliberately misled viewers of the 4FairPlay Website**, including potential or current Papaya customers,** and communicated to viewers that thousands of customers around the country had submitted

complaints about Papaya's alleged bot use to tarnish Papaya's reputation, harm its goodwill, and prevent consumers from playing Papaya games to Skillz's competitive advantage.

149.    **As a direct result of Complaint Scheme Defendants' actions, Papaya had to incur additional expenses beginning in September 2023 to rehabilitate its image, retain existing customers, and attract new customers.**

IV. **C.  Complaint Scheme** Defendants Obscure 4 Fair Play's Structure and Activities

150.    113. **Complaint Scheme** Defendants and Skillz went to great lengths to cover their tracks while soliciting, manipulating, and disseminating to law enforcement **the public** false and misleading customer complaints about Papaya via the 4FairPlay Website, presumably because 4 Fair Play's activities opened them up to significant legal exposure.

151.    114. Papaya was able to definitively link **Complaint Scheme** Defendants and Skillz to the 4FairPlay Website
in July 2024 only after filing a complaint in Virginia state court against the then-unknown John Doe defendants that created, operated, and controlled the 4FairPlay Website; issuing ten third-party **third-party** subpoenas; navigating repeated attempts by subpoena recipients to avoid producing documents; and moving to compel compliance with one of the subpoenas in Nevada state court.

152.    115. The operator of the 4FairPlay Website was identified on the website as 4 Fair Play, the fictitious alternative name of a Virginia corporation called "Fair Play for Mobile Games." **The name "**Fair Play for Mobile Games**" was intentionally chosen to indicate that the corporation was "an advocacy organization" and to add credibility "when talking with electeds and state agencies."**

153.    116. The "About" page on the 4FairPlay Website stated that "4 Fair Play is on a mission to bring fairness to mobile gaming.  We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing.  Our organization was founded

to educate

the public on fair play and provide tools and resources players need to protect themselves if they've been scammed."

154.   ~~117.~~ But neither 4 Fair Play nor **the rest of the Complaint Scheme** Defendants ~~Levin, Square Strategies, Newton, or Assemble was an organization~~**were** "on a mission to bring fairness to mobile gaming." Rather, **Complaint Scheme** Defendants were on a mission to manufacture complaints about Papaya and other mobile gaming companies to allow Skillz to unfairly compete with those companies.

155.   ~~118.~~ **Complaint Scheme** Defendants ~~and Skillz~~ were careful to cover their tracks. ~~Indeed, as confirmed by former Skillz personnel, Skillz leadership specifically instructed personnel not to take written notes about the 4FairPlay Website when it was discussed at meetings.~~

156.   ~~119.~~ By design, the 4FairPlay Website concealed any information that could connect **Complaint Scheme** Defendants or lead back to Skillz.

157.   ~~120.~~ Adam Shen, the designer of the 4FairPlay Website whom Papaya identified by analyzing website code, deleted several default web pages that would have provided information regarding its design.

158.   ~~121.~~ The 4FairPlay Website similarly had no easily attributable identifiers, and all

of the graphics on the Website, aside from the logo, were stock images.

**159.** ~~122.~~ **Complaint Scheme** Defendants ~~and Skillz~~ anonymously obtained the 4FairPlay Website's domain from registrar Tucows Inc. ("Tucows") and facilitated the transfer of the domain from Tucows to Levin, which Papaya uncovered by issuing a third-party subpoena to Tucows in May 2024.

**160.** ~~123.~~ Levin then created a short-lived front company in Virginia, Fair Play for Mobile Games (later renamed 4 Fair Play), to function as the public-facing sponsor of the 4FairPlay Website and the complaint solicitation, manipulation, and dissemination campaign.

**161.** ~~124.~~ Levin served as Executive Director of Fair Play for Mobile Games.[~~14~~16]

**162.** ~~125.~~ As Executive Director, Levin then retained The Gober Group on August 7, ~~2023,[15]~~ **2023,[17]** which helped Levin register the fictitious alternative name "4 Fair Play" on August 23, ~~2023.[16]~~ **2023.[18]**

---

[~~14~~] ~~Ex. 5 (Fair Play for Mobile Games, Articles of Incorporation).~~

[~~15~~] ~~Ex. 6 (The Gober Group Acknowledgment of Terms of Service and Fee Schedule).~~

[~~16~~] ~~Ex. 7 (Fictitious Name Certificate).~~

**163.** ~~126.~~ As noted above, a disclaimer at the bottom of the 4FairPlay Website stated that it was "Paid for by 4 Fair Play."

**164.** ~~127.~~ Levin and The Gober Group are frequent collaborators and have used this same playbook—leveraging corporate formalities to shield the identities of persons who wish to anonymously promote their agendas—on multiple occasions.

**165.** ~~128.~~ For example, Levin linked with The Gober Group to incorporate Advancing Community Values, a Virginia entity that names Levin as director and used the same principal office address as 4 Fair Play.[~~17~~19]  Advancing Community Values also created a website that encouraged visitors to sign a petition in support of the corporation's mission to "stop and

[16] Ex. 5 (Fair Play for Mobile Games, Articles of Incorporation).

[17] Ex. 6 (The Gober Group Acknowledgment of Terms of Service and Fee Schedule).

[18] Ex. 7 (Fictitious Name Certificate).

[19] Ex. 8 (Advancing Community Values, Articles of Incorporation).

reconsider the EPA's proposed PFAS water regulations."[18][20]  As with the 4FairPlay Website, the Advancing Community Values' website hides behind the faceless corporate entity and gives no information related to the identities of the persons who control that corporation.

**166.**  ~~129.~~ Levin and The Gober Group worked together to create another entity called Mobile Gaming Fairness in Virginia.  Levin served as the principal officer of Mobile Gaming Fairness with The Gober Group filing the relevant paperwork for 501(c)(4) status.[19][21]

**167.**  ~~130.~~ Mobile Gaming Fairness's mailing address links it to VA Sports Betting Alliance, which in turn lists a Gober Group email address as its principal contact.[20][22]

**168.**  The mailing address for Mobile Gaming Fairness, a UPS post office box, is also associated with at least forty-two other nonprofits.

**169.**  After creating entities to shield the identities of donors, Levin and The Gober Group typically engage a political strategy firm to carry out their goals to influence the public.

**170.**  **Complaint Scheme Defendants working** on the 4FairPlay Website **sought to conceal their relationship with the website and each other when communicating with outside vendors to mitigate risk related** to the **website and avoid "outing" Skillz.**

**171.**  Levin and The Gober Group appear to work frequently with Assemble.

---

[17]  ~~Ex. 8 (Advancing Community Values, Articles of Incorporation).~~

[18][20]  *Tell Washington to stop the EPA's Water Tax,* Advancing Community Values, https://web.archive.org/web/20240722030053/https://www.advancingcommunityvalues.org/ (last visited Mar. 5, 2025).

[19][21]  Exs. 9 (Mobile Gaming Fairness, Articles of Termination); 10 (July 19, 2022 IRS Letter for Mobile Gaming Fairness); Karen Blackistone, LinkedIn, https://www.linkedin.com/in/karenblackistoneoaks/ (last visited Mar. 12, 2025) (Karen Blackistone formerly worked as a partner at The Gober Group).

[20][22]  *See* Va Sports Betting Alliance, Virginia Public Access Project, https://www.vpap.org/lobbying/client/437576-va-sports-betting-alliance/ (last visited Mar. 7, 2024).

131. ~~The mailing address for Mobile Gaming Fairness, a UPS post office box, is also associated with at least forty-two other nonprofits.~~

132. ~~After creating entities to shield the identities of donors, Levin and The Gober Group typically engage a political strategy firm to carry out their goals to influence the public. In particular, Levin and The Gober Group appear to work frequently with Assemble.~~

**172.** ~~133.~~ Upon information and belief, 4 Fair Play retained Assemble and Newton to orchestrate ~~Skillz's~~**their** campaign to smear Papaya and assist with lobbying activities.[21][23]

**173.** ~~134.~~ Newton has worked for Assemble since 2020 and has a similar track record of creating front entities to fund anonymous lobbying activity. For example, Newton was the president of Citizens for a Fair Economy, a Virginia entity that The Gober Group helped incorporate.[22][24] Citizens for a Fair Economy is one of the forty-two nonprofits that share a mailing address with Mobile Gaming Fairness.

**174.** ~~135.~~ Newton was involved in various aspects of 4 Fair Play's campaign against Papaya, including developing strategy for both public-facing media about the campaign and the internal complaint submission process.[23][25]

**175.** As revealed in documents produced by Levin in May 2024, 4 Fair Play, following its incorporation, executed a consulting agreement with Square Strategies, a firm controlled by Levin.[26]

---

[21][23] Exs. 11 (California Lobbying Record) (showing payments to Assemble from 4 Fair Play); 12 (Draft Op-Ed) (showing feedback provided by Newton); 13 (Email from thanks@fairplay.org regarding complaint signed by "Lacie @ 4FairPlay").

Exs. 14 (Citizens for a Fair Economy, Annual Report); 15 (Citizens for a Fair Economy, Articles of Incorporation).

Ex. 12 (Draft Op-Ed) (showing feedback provided by Newton) (the exhibit contains two copies of the same draft op-ed); 13 (Email from thanks@fairplay.org regarding complaint signed by "Lacie @ 4FairPlay").

136. As revealed in documents produced by Levin in May 2024, 4 Fair Play, following its incorporation, executed a consulting agreement with Square Strategies, a firm controlled by Levin.[24]

Exs. 16 (Consulting Services Agreement); 17 (Letter from J. Levin to Fair Play for Mobile Games Board of Directors (Aug. 14, 2023)); 18 (Fair Play for Mobile Games, Unanimous Written Consent of the Board of Directors).

**176.** ~~137.~~ Square Strategies performed a variety of services for 4 Fair Play, including establishing email service, engaging web engine hosting, facilitating Google advertisements, and working with Newton to draft op-eds supporting the 4FairPlay Website's mission.~~25~~27

**177.** ~~138.~~ 4 Fair Play paid Square Strategies over $~~75,000.~~26 **75,000.**28

**178.** **Mavan ran 4 Fair Play's digital advertising,** among other **services,**29 **and 4 Fair Play paid Mavan an initial $50,000 retainer for its services in return.**

**179.** ~~139.~~ Levin facilitated the dissolution of 4 Fair Play on March 1, 2024—a mere three days before Skillz filed a lawsuit against Papaya in the Southern District of New York ("S.D.N.Y.") on March 4, ~~2024.~~27 **2024.**30

**180.** ~~140.~~ Similarly, the 4FairPlay Website was taken down at some point between February 28, 2024 and March 9, 2024—i.e., within days of Skillz's filing of the complaint against Papaya in the S.D.N.Y. litigation.

~~141. Due to the foregoing information exposed by the Virginia state court action, Skillz was forced to admit through counsel in July 2024 that it (a) "provided monetary funds to Fair Play for Mobile Games," (b) made payments "related to 4fairplay.org to" the freelance web developer~~

**181.** **Complaint Scheme** Defendants also conducted lobbying activities in at least California and New Jersey through 4 Fair Play, including lobbying attorneys general.31

---

24 ~~Exs. 16 (Consulting Services Agreement); 17 (Letter from J. Levin to Fair Play for Mobile Games Board of Directors (Aug. 14, 2023)); 18 (Fair Play for Mobile Games, Unanimous Written Consent of the Board of Directors).~~

[26][27] Exs. 19 (Square Strategies Invoices); 12 (Draft Op-Ed).

[26] [28]      Exs. 19 (Square Strategies Invoices); 11 (California Lobbying Record) (showing payments to Square Strategies from 4 Fair Play).

**[29] Ex. 11 (California Lobbying Record) (showing payments to Mavan from 4 Fair Play).**

[27][30] Ex. 20 (Fair Play for Mobile Games, Articles of Dissolution).

[31] *See* Exs. 11 (California Lobbying Record); 21 (New Jersey Lobbying Record).

that designed the 4FairPlay Website, "Mr. [Adam] Shen," and (c) had "relationship[s]" with Shen and The Gober Group.[28]

142. Serving as the go-between for Skillz, Defendants also conducted lobbying activities in at least California and New Jersey through 4 Fair Play, including lobbying attorneys general.[29]

**182.** 143. In its California disclosure, 4 Fair Play described its lobbying activities as unspecified outreach concerning "Attorney General action relating to mobile gaming."[30][32] 4 Fair Play paid both Square Strategies and Assemble for their lobbying work.[31][33]

**183.** 144. Upon information and belief, one aspect of this supposed lobbying was **Complaint Scheme** Defendants' coordinated scheme to disseminate knowingly fabricated customer complaints from the 4FairPlay Website to government officials with the malicious intent to prompt baseless investigations into Papaya and other competitors.

145. Even after the dissolution of 4 Fair Play and the termination of the 4FairPlay Website, Skillz continues to seek to weaponize law enforcement against its competitors.  For example, Paradise noted during Skillz's Q2 2024 earnings call that Skillz was "hopeful that government authorities will take note of our progress in identifying fraudulent bot use in this industry and take the quick and needed actions to protect consumers."[32]

> **D.  Defendants Create and Implement Interview Scheme to Gather Information About Papaya's Business Practices Under False Pretenses**

**184.**  **4 Fair Play,** Levin, Square Strategies, Newton, **and Assemble hired Valor to assist with a campaign aimed at fraudulently gathering evidence of Papaya's proprietary matchmaking practices.**

**185.**  **Valor representatives posed as impartial industry consultants interested in speaking with former Papaya employees about the mobile gaming industry.  But, in actuality, Valor was not aiming to "better understand the mobile gaming industry," as communicated**

**to former Papaya employees.  Instead, the interview project was designed to obtain proprietary and confidential business information from Papaya employees bound by confidentiality obligations that Skillz could use for its own competitive ends to Papaya's detriment.**

**186.    As detailed further below, Valor identified potential candidates; performed direct outreach to former Papaya employees on LinkedIn, offering them money to incentivize their participation; led interviews; and paid interview participants.  Behind the scenes, Levin, his**

146. Paradise made similar statements in Skillz's Q4 2024 earnings call: "We will continue to do our part as we advocate for enhanced policies and legislation to strengthen the

---

[28]   *See* Ex. 21 (Email from M. Lombardo to M. McIntosh (July 1, 2024)).

[29]   *See* Exs. 11 (California Lobbying Record); 22 (New Jersey Lobbying Record).

[30][32]   Ex. 11 (California Lobbying Record).

[31][33]   Ex. 11 (California Lobbying Record).

[32]   *Q2 2024 Skillz Inc Earnings Call*, Yahoo! Finance (Aug. 2, 2024), https://finance.yahoo.com/news/q2-2024-skillz-inc-earnings-173158053.html.

regulatory oversight of our space.  This includes having regulatory authorities take the necessary actions to stop the billions of dollars of fraud, stealing the hard earned savings of American consumers."[33]

consulting firm Square Strategies, Newton, and Assemble vetted former Papaya employees as potential interview participants; developed the language used in outreach to the former Papaya employees; drafted the interview guide used by Valor in conducting the interviews; and coordinated the interviews.

187.    Defendants 4 Fair Play, Levin, Square Strategies, Newton, and Assemble chose Valor to function as the "face" of the research project because it was a "plausible entity that would have a reason/need to conduct this research."  Valor "publicly advertise[s]" that it "develop[s] case studies and engage[s] in policy development."  By using Valor, they could avoid raising "red flags with participants."  For its efforts, Valor was paid $6,000.

188.    The first step in the scheme was to identify former Papaya employees most likely to have the information Skillz was seeking.

189.    Assemble created a list of six initial potential candidates who were "good archetypes of what we need" and who had "the right background."

190.    In doing so, Assemble surgically targeted those individuals most likely to possess sensitive and closely held information about Papaya's highly sensitive matchmaking practices. These individuals were identified based on their titles on LinkedIn: "Back End Developer," "Product Manager," "Mobile QA Engineer," "Unity Developer," "R&D Team Lead," and "Software Engineer." Valor thereafter reviewed LinkedIn profiles for additional potential interview targets, with Assemble performing further vetting.  The ideal interviewee was "a developer, software designer, or QA."

191.    Interview Scheme Defendants knew, or should have known, that these former Papaya employees were bound by confidentiality agreements with Papaya that prohibited them from sharing confidential information with third parties.

**192.** After identifying the relevant former Papaya employees, Assemble drafted the initial outreach, seeking Valor's advice on "any best practice language we should add to entice people to participate or get a better response rate."

**193.** Valor then sent the former Papaya employees direct messages on LinkedIn. The messages stated that Valor was "a public policy group conducting research to better understand the mobile gaming industry," explained that the former employees' profiles "caught [Valor's] eye as an eligible participant in [their] study," and offered the former Papaya employees $300 in exchange for participating in "a short 45 minute interview."



Ariel Feldman
Unity Developer

NOV 27, 2023

Natalie Hart Draper (She/Her) · 3:16pm
**$300 USD to Participate in an Industry
Survey!**
We are a public policy group conducting
research to better understand the mobile
gaming industry. We are looking to conduct a
short 45 minute interview with professionals like
you. Your profile caught our eye as an eligible
participant in our study. In exchange for your
time and insights we will compensate you with
$300 U.S. We're scheduling interviews now, to
be conducted in early December. Please reply
to let us know you are interested in
participating.

**194.** Valor contacted at least 40 former Papaya employees. Only five stated that they were interested in interviewing.

**195.** When a former Papaya employee expressed interest, Valor directed the employee to fill out a screening survey.



**196.** **Despite very few employees** responding to **the initial outreach, Valor created a false sense of urgency when corresponding with certain former Papaya employees, stating "[w]e only have a few slots left," to pressure employees into agreeing to an interview. To generate further leads, Valor asked interviewees if there were any other individuals to whom Valor should talk.**

**197.** **Throughout this process, Valor acted as the only visible point of contact. Levin, the Executive** Director of 4 Fair Play**, specifically informed Valor that he'd "like to keep all the contact info under Valor's name if at all possible, and mine off** of it**." Moreover,**

if asked by an

interview participant, Valor was instructed to tell the interviewee that they were **"preparing research for an advocacy organization working to market and develop policy** in this **space."**

**198.     Nowhere did the parties involved contemplate disclosing Skillz's involvement.** Upon information and belief, **had the interviewers disclosed that Skillz was involved with the interviews, no former Papaya employees would have participated.**

**199.     As the operative interview guide makes clear, Interview Scheme Defendants and Skillz executives' goal was to obtain highly sensitive information about Papaya's proprietary business practices and technology, not to conduct a bona fide industry study. Indeed, the interview guide, which Levin and Assemble drafted and former Skillz executives Orit Peleg and Casey Chafkin workshopped, emphasized that questions concerning Papaya's matchmaking practices— which have formed the backbone of Skillz's public-facing** representations and **allegations about Papaya—constituted "the CORE reason** we are **interviewing this person."**

**200.     The guide further instructed the interview team to "look into using different approaches to get him/her to say what we need them to say (and feel comfortable doing so),** **" further underscoring that the interviews were designed to create and promote a misleading narrative.**

**201.     Suggested interview questions included: "How do you solve for player liquidity?" and "We have heard from other conversations that bots are widely used in the industry. From your experience how do they work? When do you use bots for this purpose?"**

**202.     If the interviewee started discussing bots, the guide directed Valor to ask questions like "Which companies do you think have done a better job than others in implementing bots?"; "Give me an example – What games to your knowledge use them?"; or "Can you share an example from your own business experience that brings this to life?"**

If, on the other hand, the former

Papaya employee responded that they were not aware of bots, Valor was instructed to "probe deeper" by asking questions aimed at revealing sensitive information about Papaya's technology: "So you are saying no mobile games use bots?  We were told that is common practice.  Can you shed some light on how those games work without them?"; "How do you guarantee that players are always matched?"; or "What about training games?  Do those not use bots either?"

203.    Former Skillz executives, including Peleg and Chafkin, provided specific feedback on the interview guides' questions, including suggesting certain questions did not seem like "a smooth 'lead in'" and proposing new questions.



CONFIDENTIAL

NEWTON001745

204.     Valor recorded the interviews, enabling the information conveyed by the former Papaya employees to be shared with Skillz. Upon information and belief, some of the former employees were not told that the conversations were being recorded.

    **1.**   *Interview Scheme Defendants Induce Former Papaya Employees to Breach Confidentiality Provisions Contained in Their Employment Agreements, Enabling Skillz to Unfairly Compete with Papaya*

**205.**   Valor ultimately interviewed at least two former Papaya employees: Ariel Feldman and Or Kaim. Ariel Feldman worked as a Software Engineer with expertise in Unity, a development platform. Or Kaim served as a VIP Account Manager.

**206.**   During the interviews, Valor continued to hide its connection to Skillz to induce the former Papaya employees to reveal Papaya's proprietary and confidential information. Indeed, when Feldman specifically stated, "And of course, you're probably not a competitor," Valor's representatives responded: "No, no, no, no."

**207.**   As during its LinkedIn outreach, Valor described its efforts as a "small project on mobile gaming." Kaim even remarked at the end of his interview that Valor's decision to reach out on LinkedIn gave "credibility" and "assured" him that the interview was not a scam.

**208.**   Lulled into a false sense of security, the former Papaya employees disclosed highly sensitive proprietary and confidential information, enabling Skillz to acquire Papaya's confidential information without Papaya's consent and to unfairly compete in the market against Papaya.

**209.**   Feldman disclosed aspects of Papaya's matchmaking processes, including methods to address player liquidity and ensure player retention and technical knowhow behind those processes.

**210.**   Kaim revealed a number of highly specific facts regarding his role managing VIP customers for Papaya, Papaya's methods of conducting customer research, and Papaya's matchmaking processes. For example, Kaim discussed the frequency of outreach to customers, the method of identifying customers for outreach, the type of information

sought, where such outreach occurred, and the incentives Papaya offered to customers to continue playing.

**211.**    Upon information and belief, Interview Scheme Defendants shared this information with Skillz. Interview Scheme Defendants also intended to "hand off findings to AGs or legal entities."

**212.**    Prior to conducting the interviews, Skillz contemplated directing reporters to contact specific former Papaya employees. In a draft comment on a document titled "Fairness – New York Post Release Follow-Up Strategy," Chafkin wrote, "Furthermore, we can direct you to former employees at . . . Papaya that we have spoken to who might share their insider knowledge of what is really happening within the walls of those scam companies."

**213.**    After acquiring proprietary and confidential information regarding Papaya's matchmaking processes from Interview Scheme Defendants, Skillz, upon information and belief, used the information from the interviews to unfairly compete with Papaya, including to focus its advertising and marketing efforts in the market.

**214.**    As revealed in Skillz's February 26, 2024 "Pitch" document titled "PAPAYA: FACT SHEET," Skillz intended to and, upon information and belief, did make statements to reporters based on information learned by Interview Scheme Defendants during the interviews. The pitch identified Papaya as Skillz's "latest target" in a crusade to "expose" companies "defraud[ing] mobile gamers" and invited reporters to reach out to its CEO Paradise for interviews.

**215.**    Paradise later gave an interview to Bloomberg for a July 26, 2024 article titled, "Are You Playing a Person or a Bot for Cash Gaming Prizes?"[34] Upon information and belief, Interview Scheme Defendants' interviews with former Papaya employees were a basis for Paradise's statements in the Bloomberg interview.

---

[34]  Ceicilia D'Anastasio, *Are You Playing Against a Person or a Bot for Cash Gaming Prizes?*, Bloomberg (Jul. 26, 2024 6:00 AM), https://www.bloomberg.com/news/articles/2024-07-26/are-you-playing-a- person-or-a-bot-for-cash-gaming-prizes.

**216.** **Other internal Skillz documents—including a December 18, 2023 deck titled "UA Solitaire Cube Campaign Concept Deck," January 24, 2024 User Acquisition team notes, and a presentation titled "Skillz Champions"—show**, upon information and belief, **that proprietary and confidential information revealed by the former Papaya employees to Interview Scheme Defendants informed Skillz's business decisions regarding user acquisition strategy and advertising spending. These documents indicate that Skillz intended to convey particular messages to consumers, focus advertising spending on certain games, and strengthen specific aspects of its own products as a result of information it learned about Papaya's matchmaking practices.**

### *2. Papaya's Reasonable Efforts to Safeguard its Proprietary and Confidential Information*

**217.** **Since 2019, Papaya has invested millions of dollars as well as significant time and non-monetary resources in the research and development of its mobile games.**

**218.** **As a result of its extensive investment of time, effort, money, and creativity**. Papaya is **the sole owner and proprietor of all right, title, and interest in a wide range of proprietary and confidential information, including information related to how players are matched with others** for purposes of **its tournaments and how Papaya manages its customer relationships.**

**219.** **Papaya's matchmaking processes and customer research are crucial to Papaya's success in the mobile gaming industry,** and their **secrecy is vital to protecting the value of Papaya's investment in its games for the benefit of its customers, employees, and investors. Disclosure of information concerning Papaya's matchmaking processes and customer relationship management damages Papaya's business and financial interests.**

**220.** **Papaya therefore takes, and has at all relevant times taken, reasonable steps**

to safeguard its proprietary and confidential information, including its matchmaking processes, its customer management methods, and the know-how used to develop them.

221.    When hired, Papaya employees sign employment agreements that prohibit the disclosure of Papaya's confidential information and trade secrets, both during their employment and at any time after they leave the company.

222.    Ariel Feldman signed an employment agreement with Papaya on July 3, 2020. Appendix A to that agreement, titled "Statement of Undertaking – Confidentiality, Non-Compete and Intellectual Property"—which was executed as a condition of and in consideration for employment with Papaya—included several paragraphs pertaining to confidentiality.

223.    Paragraph 1.1 specifically stated, "The Employee hereby agrees that he shall not, directly or indirectly, disclose or transfer to any person or any entity at any time, either during or subsequent to his employment period, any trade secrets or other confidential information, whether patentable or not, of the Company Group. . . ." The paragraph then listed specific types of information deemed confidential, including "any information directly or indirectly related to research and development connected with present or future products, inventions, hardware, software, production processes, discoveries, improvements, developments, innovations, designs, . . . calculations, diagrams, algorithms, formulas, computer files, computer programs, data, planning processes, list of clients, . . . and other information related to business of the Company Group and/or their clients     "

1.1.     The Employee undertakes to maintain the confidentiality of the Confidential Information (as defined below), during the term of his employment with the Company and after the termination of such employment, for any reason.

Without derogating from the generality of the foregoing, the Employee hereby agrees that he shall not, directly or indirectly, disclose or transfer to any person or entity, at any time, either during or subsequent to the employment period, any trade secrets or other confidential information, whether patentable or not, of the Company Group, including but not limited to, all the Company Group's trade secrets, property, business, any information directly or indirectly related to research and development connected with present or future products, inventions, hardware, software, production processes, discoveries, improvements, developments, innovations, designs, drawings, sketches, design, calculations, diagrams, algorithms, formulas, computer files, computer programs, data, planning processes, list of clients, list of suppliers, costing, prices, terms of payment, plans, business secrets, business plans, plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers, information regarding the skills and compensation of other employees of the Company Group, names of clients, sales, and any other information related to the business of the Company Group and/or their clients, including clients with whom the Company Group is negotiating and including affiliates and/or subsidiaries, present and future, all the foregoing whether or not such information is protectable as a patent or any other proprietary right and any other information purchased or received directly or indirectly in connection with Company Group, their affairs and/or business (collectively, "**Confidential Information**"), of which the Employee is or becomes informed or aware during the employment period, whether or not developed by the Employee. Confidential Information may be in any form including oral, writing, stored in a computer file and/or in any other digital or other existing and/or future media.

**224.     By signing, Feldman further agreed to use Papaya's confidential information only for the purposes of his employment and for the benefit of Papaya.**

1.2.     The Employee undertakes not to use the Confidential Information for any purpose whatsoever other than the performance of his services on behalf of the Company. Without limiting the scope of this duty, he shall only use the Confidential Information for the benefit of the Company Group, and only to the extent required for the performance of the services and may not disclose the Confidential Information to any other third party who is not performing the service.

**225.     Or Kaim signed a similar employment agreement with Papaya on May 26, 2022. Exhibit B to that agreement, titled "Non-Disclosure, Unfair Competition and Ownership of Intellectual Property Undertaking"—which was executed as a condition of employment and in consideration for employment with Papaya—included two relevant confidentiality provisions.**

**226.     Paragraph 1.1 defined "Confidential Information" to include: "trade secrets,**

know- how, technology, products (including products under development), research and

development.

trials, formulae, processes, intellectual property, business, assets, financial condition,
agreements and engagements, obligations, activities, marketing and promotion, plans
(including business and financial), strategies, policies,      "

1.1.    For the purpose of this Undertaking, "**Confidential Information**" shall include, all
information (whether or not marked or designated as confidential), related to the Company, including all
information concerning trade secrets, know-how, technology, products (including products under
development), research and development, trials, formulae, processes, intellectual property, business, assets,
financial condition, agreements and engagements, obligations, activities, marketing and promotion, plans
(including business and financial), strategies, policies, forecasts, customers, suppliers, business partners,
information related to third parties with whom the Company has undertaken to hold information of such
party in confidence and any other information related to the Company's employees, consultants, officers,
directors, and shareholders. Confidential Information includes information in any form whatsoever, including
written, oral or magnetic or electronic media.

**227.    Paragraph 1.2 then governed Kaim's non-disclosure obligations, stating that**
**"[d]uring the term of the Employee's employment and at any time after termination or**
**expiration thereof, indefinitely, the Employee shall keep in strict confidence, shall safeguard,**
**and shall not disclose to any third party, nor use for the benefit of any party other than the**
**Company and according to the Company's instructions, Confidential Information."**

1.2.    During the term of the Employee's employment and at any time after termination or expiration
thereof, indefinitely, the Employee shall keep in strict confidence, shall safeguard, and shall not disclose to
any third party, nor use for the benefit of any party other than the Company and according to the Company's
instructions, Confidential Information. The Employee acknowledges that the Employee's employment by the
Company and the access to Confidential Information creates a relationship of confidence and trust with
respect to such Confidential Information.

**228.    Confidentiality and non-disclosure agreements, like those signed by Feldman**
**and Kaim, are industry standard, as Skillz, with which Interview Scheme Defendants**
**collaborated, well knows. Upon information and belief, Interview Scheme Defendants**
**likewise knew, or should have known, that Feldman and Kaim were subject to confidentiality**
**and non-disclosure agreements.**

229.    In addition to requiring employees to sign employment agreements that prohibit them from disclosing its proprietary and confidential information, Papaya takes additional reasonable measures to ensure its proprietary and confidential information remains secret.

230.    Papaya employs security measures, both physical and electronic, at its offices and in all of its systems to restrict access to its proprietary and confidential information. Access to Papaya's systems is password-protected. Papaya also employs two-factor authentication.

231.    Papaya discloses proprietary and confidential information within the company only to those employees who have a business need to know.

232.    Employees are prohibited from storing Papaya's proprietary and confidential information on personal or external storage space.

233.    Papaya maintains these measures to ensure that its proprietary and confidential information does not fall into its competitors' hands, thereby preventing its competitors from reaping the benefits of Papaya's years of labor and innovation.

234.    Despite Papaya's best efforts, Interview Scheme Defendants induced former Papaya employees to breach their employment agreements by revealing proprietary and confidential information related to Papaya's matchmaking processes and the method by which Papaya manages its customer relationships.

II.    V. Defendants' Unlawful Conduct Has Harmed Papaya

235.    147. Defendants' willful deceptive conduct was intended to harm, and has harmed, Papaya.

236.    148. Absent being deceived by Complaint Scheme Defendants' numerous false representations about Papaya, upon information and belief, at least some mobile gamers who

**visited the 4FairPlay Website** would have chosen **or continued** to play Papaya games.

237. ~~149.~~ The false suggestion that Papaya has been the subject of thousands of customer complaints **about alleged bot use**, that it is the subject of more than eight complaints every minute, and that consumers complain about Papaya more than they complain about any other gaming company (including Skillz, which supposedly faces *no* complaints), have eroded Papaya's ~~hard-earned~~**hard- earned** goodwill and favorable reputation.

238. **Indeed, customers submitted complaints to Papaya referring** to the 4FairPlay Website.

239. **Papaya** was forced to incur **additional expenses to rehabilitate its image, retain existing customers, and attract new customers beginning in September 2023 as a direct result of Complaint Scheme Defendants' actions. These added expenses continue to this day.**

240. **Papaya has experienced a significant increase in its effective cost per install since the launch of the 4FairPlay Website.**

241. ~~150.~~ **Complaint Scheme** Defendants' denigration of Skillz's competitors also harmed Papaya by bringing disrepute to portions of the mobile gaming industry and diverting consumers ~~away~~ from Papaya.

242. ~~151.~~ **Complaint Scheme** Defendants likewise caused Papaya to incur expenses, including legal fees, related to the 4FairPlay Website's falsehoods and the foreseeable dissemination of complaints. **For example, Papaya paid legal fees after receiving a cease-and-desist letter from a state gaming control board that,** upon information and belief, **stemmed at least in part from complaints submitted to state law enforcement via** 4 Fair Play.

243. **Interview Scheme Defendants' fraudulent inducement of former Papaya employees to reveal Papaya's proprietary and confidential information in breach of confidentiality provisions**

contained within their employment agreements deprived Papaya of its business investments in matchmaking and customer management processes.

244.    Skillz's use of Papaya's proprietary and confidential information further harmed Papaya by means of lost profits and diminished goodwill and reputational standing in the market.

245.    ~~152.~~ Papaya's loss of customers, reputational harm, and resulting expenses have caused damages that exceed $75,000.

---

[33] ~~*Earnings Call Transcript: Skillz Q4 2024 Sees Revenue Drop, Stock Dips,* Investing.com (Mar. 13, 2025), https://www.investing.com/news/transcripts/earnings-call-transcript-skillz-q4-2024-sees-revenue-drop-stock-dips-93CH-3928260.~~

## COUNT I
### Business Conspiracy in Violation of Va. Code Ann. § 18.2-499
### (All Defendants)

246.    ~~153.~~ All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

247.    ~~154.~~ As detailed above, **Complaint Scheme** Defendants have made false and misleading statements about Papaya ~~in connection with the fraudulent 4FairPlay Website~~, including by fabricating customer **testimonials and** complaints about mobile games' alleged bot use, presenting fabricated data about the complaints about Papaya and other mobile gaming companies **on the 4FairPlay Website** to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

248.    **As detailed above, Interview Scheme Defendants induced Ariel Feldman and Or Kaim to disclose proprietary and confidential information regarding Papaya's matchmaking and customer management practices in violation of the confidentiality**

**provisions** in their **employment contracts.**

**249.** ~~155.~~ Under Va. Code ~~Ann.~~ Ann. § 18.2-499(A), "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of," among other things,

"willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor." A corresponding statute permits "[a]ny person who shall be injured in his reputation, trade, business, or profession by reason of a violation of § 18.2-499" to initiate a civil action and "recover three-fold the damages by him sustained." *Id.* § 18.2-500(A).

**250.** ~~156.~~ Defendants are two or more persons who~~, along with Skillz,~~ had a common goal of willfully and maliciously causing harm to Papaya's business and created, operated, and controlled the Website **and orchestrated the interview scheme** to achieve that purpose. They cooperated to fabricate customer complaints, present fabricated data about the complaints online, and disseminate altered complaints to law enforcement

with the purpose of willfully and maliciously injuring Papaya's business. They knew that statements on the 4FairPlay Website and in customer complaints were false. **They also cooperated to intentionally induce former Papaya employees to reveal Papaya's proprietary and confidential information in violation of the employees' confidentiality obligations for Skillz's competitive benefit.**

**251.** ~~157.~~ Defendants' conduct was unlawful for several reasons, including because it~~, as set forth below,~~ constituted defamation and ~~violated the Lanham Act~~ **tortious interference with contract**

~~158. Defendants' conduct was also unlawful because it violated several state consumer protection laws.~~ *~~See, e.g.~~*~~, Va. Code Ann. § 59.1-200 (West 2024); Cal. Bus. & Prof. Code § 17500 (West 2024); N.J. Stat. Ann. § 56:8-2 (West 2024). Defendants unfairly disparaged Papaya through many false and misleading statements on the 4FairPlay Website as part of Skillz's deceptive advertising campaign that misled consumers about the nature of Skillz's and its competitors' games, drove players away from Papaya's games to~~ ~~games on the Skillz platform,~~

and harmed both Papaya and consumers.

**252.** 159.  **Complaint Scheme** Defendants' conduct was also unlawful because it violated federal and state law prohibiting individuals from ~~lying~~**making false statements** to law enforcement. *See, e.g.*, 18 U.S.C. § 1001; N.Y. Penal Law § 175.30.  Upon information and belief, **Complaint Scheme** Defendants knowingly and willfully manipulated complaints about Papaya's alleged bot use that they disseminated to federal and state law enforcement, all the while knowing that the complaints contained materially false statements.

**253.** ~~160.~~ As a direct and proximate result of Defendants' unlawful acts, which were committed in furtherance of the above-described conspiracy to harm Papaya's business, Papaya suffered damages, including through reputational harm and loss of goodwill.

**254.** ~~161.~~ Papaya also was forced to incur **added expenses and** legal fees to respond to the false representations on the 4FairPlay Website and in complaints ~~and~~**,** the foreseeable consequences of ~~their~~**the complaints'** dissemination**, and the disclosure and use of its proprietary and confidential information**.

## COUNT II
~~Common Law Conspiracy~~
**(~~All~~Tortious Interference with Contract (Interview Scheme** Defendants)

**255.** ~~162.~~ All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

**256.** **As detailed above, Interview Scheme Defendants induced Ariel Feldman and Or Kaim to disclose proprietary and confidential information regarding Papaya's matchmaking and customer management practices in breach of the confidentiality provisions in their employment contracts.**

**257.** The common **law** tort of **tortious interference with contract** imposes liability **where** ~~163. As detailed above, Defendants have made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data concerning the complaints about Papaya and other mobile gaming companies to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.~~ **(1) a valid contractual relationship exists; (2) the defendants have actual or constructive knowledge of the contractual relationship; (3) the defendants intentionally interfere thereby inducing or causing a breach or termination of the contractual relationship; and (4) the party whose relationship has been disrupted suffers damages.**

**258.** **The employment agreements between Feldman and Kaim and Papaya, as well**

20

as the confidentiality provisions incorporated within those agreements, constitute valid and enforceable contracts supported by adequate consideration.    The confidentiality obligations

survived the end of Feldman and Kaim's employment at Papaya.

259.     Interview Scheme Defendants expressly targeted Feldman and Kaim because of their previous employment relationship with Papaya. Interview Scheme Defendants knew or should have known that, by virtue of that previous employment relationship, Feldman and Kaim were subject to confidentiality provisions that prohibited them from disclosing Papaya's proprietary and confidential information.

260.     Interview Scheme Defendants intentionally and successfully induced Feldman and Kaim to breach their confidentiality obligations, including by providing them with monetary compensation for participating in "industry" interviews in which they disclosed Papaya's business secrets.

261.     Interview Scheme Defendants acted with an improper motive as their actions were taken with the intention of allowing Skillz to unfairly compete with Papaya by misusing Papaya's proprietary and confidential information.

262.     As a direct and proximate result of Interview Scheme Defendants' intentional interference, Papaya has been injured by losing the benefit of the confidentiality provisions contained within the employment agreements, which were intended to protect Papaya's business, goodwill, and reputation.  Papaya has sustained direct and indirect damages, including special and consequential damages, in an amount to be determined at trial.

263.     Interview Scheme Defendants' conduct was intentional, willful, wanton, reckless, and malicious, and warrants exemplary damages.

**COUNT III**
**Common Law Conspiracy**
**(Interview Scheme Defendants)**

**264.**    All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

**265.**    **As detailed above, Interview Scheme Defendants induced Ariel Feldman and Or Kaim to disclose proprietary and confidential information regarding Papaya's matchmaking and customer management practices in violation of the confidentiality provisions in their employment contracts.**

**266.**    ~~164.~~ The tort of common law conspiracy imposes liability on two or more persons who combine to accomplish, by some concerted action, some criminal or unlawful purpose by a criminal or unlawful means, and whose acts committed in furtherance of the conspiracy cause damage.

**267.**    ~~165.~~ Defendants are two or more persons who~~, along with Skillz,~~ had a common goal of causing harm to Papaya's business and unlawfully ~~created, operated, and controlled the 4FairPlay Website~~ **orchestrated the interview scheme** to achieve that purpose. They cooperated to ~~fabricate customer complaints, present fabricated data about the complaints, and disseminate altered complaints to law enforcement with the purpose of willfully and maliciously injuring Papaya's business. They knew or recklessly disregarded that statements on the 4FairPlay Website and in customer complaints were false.~~ **intentionally induce former Papaya employees to reveal Papaya's proprietary and confidential information in violation of the employees' confidentiality obligations for Skillz's competitive benefit.**

**268.**    ~~166.~~ Defendants' conduct was unlawful, including because it constituted ~~defamation and violated the Lanham Act and several state consumer protection laws~~ **tortious interference with contract**.

**269.** ~~167.~~ As a direct and proximate result of Defendants' unlawful acts, which were committed in furtherance of the above-described conspiracy to harm Papaya's business, Papaya suffered damages, including through reputational harm and loss of goodwill.

**270.** ~~168.~~ Papaya also was forced to incur **added expenses and** legal fees to respond to the ~~false representations on the 4FairPlay Website and in complaints and the foreseeable~~ ~~consequences of their dissemination~~**disclosure and use of its proprietary and confidential information**.

~~COUNT III~~
~~Defamation~~
~~(All Defendants)~~

~~169. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.~~

~~170. As detailed above, Defendants have made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data concerning the complaints about Papaya and other mobile-gaming companies to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.~~

~~171. The tort of defamation imposes liability on persons who publish an actionable statement with the requisite intent.~~

~~172. Defendants published actionable statements by posting knowingly false representations and fabricated data on the 4FairPlay Website, which was publicly accessible for at least a six-month period, as well as disseminating false and misleading complaints to law enforcement. Defendants knew or recklessly disregarded that these statements were false.~~

~~173. Defendants' conduct constituted defamation per se because the false representations and fabricated data posted on the 4FairPlay Website and contained within the false and misleading complaints disseminated to law enforcement prejudiced Papaya in its profession or trade by casting~~

**80**

aspersions on its honesty and prestige as a business.

174. In addition, Defendants' conduct caused reputational harm to Papaya, which lost standing in the community as a result.

175. Defendants' unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

176. Papaya also was forced to incur legal fees related to the false representations.

## COUNT IV
### False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B)
### (All Defendants)

177. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

178. As detailed above, Defendants made false and misleading statements about Papaya and other mobile-gaming companies in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data regarding the complaints about Papaya and other mobile-gaming companies to deliberately mislead viewers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

179. The Lanham Act imposes liability on persons who, among other things, "on or in connection with any goods or services . . . use[] in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

180. Defendants made claims about Papaya's services that were literally false, false by

necessary implication, and/or misleading.

181. Defendants' statements on the 4FairPlay Website constituted a commercial advertisement. Knowingly conspiring with Skillz, which is in commercial competition with Papaya, Defendants made the false statements for the purpose of influencing customers to use Skillz's services instead of Papaya's. The statements, which were posted on a website available to the public throughout the United States, were disseminated sufficiently to and targeted toward the relevant purchasing public to constitute advertising within the mobile gaming industry.

182. Defendants' false statements on the 4FairPlay Website deliberately and actually deceived or had the tendency to deceive a substantial segment of the 4FairPlay Website's audience.

183. Defendants' false statements were material in that they were likely to influence customers' decisions to use Papaya's services.

184. By posting the false statements to the 4FairPlay Website, which was accessible throughout the United States, Defendants caused those statements to enter interstate commerce.

185. As a result of Defendants' conduct, Papaya has been injured through a loss of goodwill associated with its mobile gaming products.

186. Defendants' unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

187. Papaya also was forced to incur legal fees related to the false representations.

**JURY TRIAL DEMAND**

Papaya requests a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Papaya Gaming, Ltd. respectfully requests that this Court enter judgment against Defendants for the following:

1.        Injunctive relief;

2.        Monetary damages in the form of actual, compensatory, and consequential damages suffered as a result of Defendants' wrongful conduct;

3.        Statutory, treble, and/or punitive damages;

4.        Costs and attorneys' fees incurred in this action;

5.        Pre- and post-judgment interest to the extent permitted by law; and

6.        Such other relief as the Court may deem just and proper.


Dated: ~~March 14~~ April 4, 2025                 Respectfully submitted,

                                                                  /s/     Todd D. Kelly
                                                                  Todd D. Kelly (Va. Bar No. 92331)
                                                                  Margaret E. Krawiec (*pro hac vice ~~motion forthcoming~~*) David B.
                                                                  Leland (*pro hac vice ~~motion forthcoming~~*) Michael A. McIntosh
                                                                  (*pro hac vice ~~motion forthcoming~~*)
                                                                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                                                  1440 New York Ave. NW
                                                                  Washington, DC 20005
                                                                  Phone: (202) 371-7000
                                                                  Fax: (202) 393-5760
                                                                  todd.kelly@skadden.com
                                                                  david.leland@skadden.com
                                                                  margaret.krawiec@skadden.com
                                                                  michael.mcintosh@skadden.com

                                                                  *Counsel for Papaya Gaming, Ltd.*

# Exhibit 1



# Complaints by state

Scam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions.

- Over 1000+ Complaints
- 201-1000 Complaints
- 100-200 Complaints
- Under 100 Complaints









## About

4 Fair Play is on a mission to bring fairness to mobile gaming. We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing. Our organization was founded to educate the public on fair play and provide tools and resources players need to protect themselves if they've been scammed.

If you have questions or want to learn more about us, please feel free to contact hello@4fairplay.org.

Paid for by 4 Fair Play | Privacy Policy

FILE A COMPLAINT      FAQ      ABOUT US

## Fight back against scam games!

Don't let these games steal your money and get away with it! They promise fair competition, but secretly pair players like you against a bot that is programmed to make sure you lose more money than you win.

ACT NOW!

## File a complaint. It only takes a minute.

If you've lost money playing against bots, you're not alone—and you may be entitled to compensation. It's time you got your hard-earned money back by bringing those companies to justice.

File a complaint today.

By clicking 'submit', an email will auto-populate with your information so you can directly share your complaint with your local attorney general. This is the most effective way of bringing these gaming companies to justice and receiving compensation.















# Why do we collect this info?

If you use the tools on this page, your address determines which state official(s) or office receives your message. Your name, zip, and email tell the recipient who sent it.

# Information Collected

We collect the information you provide for the purpose of matching to your state officials, to deliver your message to them, and to keep a record of the messages delivered. This may include but is not limited to, your name, email, phone number, and zip code.

# Information Shared

We will share information that you provide with the people with whom you choose to communicate, and with our vendors only as needed to deliver your message. We may follow up with you to request more information on your experience. 4 Fair Play's name and contact information can be found on each page of this site.

Paid for by 4 Fair Play | Privacy Policy

8

# Exhibit 2



AS - 0003



AS - 0004



AS - 0005



AS - 0006



AS - 0007



# Exhibit 3

| Row #/RO W | F | L | Init | FirstN LastInit | State | AG | Games ready | Games 75% | Games halfway | Games raw | Submitted Time | District | First Name | Last Name | Solitaire Cash | Bingo Cash | Bubble Cash | Solitaire Clash | Bingo Clash | Bingo Tour | Solitaire King | Bingo King | Battle Bingo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | S | B | S.B. | Sharon B. | NY | Letitia A. James | x | x | | x | 10/24/2023 11:36 | New York | Sharon | Bryce | I have lost winnings on every game I downloaded. Too many games to send in a message. Skillz don't honor any winnings that individuals win. So I wonder who's actually getting the winnings. | | | | | | | | |
| 13 | V | H | V.H. | Vergis H. | NY | Letitia A. James | x | x | | x | 10/24/2023 19:24 | New York | Vergis | Harris | Enjoy | | | | | | | | |
| 36 | T | | G | T.G. | Thomas G. | NY | Letitia A. James | x | x | | x | 10/25/2023 10:26 | New York | Thomas | Green | Money tree I eared $1,0000 and and they told to pay$2 to . withdraw it and never. sent it instead a week later after not . receiving the. earnings not | | | | | | | | |
| 66 | S | B | S.B. | Sharon B. | NY | Letitia A. James | x | x | | x | 10/26/2023 6:34 | New York | Sharon | Bryce | Ello Jump $1,689. Amazon $4,179., Dice King $14,999. $19,999, $29,999,$49,999,$89,999, Amazon $9,999.,$19,000.,$29,999.,$ 49 ,999., Solitaire Craft $1,522.01 | | | | | | | | |
| 67 | S | B | S.B. | Sharon B. | NY | Letitia A. James | x | x | | x | 10/26/2023 6:35 | New York | Sharon | Bryce | There are too many games and .. I still play the games because I . enjoy them | | | | | | | | |

Excerpt of Spreadsheet of Complaints Produced by Adam Shen on May 22, 2024

# Exhibit 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SKILLZ PLATFORM INC.,
a Delaware corporation,

      Plaintiff,

          -against-

PAPAYA GAMING, LTD., a foreign
corporation; and PAPAYA GAMING, INC.,
a Delaware corporation,

      Defendants.

Civil Action No.: 1:24-cv-01646

Hon. Denise L. Cote

---

PAPAYA GAMING, LTD.,

      Counterclaim-Plaintiff,

          -against-

SKILLZ PLATFORM INC.,

      Counterclaim Defendant,

      And

TETHER STUDIOS LLC, GOLDEN WOOD
COMPANY, LTD., LUCKYO LIMITED,
GAMENEXA STUDIOS PRIVATE
LIMITED and DNR GAME STUDIO,

      Additional Counterclaim-Defendants.

# COUNTERCLAIM-DEFENDANT SKILLZ PLATFORM INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO SEVER AND DISMISS PAPAYA GAMING, LTD.'s COUNTERCLAIMS

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     FACTUAL BACKGROUND ...................................................................... 2

    A.   Papaya's Barebones Allegations that Skillz Deceives Consumers .......................... 4

    B.   Papaya—Which Advertises Its Games as "Fair"—Alleges that Skillz's Advocacy
         for Fairness Is Defamation ...................................................................... 5

    C.   Papaya Asserts Intellectual Property Counterclaims Against Skillz and Third-
         Party Developers ................................................................................. 7

III.    MOTION TO DISMISS PAPAYA'S FALSE ADVERTISING, DEFAMATION,
        DECEPTIVE TRADE PRACTICES, AND COPYRIGHT COUNTERCLAIMS ........................ 8

    A.   Papaya's False Advertising and Deceptive Trade Practices Counterclaims Should
         Be Dismissed Because Papaya Has Not Alleged A Materially False Statement By
         Skillz ............................................................................................. 9

        1.   Papaya does not plausibly allege that Skillz's statements that its platform is
             free of bots are false .................................................................... 10

        2.   Papaya does not plausibly allege that Skillz's statements to consumers
             about its competitors' deployment of bots are false ................................ 13

    B.   Papaya Fails to State a Claim for Defamation .................................................. 14

        1.   Papaya does not plausibly allege statements on the 4Fairplay Website are
             materially false ......................................................................... 15

        2.   The Bonus.com article is protected by Section 74 of the New York Civil
             Rights Law ............................................................................. 17

    C.   Papaya Cannot Plausibly Allege Copyright Counterclaims Because They Seek
         Protection of Unregistered Aspects of Papaya's Works ...................................... 19

IV.     MOTION TO SEVER PAPAYA'S COPYRIGHT AND TRADEMARK CLAIMS
        ..................................................................................................... 21

    A.   The Court Should Exercise Its Discretion to Sever Papaya's Intellectual Property
         Claims from this Action ...................................................................... 21

        1.   The Intellectual Property Counterclaims rest on unrelated facts .............. 22

        2.   The Intellectual Property Counterclaims present no common questions of
             law or fact ............................................................................. 23

        3.   Severance would serve the interests of judicial economy ...................... 23

        4.   Severance would avoid prejudice to Skillz ................................... 24

5. The Intellectual Property Counterclaims require discovery from different
witnesses and different documentary evidence .......................................... 25

V. CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017) ............................15

*Anderson v. Unilever United States, Inc.*,
   607 F. Supp. 3d 441 (S.D.N.Y. 2022)........................................................................................4

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)........................................................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................................8, 12, 19

*Becher v. Troy Pub. Co.*,
   589 N.Y.S.2d 644 (3d Dep't 1992) ..........................................................................................19

*Celle v. Filipino Rep. Enters., Inc.*,
   209 F.3d 163 (2d Cir. 2000)......................................................................................................14

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014)................................................................................................14, 22

*Clairol Inc. v. Gillette Co.*,
   389 F.2d 264 (2d Cir. 1968)........................................................................................................7

*Clark v. Hanley*,
   89 F.4th 78 (2d Cir. 2023)..........................................................................................................8

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992)......................................................................................................21

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
   551 F. Supp. 3d 320 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned
   Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. 2022).....................................15, 17, 18

*Doe v. Uber Techs., Inc.*,
   551 F. Supp. 3d 341 (S.D.N.Y. 2021) ......................................................................................13

*Erickson v. Pardus*,
   551 U.S. 89 (2007)......................................................................................................................8

*Fourth Estate Public Benefit Corp v. Wall-Street.com, LLC*,
   586 U.S. 296 (2019)..................................................................................................................20

*Franklin v. Daily Holdings, Inc.*,
   21 N.Y.S.3d 6 (1st Dep't 2015) ..........................................................................................15, 19

*Greenberg v. Spitzer*,
    62 N.Y.S.3d 372 (2d Dep't 2017) ............................................................17

*Int'l Code Council, Inc. v. UpCodes Inc.*,
    43 F.4th 46 (2d Cir. 2022) ...........................................................................9

*Jem Accessories, Inc. v. JVCKENWOOD USA Corp.*,
    2021 WL 706646 (S.D.N.Y. Feb. 22, 2021) ...........................................22, 24

*Karedes v. Ackerley Grp., Inc.*,
    423 F.3d 107 (2d Cir. 2005) .......................................................................18

*Komarov v. Advance Mag. Publishers, Inc.*,
    691 N.Y.S.2d 298 (N.Y. Sup. Ct. 1999) .....................................................17

*McCracken v. Verisma Sys., Inc.*,
    91 F.4th 600 (2d Cir. 2024) .........................................................................9

*Medmix Switzerland AG v. Kettenbach GmbH & Co. KG*,
    2024 WL 1973365 (E.D.N.Y. May 3, 2024) ...............................................22

*Morris v. Northrop Grumman Corp.*,
    37 F.Supp.2d 556 (E.D.N.Y. 1999)............................................................22

*Ndugga v. Bloomberg L.P.*,
    2024 WL 3755564 (S.D.N.Y. Aug. 12, 2024) ............................................23

*North Jersey Media Group, Inc. v. Fox News Network, LLC*,
    312 F.R.D. 111 (S.D.N.Y. 2015)...........................................................22, 23

*Palmieri v. Thomas*,
    814 N.Y.S.2d 717 (2d Dep't 2006) .............................................................18

*Reus v. ETC Hous. Corp.*,
    148 N.Y.S.3d 663 (N.Y. Sup. Ct. 2021), *aff'd*, 164 N.Y.S.3d 692 (3d Dep't
    2022) ..........................................................................................................17

*Rosner v. Amazon.com*,
    18 N.Y.S.3d 155 (2d Dep't 2015) ...............................................................14

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
    241 F.3d 232 (2d Cir. 2001)........................................................................14

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999)........................................................................11

*Schultz v. Lost Nation Booster Club*,
    2014 WL 10038777 (S.D. Iowa Oct. 14, 2014) ..........................................21

*Gryl ex. rel. Shire Pharms. Grp. PLC v. Shire Pharms Grp. PLC*,
   298 F.3d 136 (2d Cir. 2002) ............................................................... 7, 8, 10

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017) ............................................................... 15, 16

**Statutes**

15 U.S.C. § 1094 ...................................................................................... 7

15 U.S.C. § 1125(a)(1)(A) ........................................................................ 9

17 U.S.C. § 101 ....................................................................................... 21

17 U.S.C. § 411(a) ............................................................................... 20, 21

N.Y. Civ. Rights Law § 74 ............................................................. 17, 18, 19

N.Y. Gen. Bus. Law § 349 .................................................................... 3, 9

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 14, 19

Fed. R. Civ. P. 21 ..................................................................................... 22

Counterclaim-Defendant Skillz Platform, Inc. ("Skillz"), a United States public company, submits this Memorandum in Support of its Motion to Sever and Dismiss Counterclaim-Plaintiff Papaya Gaming, Ltd.'s ("Papaya") Counterclaims.

## I.     PRELIMINARY STATEMENT

For years, Papaya misled the American public by representing that it provided a chance for players to compete against one another. In fact, human players unwittingly competed against Papaya's computer algorithms (so-called "bots"), which Papaya designed to masquerade as people, inducing customers to pay to play games they could not win. Even now that it has been sued in the instant matter, Papaya does not deny—because it cannot—that Papaya purposely and secretly deployed bots on its platform to mimic human players. Nor does Papaya deny that it has received subpoenas from government agencies investigating its deceptive bot use. Skillz sued Papaya in this action to hold it to account for its false advertising and deceptive trade practices.

Left with no strategy other than distraction, the foreign Papaya entity counter-sued Skillz, levying copycat false advertising and deceptive trade practices claims, meritless claims for defamation, and bogus copyright and trademark infringement claims against Skillz. As set forth below, Papaya fails to allege any facts that Skillz used bots to compete in cash games and took money from human players. Rather, Papaya's counterclaims make clear that the alleged "bot use" Papaya supposedly identified on Skillz's platform is limited to two narrow, fully-disclosed circumstances: (1)  mandatory practice games for new players that ***do not involve cash*** wagers; and (2) bots controlling random elements in gameplay to ensure that ***two human players*** who compete against each other in a tournament experience the same level of difficulty (*i.e.*, no bot can win). As pleaded, Papaya fails to state a claim that such circumstances somehow render Skillz's statements about not using bots in cash games materially false or deceptive. Papaya's defamation

claims are likewise meritless and fail as a matter of law because Papaya does not plausibly allege that Skillz's statements that Papaya utilized bots in cash games or that Papaya was being investigated by government agencies were false.

Separately, Papaya's copyright and trademark claims are entirely unrelated to this litigation, seeking joinder of defendants that, to date, largely have not been served, and witnesses and documents that do not overlap with Skillz's claims in this case. Papaya's copyright infringement claims are particularly weak because public documents indicate that Papaya did not register with the U.S. Copyright Office any of the design elements that it claims Skillz and developers have infringed; rather, public documents indicate that Papaya sought and obtained copyright protection only for the underlying software code embedded in its mobile games, which is not something that any party to this action is alleged to have infringed.

Given that Papaya's counterclaims represent nothing more than subterfuge by its foreign controlling owners, intended to bog down this litigation and delay an ultimate resolution pleading deficiencies in Papaya's counterclaims, Skillz served a Rule 11 sanctions letter on Papaya demanding they withdrawn. In the meantime, as set forth below, Skillz respectfully submits that Papaya's (1) defamation claims, false advertising, and deceptive trade practices claims should be dismissed; (2) copyright claims should be dismissed or severed; and (3) trademark claims should be severed.

## II.     FACTUAL BACKGROUND

Skillz filed this lawsuit on March 4, 2024, alleging that Papaya (one of several foreign companies defrauding U.S. consumers in the mobile gaming industry) has gained anticompetitive advantage, to Skillz's financial detriment, by falsely advertising its games as "fair" and "skill-based" when, in fact, Papaya controls the outcomes of its games by deploying bots. ECF No. 1. To

date, Papaya has not refuted that it used bots. ECF No. 28 ("MTD") at 9 ("Papaya does not represent that its games never include computerized opponents"); 10 ("Papaya has not denied or refuted that it deployed bots"); 24 ("Papaya has never denied or refuted the alleged bot usage"). The Court denied Papaya's MTD, holding that Skillz's Complaint "sufficiently allege[d] that Papaya's representations about the nature of its games are impliedly false" as to its use of bots, plausibly allege[d] that Papaya's representations implying that all competitors are human are material, and adequately allege[d] that Skillz suffered damages. ECF No. 40 at 7–9.

On August 5, 2024, Papaya filed its Answer and Counterclaims. Papaya brought ten bogus counterclaims against Skillz, which can be grouped into three categories. *First*, Papaya asserts claims under the Lanham Act for false advertising (counterclaim I) and under New York General Business Law § 349 for deceptive trade practices under (counterclaim II) based on Skillz's alleged bot usage (the "False Advertising Counterclaims"). *Second*, Papaya brings counterclaims for defamation (counterclaim III) and civil conspiracy (counterclaim IV) regarding (i) Skillz's statements that it favors "fairness" in the mobile gaming industry and opposes the deceptive use of bots by competitors such as Papaya, (ii) Skillz's involvement in the 4FairPlay Website, and (iii) the alleged reposting of an online article related to the arguments made in Papaya's motion to dismiss (the "Defamation Counterclaims"). *Third*, Papaya asserts intellectual property counterclaims against Skillz and five third-party developers, including alleged (i) trademark infringement upon Papaya's registrations and common law rights related to names and icons used for its Bingo Cash, Solitaire Cash, and 21 Cash games (counterclaims V and VII); (ii) counterclaims against Skillz for contributory and/or vicarious trademark infringement of Papaya's same names and icons (counterclaims VI and VIII) (together with counterclaims V and VII, the "Trademark Counterclaims"); and (iii) alleged copyright infringement by Skillz and five third-

party game developers of Papaya's Bingo Cash game, (counterclaims IX and X, the "Copyright Counterclaims").

### A. Papaya's Barebones Allegations that Skillz Deceives Consumers

In support of the False Advertising Counterclaims, Papaya asserts that Skillz uses bots.[1] ECF No. 46 ¶¶ 19, 21–23. Papaya relies solely on a handful of online customer reviews and one line from Skillz's Developer FAQs previously addressed in Skillz's Opposition to Papaya's MTD. *Id*. ¶¶ 194–96; 207–25. Papaya points to no other facts in support of its assertion that Skillz uses bots.

Skillz, for its part, has represented to this Court and to the public that it does not use, operate or enable computerized or artificial competitors, *i.e.*, "bots," to compete against and win money from human players in its cash games, that Skillz is "committed to rooting out and eradicating" bots, and that players of Skillz-platform games "can be sure we will continue to . . . only match you against real human opponents of equal skill. No unfair bots, not ever." *Id*. ¶¶ 199, 187. Cash games available for play on the Skillz platform "include only human opponents and never incorporate, or have ever incorporated, bot opponents." *Id*. ¶¶ 329, 333, 335. In other words, if a human player enters a cash competition on the Skillz platform, that individual is competing against another human player, and one of the human players will win the cash prize offered. It is the use of a bot as a ***competitor that can win a cash competition*** against a human player that Skillz has opposed, does not permit on its platform, and has accused Papaya of doing in its complaint.

Papaya deceptively relies upon selective information in Skillz's Developer FAQs to assert that Skillz's representations to consumers about not using bots in cash games are false. *Id*. ¶¶ 194–

---

[1] The factual allegations outlined in this motion are drawn from Papaya's Answer and Counterclaims (ECF No. 46) and "are assumed to be true for the purposes of resolving the instant Motion." *Anderson v. Unilever United States, Inc*., 607 F. Supp. 3d 441, 446 (S.D.N.Y. 2022).

96. The plain language of Skillz's Developer FAQs disclose the permitted use of bots in two narrow situations: allowing players to learn about gameplay on the platform upon downloading an app (*i.e.*, "Z tournaments," practice games against bots in which no cash is wagered), and controlling the random elements of the game when ***two human players compete against each other*** asynchronously and compare their scores to determine a winner.[2] Declaration of Craig Carpenito ("Carpenito Decl."), Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness").

### B. Papaya—Which Advertises Its Games as "Fair"—Alleges that Skillz's Advocacy for Fairness Is Defamation

Papaya claims that Skillz defamed it by making statements and funding an entity that promotes fairness in the mobile gaming industry. Specifically, Papaya claims that it was defamed by: (1) Skillz's involvement in a 501(c)(4) organization dedicated to fairness and transparency in mobile gaming; and (2) an article published by the website Bonus.com that interpreted Papaya's arguments in its motion to dismiss, which was republished by Skillz and its employees on social media. *Id.* ¶¶ 233–36, 357–60.

*First*, Skillz has been, and continues to be, a vocal advocate for fair play in mobile gaming that seeks to raise awareness of the deceptive use of bots in the real-cash mobile gaming industry. *Id.* ¶¶ 184–87, 189. Consistent with such efforts, Skillz provided funds to and worked with Fair Play for Mobile Games ("FPFMG"), a 501(c)(4) nonprofit organization. *Id.* ¶ 125. FPFMG collected complaints from customers who believed they were defrauded out of money by mobile gaming companies using bots (including Papaya), helped route those complaints to appropriate

---

[2] Skillz offers two gameplay modes: Real-time and Play-and-Compare. In Real-time mode, Skillz does not permit bots in cash games. In Play-and-Compare mode, players play at different times and compare their performances. In Play-and-Compare games, bots do not compete or win; rather, as Skillz's FAQs make clear, the bot controls the random elements of a game so when two human players enter a cash tournament against one-another, each human plays against the same bot so they experience the same level of difficulty, and only the ***human player*** with the highest score wins. Carpenito Decl., Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness").

state agencies, and reported certain information about those complaints on a website called 4FairPlay.org (the "4FairPlay Website"). *Id*. ¶¶ 128–30. The 4FairPlay Website reported the volume of complaints FPFMG received as to specific mobile gaming companies, with a ticker illustrating the fact that that FPFMG continued to receive complaints. *Id*. ¶¶ 139, 150. Papaya asserts without explanation that the ***number of*** complaints received by FPFMG as reported on the 4FairPlay Website was falsely represented. *Id*. ¶ 151. But Papaya does not dispute that the complaints themselves were genuine. Nor does it deny that it received communications from government agencies investigating its use of bots, or even that it used bots prior to or at the time the 4FairPlay Website was operational (*i.e.*, that the purported implications created by the website related to Papaya's bot use were false).

*Second*, on June 25, 2024, a website called Bonus.com published an article covering this lawsuit, whose headline stated that Papaya "admit[ted] bot use" in this lawsuit. *Id*. ¶ 233. The Bonus.com article reported on arguments at the parties' May 10, 2024 conference and directly quoted from the parties' filings. Carpenito Decl., Ex. B [Bonus.com article].[3] Without any factual basis and despite receiving contrary information from Skillz's counsel in this litigation, Papaya conclusively asserts without any factual basis that Skillz paid for the Bonus.com article to be written and published. The headline of the article was corrected by Bonus.com at Papaya's request on June 25, 2024 (the same day it was published). ECF No. 46 ¶¶ 27, 233–36, 242; Carpenito Decl., Ex. B [Bonus.com article]. Also at Papaya's request, Skillz and its employees promptly took

---

[3] While Papaya's Answer and Counterclaims extensively reference the Bonus.com article as the basis for Papaya's defamation claims, Papaya did not include the full article as an exhibit. Because the original Bonus.com article as published before the revisions requested by Papaya is no longer available online, Skillz attaches the Bonus.com article as currently published herein as Exhibit B.

down their social media posts resharing the article as it had been published by Bonus.com. *Id.* ¶¶ 233–35.

### C. Papaya Asserts Intellectual Property Counterclaims Against Skillz and Third-Party Developers

Papaya further alleges counterclaims for trademark and copyright infringement by Skillz along with five third-party developers over five mobile games on the Skillz platform: Cash Out Bingo, Bingo For Cash, Solitaire World–Win Cash, Solitaire Cash, and 21 Bash.

In its Trademark Counterclaims, Papaya falsely alleges infringement by the games Cash Out Bingo and Bingo For Cash on Papaya's alleged trademark rights in its Bingo Cash game, infringement by the games Solitaire World–Win Cash and Solitaire Cash upon Papaya's alleged trademark rights in its Solitaire Cash game, and infringement by the game 21 Bash upon Papaya's alleged trademark rights in its 21 Cash game. *Id.* ¶¶ 81–86, 263–98. All three of the word mark trademark registrations (for Papaya's games Bingo Cash, Solitaire Cash and 21 Cash) were issued on the Supplemental Register.[4]  Papaya alleges that it alone has the right to use the word "cash" in connection with the generic terms "bingo," "solitaire," and "21." Papaya also asserts trademark claims as to certain registered design marks for its games, comprised generally of symbols and lettering including BINGO, dollar signs, playing cards or numbers with disclaimers of rights asserted in "bingo" and "21."[5]

---

[4] As noted by the Second Circuit in *Sulzer Mixpac AG v. A&N Trading Co.*, "[t]he supplemental register lists 'non-mark designations . . . that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning." 988 F. 3d 174, n.2 (2d Cir. 2021) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 19:33 (5th ed. 2020)). Thus, registration on the supplemental register does not confer the same benefits as does registration on the principal register, *see* 15 U.S.C. § 1094; in fact, it "does nothing to enlarge the substantive rights of the registrant." *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 267 (2d Cir. 1968).

[5] The U.S. Patent and Trademark Office certificates demonstrating the limited scope of Papaya's trademark registrations, submitted herewith as Carpenito Decl., Ex. F, are properly before the Court as their terms and effect were relied upon by Papaya in drafting the Counterclaims. The Court may properly consider documents incorporated by reference, as well as those "whose terms and effect are relied upon by the plaintiff in drafting the complaint." *Gryl ex. rel. Shire Pharms. Grp. PLC v. Shire Pharms Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002).

In its Copyright Counterclaims, Papaya alleges that the games Cash Out Bingo and Bingo For Cash infringe on its copyright rights in its Bingo Cash game. *Id*. ¶¶ 402–11. Papaya claims "copyright in the unique artistic expression encompassed within the Papaya Games" which "includes without limitation icons, play screens, game boards, and the overall user interface of the Papaya Games." *Id*. ¶ 93. While Papaya identifies U.S. Copyright Registration No. PA0002481705 it its Counterclaim, *id*. ¶¶ 94, 403, it suspiciously did not attach a copy of its registration as an exhibit. Carpenito Decl., Ex. C [Copyright.gov Printout Showing Particulars for Registration No. PA0002481705].[6] Papaya's registration for Bingo Cash with the United States Copyright Office is for its software code, not its artistic expression. *Id*. (registering Bingo Cash under form PA [performing arts] with the work identified as "computer files"). According to its copyright registration, Bingo Cash was first published in the United States. *Id*. (listing "Nation of First Publication: United States").

## III. MOTION TO DISMISS PAPAYA'S FALSE ADVERTISING, DEFAMATION, DECEPTIVE TRADE PRACTICES, AND COPYRIGHT COUNTERCLAIMS

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Dismissal is proper where a claim lacks "facial plausibility"—that is, where the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When assessing the pleadings on a motion to dismiss, a court may review "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken, as well as documents not expressly incorporated by

---

[6] This document is properly before the Court as a document incorporated by reference in Papaya's counterclaims. *Gryl*, 298 F.3d at 140.

reference in the complaint which are nevertheless integral to the complaint." *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (cleaned up).

### A. Papaya's False Advertising and Deceptive Trade Practices Counterclaims Should Be Dismissed Because Papaya Has Not Alleged A Materially False Statement By Skillz

Papaya asserts claims for false advertising by Skillz based on two different categories of representations to consumers: (1) statements that games on the Skillz platform are free of bots; (2) statements that "other companies' games" are "unfair and/or not-skill based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience"; and (3) statements that "cash withdrawals from the Skillz platform are available 'at any time.'" ECF No. 46 ¶¶ 329–30, 332. Papaya alleges deceptive trade practices based on these same representations, as well as Skillz's involvement in the 4FairPlay Website. *Id.* ¶¶ 341–46.

Section 1125(a)(1)(A) of the Lanham Act prohibits false or misleading descriptions or representations of fact "in commercial advertising or promotion" concerning "the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities." Accordingly, to state a claim for false advertising under the Lanham Act, a plaintiff must plausibly allege both falsity and materiality of each challenged statement. *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022). Similarly, to state a claim for deceptive business practices under New York General Business Law § 349, a plaintiff must allege that the defendant is engaged in (1) consumer-oriented conduct; (2) which is materially misleading; and (3) which injured the plaintiff was injured as a result. *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 607 (2d Cir. 2024). Because Papaya fails to plausibly allege that any of Skillz's representations are materially false, Papaya fails to state a claim for false advertising or deceptive trade practices.

### 1. Papaya does not plausibly allege that Skillz's statements that its platform is free of bots are false

Papaya fails to plausibly allege that Skillz's representations that it does not use bots on its platform are false. Although Papaya alleges that Skillz "repeatedly represents to consumers that the games available for play on its platform include only human opponents and never incorporate, or have incorporated, bot opponents," it does not sufficiently allege that these statements are materially false. ECF No. 46 ¶ 329. Papaya does not, because it cannot, allege that Skillz deploys bots that enter cash tournaments and take money from human players.

Papaya's argument that Skillz is actually using bots (and thus, lying to the public about it) rests on a snippet—taken out of context—from Skillz's Developer FAQs on its website.[7] *Id.* ¶ 194. The full section of the FAQ states:

> Skillz offers two distinct gameplay modes: Real-time and Play-and-Compare.
>
> Real-time mode
>
> In this mode, **bots are only permitted during the First Time User Experience**, which consists of the mandatory Z tournaments a player goes through after a new install. The primary goal of the synchronous bot opponents is to educate the players on the game mechanics while also giving them an idea of the in-game experience.
>
> Play-and-Compare mode
>
> Given the asynchronous nature of this mode (where **players "play and compare"**), when bots are present, players must **face identical bots** to ensure fairness. These bots are tailored to deliver consistent experiences.

Carpenito Decl., Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness") (emphases added).

---

[7] Because the Developer FAQs are incorporated by reference in Papaya's Counterclaims, they may properly be considered by the Court in reviewing this Motion. *Gryl*, 298 F.3d at 140.

The plain language of this FAQ shows makes clear that bots are used only a) to simulate the real "in-game experience" and b) to help facilitate *human to human* play in a specific "Play-and-Compare mode." These representations, in other words, do not in any way indicate that Skillz allows the use of bots to compete in and win cash competitions against human opponents on its platform. Furthermore, as re-printed above, the FAQ relates to only to "Z Games," which use Skillz's virtual currency and are not played for cash. Ex. D (Skillz Developer FAQs § 2.2, "Tournaments and Gameplay Parameters"). Skillz's representations that it does not allow bots on its platform the way *Papaya* uses them cannot be false, as they do not "conflict[] with reality." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).

Further, Papaya has not plausibly alleged materiality—*i.e.*, that the presence of bots in certain ***practice*** games, ***where no money is at stake***, is likely to influence players' purchasing decisions. A statement is material when it is "likely to influence purchasing decisions." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016). Papaya's counterclaims fail to allege how the limited use of bots in certain noncash practice games (as disclosed in the FAQ's on Skillz's website) is misleading or otherwise would be material to any user of any Skillz's platform. Papaya's claims related to the use of bots in practice games therefore fail. *Id.*

Papaya's allegations related to the use of bots in asynchronous games, where two human players play at separate times and compare their scores, fares no better. ECF No. 46 ¶¶ 194–95. Again, the plain text of Skillz's FAQ explains that when two human players compete against each other in an asynchronous game involving randomized elements impacting the game's difficulty level, a third-party developer may use bots to ensure that each human player competing against another human player for a high score faces the same randomized elements and gameplay, so that the comparison of one human player's score against another human player's score in a game to

determine the winner of the competition accurately reflects the player's skill (as opposed to having the outcome dictated by randomization).[8] Papaya has no plausible allegations that Skillz itself is deploying bots to masquerade as human players competing in cash games on its platform; that is simply not what the FAQ says. Thus, Papaya's reliance on Skillz's disclosures regarding the use of bots to ensure fairness in asynchronous *human to human* gameplay does not undermine the truth of Skillz's representations that it does not permit bots to compete against and win money from human players in cash competitions.[9]

     *Second*, Papaya's reliance upon customer reviews to claim that Skillz uses bots to deceive customers out of their money is hypocritical at best because, *according to Papaya*, customer reviews alone are insufficient to raise a facially plausible claim. ECF No. 28 at 13. Papaya cites thirteen purported customer reviews, none of which Papaya asserts are true and provide sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; ECF No. 46 ¶¶ 207–25. Papaya's heavy reliance on these reviews—with practically nothing else—is insufficient to satisfy its pleading standard. Indeed, in contrast to Papaya's counterclaims, Skillz's original claims against Papaya are based on, among other things, plausible factual allegations concerning: (1) statements of Papaya's former employees; (2) the mobile gaming market, (3) player liquidity, (4) features of Papaya's own games; and (5) Papaya's failure to publicly deny bot usage. Together, all of this

---

[8] For instance, in a game involving randomized obstacles, bots can be utilized to ensure that players of the same game in an asynchronous competition face the same obstacles, depending on the decisions the player makes during the game. The two human players' scores would then be compared against each other to determine a winner; a bot is not permitted to compete and cannot win a competition or take any cash prize from a human competitor in any cash game on Skillz's platform.

[9] Skillz made all of this clear in its Opposition to Papaya's motion to dismiss. ECF No. 35 at 25 & n.8. Indeed, Skillz unambiguously clarified to Papaya that "posting guidelines for developer use of bots in designing a game and ensuring gameplay fairness is not the same as putting bot competitors into cash competitions and secretly pocketing those bots' 'winnings.'" *Id*. Thus, Papaya knew its strained, incorrect interpretation of Skillz's guidelines lacked merit when it filed its counterclaims, but it nonetheless filed its claims anyway.

information supported Skillz's claim that Papaya uses bots. *See*, *e.g.*, ECF No. 1 ¶¶ 6, 31–33, 51–57, 70–72, 81–83. Customer reviews only serve to further bolster these other plausible allegations and underscore that customers believed Papaya represented itself as not using bots and that they viewed such representations as material. ECF No. 40 at 8 ("The complaint also plausibly alleges that Papaya's representations regarding who is playing in the competition are material. The representations concern a material quality of the Papaya platform. To bolster this argument, the complaint recites negative online reviews of Papaya games in which those posting the reviews complain about Papaya's use of bots."). Indeed, Papaya's reliance on selected customer reviews as the sole basis for its allegations that Skillz deploys bots to compete in cash games on its platform to win prizes against human players is especially puzzling when it previously asserted to this Court that customer reviews cannot constitute proof of bot usage. ECF No. 28 at 13.

> ## 2.  Papaya does not plausibly allege that Skillz's statements to consumers about its competitors' deployment of bots are false.

Papaya's similarly fails to plausibly allege that Skillz's representations about its competitors' use of bots are untrue. Papaya alleges that Skillz represents to consumers that "other companies' games" are "unfair and/or not-skill based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience" and that "cash withdrawals from the Skillz platform are available "at any time." ECF No. 46 ¶¶ 330, 332. But Papaya pleads no facts demonstrating that these statements are actually false. *Skillz Platform Inc. v. AviaGames Inc.*, Case. No. 21-cv-02436-BLF (N.D. Cal 2023) (ECF No. 435 at 14–15; ECF No. 509 at 8–10) (finding statements made mobile gaming company, Avia Games Inc., related to bot use more likely than not constituted fraud); ECF. No. 46 ¶ 80 (Papaya's answer limiting its denial related to bot use to the date of its Answer). Skillz's statement that "only Skillz can be trusted," is a statement of opinion which cannot be proven true or false and is not actionable under New York law. *See Doe v. Uber Techs.*,

*Inc.*, 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) (statements which "convey only the seller's opinion that its product is superior" are not actionable). None of these statements can serve as the foundation for Papaya's false advertising allegations.[10]

Because counterclaims I-II fail to plausibly allege Skillz's statements are materially false, they should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

### B. Papaya Fails to State a Claim for Defamation

Papaya's Defamation Counterclaims should be dismissed because they fail to state a claim under New York law. Papaya claims defamation in connection with statements made (1) on the 4FairPlay website, and (2) in an article published on Bonus.com. To prove libel under New York law, a plaintiff must prove "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Chau v. Lewis*, 771 F.3d 118, 126–27 (2d Cir. 2014). Falsity is a necessary element of a defamation cause of action and because "only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." *Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015) (internal quotation marks omitted). "Whether particular words are defamatory presents a legal question to be resolved by the court[] in the first instance." *Celle v. Filipino Rep. Enters., Inc*., 209 F.3d 163, 177 (2d Cir. 2000). Furthermore, courts have held that "[b]ecause a defamation suit 'may be as

---

[10] Similarly, Papaya quotes an article in the Skillz Help Center for the proposition that Skillz promises consumers that they can withdraw their cash winnings "at any time." ECF No. 46 ¶¶ 33–34, 250, 253, 318, 332, 345. The Help Center home page contains a prominent list of articles on the topic of "Withdrawals and Deposits," including an article entitled "Why does it take 4-6 weeks to get my withdrawal." Carpenito Decl., Ex. G [Skillz Help Center Players homepage]. Skillz's statement that withdrawals can be made "at any time," viewed in the context available to users, is not false. *S.C. Johnson & Son, Inc. v. Clorox Co*., 241 F.3d 232, 238 (2d Cir. 2001) (holding that in a false advertising case, "'text must yield to context' . . . 'a court must consider the advertisement in its entirety and not engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately.'") (quoting *Avis Rent A Car Sys., Inc. v. Hertz Corp*., 782 F.2d 381, 385 (2d Cir. 1986)) (cleaned up).

14

chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself,' courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

## 1. Papaya does not plausibly allege statements on the 4Fairplay Website are materially false

Statements on the 4FairPlay Website cannot be the subject of a defamation claim because Papaya does not sufficiently allege they were materially false—"a necessary element of any defamation claim." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 326 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. 2022). A plaintiff must therefore plead "facts that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).

"[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 242. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Id.* at 243. In assessing whether an allegedly defamatory statement meets this standard, "[c]ourts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader." *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6 (1st Dep't 2015).

Here, the 4FairPlay Website contained statements which would not plausibly "have a different effect on the mind of the average reader," *see id.*, than the version of the truth that Papaya claims should have been disclosed. According to Papaya, the 4FairPlay Website purports to state: (1) Papaya used bots in its cash games; (2) many customers complained about such bot use; and

15

(3) Papaya was being investigated by state attorneys general related to its bot use. ECF No. 46 ¶¶ 9, 11, 14, 128. Papaya's counterclaims do not, because they cannot, assert that any of these statements are untrue. Specifically, nowhere in Papaya's 104-page Answer does it deny that it used bots as of the filing of Skillz's Complaint or at the time the 4FairPlay Website was live. Rather, Papaya conspicuously limits its responses to its practices as of the date of the filing of its Answer. *See id*. ¶ 29 ("Papaya ***does not*** incorporate 'bots' or computerized opponents into its games other than in tutorial matches"); *id.* [Answer] 80 ("***as of the date of the filing of this Answer***, Papaya does not deploy bots to compete against live human players other than in tutorial games.") (emphases added). Nor has Papaya alleged, because it cannot, that it is false to imply that Papaya has received complaints from customers related to bot use (it has)[11] or that government agencies are investigating (or have investigated) Papaya for its bot use. ECF No. 1 ¶¶ 72–75; 85–92. Papaya's Defamation Counterclaims therefore fail to plead facts that, if proven, would establish that the 4FairPlay Website's statements as not true. *See Tannerite Sports*, 864 F.3d at 247.

Further, Papaya takes issue with the 4FairPlay Website displaying the number of complaints Papaya and other companies received on its website, accompanied by a "ticker" illustrating that FPFMG continued to receive complaints. ECF No. 46 ¶¶ 11–13. This ticker serves as the ***entire factual basis*** for Papaya's conclusory allegations that the data on the 4FairPlay Website was "fabricated." But the ticker did not, as Papaya alleges, purport to show live data. Rather, it was an illustration demonstrating that the 4FairPlay website continued to receive complaints on an ongoing basis. Papaya's own counterclaims underscore that no reasonable person would believe the ticker was meant to represent "live data" given, as Papaya alleges: (1) the ticker

---

[11] Skillz is informed that Papaya has received data from FPFMG that shows data supporting over 26,000 complaints used for the 4fairplay website. Yet, despite receiving such data, Papaya proceeded with its counterclaims anyway without any factual basis to allege such data was "fabricated."

16

was unmistakably on a timer; (2) no data on the website updated based on any "live data;" and (3) the starting number of complaints remained the same each time you entered the website. *Id*. ¶¶ 139–47. And, even if the ticker can somehow be interpreted as inflating the number of customer complaints against Papaya and others, whether those complaints totaled 27,000 versus 26,000 complaints would not "have produced any discernibly different impact on readers than the 'pleaded truth'" that players across the country have complained about Papaya's bot use. *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 391 (2d Dep't 2017). Thus, because Papaya has no factual basis to allege that the data included on the 4Fairplay Website was "fabricated" and, at best, alleges that the number of complaints against Papaya was immaterially inflated, Papaya's defamation claims related to the 4FairPlay Website fail as a matter of law.

## 2. The Bonus.com article is protected by Section 74 of the New York Civil Rights Law.

Papaya's claim that it has been defamed by the Bonus.com article is legally meritless and should be dismissed because the statements in that article were about judicial proceedings and thus are protected by New York's fair and true report privilege. "A plaintiff cannot prevail on a defamation claim where the statements complained of are privileged under state law." *Ctr. for Med. Progress*, 551 F. Supp. 3d at 328 (internal quotation marks omitted). Under New York law, "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." *Id*. (quoting N.Y. Civil Rights Law § 74). "The protections of section 74 extend to pleadings … and the release by the parties of background material regarding their positions in the case." *Id*. at 329. "The protections of Section 74 also extend to reports of judicial proceedings that are mixed with commentary or opinion." *Id*.; *see also Reus v. ETC Hous. Corp*., 148 N.Y.S.3d 663, 668 (N.Y. Sup. Ct. 2021), *aff'd*, 164 N.Y.S.3d 692 (3d Dep't 2022) (A report "need not stem directly from a judicial proceeding, but rather, can be

*about* a judicial proceeding." (emphasis in original)); *Komarov v. Advance Mag. Publishers, Inc.*, 691 N.Y.S.2d 298, 300 (N.Y. Sup. Ct. 1999) (Section 74 privilege applies "to any pleading made within the course of the proceeding.").

New York law is decidedly pro-publisher and applies a liberal standard for what constitutes a "fair and true report": "the exact words of every proceeding need not be given if the substance be substantially stated." *Palmieri v. Thomas*, 814 N.Y.S.2d 717, 718 (2d Dep't 2006); *see also Ctr. for Med. Progress*, 551 F. Supp. 3d at 330. A "substantially accurate" publication is one that, "despite minor inaccuracies, [] does not produce a different effect on a reader than would a report containing the precise truth." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005).

Moreover, Papaya has no good faith basis to allege that Skillz was responsible for the Bonus.com article's headline and content.[12] And even if it did, the protections afforded by Section 74 clearly cover the statements in the Bonus.com article. First, the allegedly defamatory statements are, without question, about the pleadings made within the course of this judicial proceeding. *Ctr. For Med. Progress*, 551 F. Supp. 3d at 329. The article references the lawsuit repeatedly, names the judge and the court in which the Skillz's lawsuit was filed, references oral arguments at the parties' May hearing, and quotes directly from the parties' pleadings. Carpenito Decl., Ex. B [Bonus.com article]. And the statements are a "substantially accurate" summary of Papaya's pleadings and representations in this case. Papaya's own brief in support of its motion to dismiss, filed on the public docket, states: **"Papaya has never denied or refuted the alleged bot usage"** (ECF No. 28 at 24); **"Papaya does not represent that its games *never* include computerized opponents"** (*id.* at 9 (emphasis added)); and **"Papaya has *not* denied or refuted that it deployed bots"** (*id.* at 10 (emphasis in original)). It is a reasonable interpretation of these statements that

---

[12] Notably, Papaya has not sued Bonus.com for writing and publishing the article.

18

Papaya admitted it used bots.[13] Accordingly, Papaya does not allege any set of facts that "allows the court to draw the reasonable inference that the defendant is liable" for defamation. *Iqbal*, 556 U.S. at 678.

But even to the extent the Court finds Papaya's position ambiguous, any such doubts should be resolved in Skillz's favor. *See Becher v. Troy Pub. Co.*, 589 N.Y.S.2d 644, 646–47 (3d Dep't 1992) ("Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of statutes like [Section 74]. Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression.").

Lastly, given that Papaya's counterclaims still do not allege that Papaya never used bots in its cash games, the statements published do not create a "different effect on the mind of the average reader." *Franklin*, 21 N.Y.S.3d at 6. Papaya's defamation claims should therefore be dismissed.

### C. Papaya Cannot Plausibly Allege Copyright Counterclaims Because They Seek Protection of Unregistered Aspects of Papaya's Works

Papaya also cannot state a claim for its Copyright Counterclaims, because it asserts claims regarding aspects of Papaya's works which were not registered with the U.S. Copyright Office as required by law. Papaya's Copyright Counterclaims assert copyright infringement for alleged violations of the copyright for Papaya's game Bingo Cash and contributory and/or vicarious copyright infringement against Skillz. These claims should be dismissed pursuant to Fed. R. Civ.

---

[13] Papaya intentionally mischaracterizes its counsel's remark to the Court at a conference on May 10. Papaya alleges that at that conference, its counsel represented that the platform "does not incorporate bots (and that a written certification would be forthcoming, which was subsequently provided)." ECF No. 46 ¶ 241. But as the Court surely knows, Papaya's counsel actually represented only that "the games *as currently constituted* do not use bots." 5/10/24 Hr'g Tr. 9:24–10:3 (emphasis added). Whether Papaya *currently* used bots as of May 10, 2024 is not relevant to the question of whether Papaya *previously* used bots as Skillz complaint alleges.

P. 12(b)(6). Papaya claims that it owns "copyright in the unique artistic expression encompassed within the Papaya Games" which "includes without limitation icons, play screens, game boards, and the overall user interface of the Papaya Games." ECF No. 46 ¶ 93. Papaya identifies only one copyright registration, namely, U.S. Copyright Registration No. PA0002481705. *Id*. ¶¶ 94, 403. Notably and suspiciously, Papaya did not attach a copy of its registration to its Counterclaim pleading. Carpenito Decl., Ex. C [Copyright.gov Printout Showing Particulars for Registration No. PA0002481705].

Though Papaya sued Defendants for infringement on the "unique artistic expression" in Bingo Cash, it has not registered the visuals, graphics, or "unique artistic expression" within the game with the U.S. Copyright Office. A copyright holder for a United States work may only sue after registering the work with the Copyright Office. 17 U.S.C. § 411(a); *Fourth Estate Public Benefit Corp v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019). Such registration "is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Id*. While Papaya has registered Bingo Cash's **software code** through the Copyright Office, it does not appear to have registered its "unique artistic expression" including "icons, play screens, game boards, and user interface" as alleged. *Compare* Carpenito Decl., Ex. C (Bingo Cash, U.S. Copyright No. PA0002481705 (filed Jul. 18, 2024) (registering Bingo Cash under form PA (performing arts) with the work identified as "computer files")), *with* Ex. E (Papaya Gaming, Inc.'s unasserted registration for Solitaire Cash, U.S. Copyright No. VA0002259316 (filed Jul. 18, 2021) (registering Solitaire Cash under form VA (visual arts) as "visual material")).[14] Though the copyright for Bingo Cash was registered by Papaya Gaming, Ltd., an Israel company,

---

[14] Papaya referenced the registration for Bingo Cash in its Answer and Counterclaims but did not append it as an exhibit. ECF No. 46 ¶¶ 94, 403.

Bingo Cash was first published in the United States. Carpenito Decl., Ex. C [Bingo Cash, U.S. Copyright No. PA0002481705] (listing "Nation of First Publication: United States"). A work is a United States work, requiring registration prior to enforcement of copyright claims, if it is first published in the United States. 17 U.S.C.A. § 101. Because Bingo Cash was first published in the United States, it requires registration with the Copyright Office prior to bringing any action for infringement, and Papaya did not register the aspects at issue in the Copyright Counterclaims.

Because Papaya's copyright registration for Bingo Cash covers only its computer code and not the visual aspects of the game, it cannot state a claim for Copyright infringement. To the extent Papaya claims infringement on aspects of Bingo Cash not registered with the Copyright Office (such as its "unique artistic expression" and visual elements), these claims are barred by § 411(a). *Schultz v. Lost Nation Booster Club*, 2014 WL 10038777, at *3 (S.D. Iowa Oct. 14, 2014) (holding "copyright registration of [the plaintiff's] HTML code does not extend to the visual presentation of the website"); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 703 (2d Cir. 1992).

Because Papaya's Copyright Counterclaims seek to protect aspects of Bingo Cash not included in its registration with the U.S. Copyright Office, Papaya cannot state a claim for either copyright infringement (counterclaim IX) or contributory and/or vicarious copyright infringement (counterclaim X). In the alternative, should the Court find that Papaya has stated a claim for the Copyright Counterclaims, these claims should be severed. *See infra* Section IV.

## IV. MOTION TO SEVER PAPAYA'S COPYRIGHT AND TRADEMARK CLAIMS

### A. The Court Should Exercise Its Discretion to Sever Papaya's Intellectual Property Claims from this Action

Papaya's Copyright Counterclaims and the Trademark Counterclaims (collectively, the "Intellectual Property Counterclaims") should be severed from this action because Skillz will be prejudiced by the additional time necessary to litigate Intellectual Property Counterclaims that

21

contain no common questions of law or fact with Skillz's original claims. In the interest of judicial economy, severance of the Intellectual Property Counterclaims is appropriate because they will require new evidentiary proof and witnesses that do not overlap with the original claims (or even Papaya's other counterclaims).

Rule 21 permits courts to add or drop a party "at any time, on just terms." Fed. R. Civ. P. 21. The court may also "sever any claim against a party" pursuant to Rule 21. *Id*. In deciding whether severance is appropriate, courts consider five factors: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *Morris v. Northrop Grumman Corp*., 37 F.Supp.2d at 580. Any of these factors alone warrants severance of claims. *Medmix Switzerland AG v. Kettenbach GmbH & Co. KG*, 2024 WL 1973365, at *5 (E.D.N.Y. May 3, 2024); *see also Lewis*, 2000 WL 423517 at *2 (citation omitted). Here, *all five* factors militate in favor of severance of the Intellectual Property Counterclaims.

### 1. The Intellectual Property Counterclaims rest on unrelated facts

"Generally, counterclaims are severable when they are based upon an entirely different factual situation from that upon which the plaintiff's claims are based." *North Jersey Media Group, Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 115 (S.D.N.Y. 2015). More specifically, severance is appropriate where claims do not arise from the same series of transactions or occurrences. *Jem Accessories, Inc. v. JVCKENWOOD USA Corp.*, 2021 WL 706646, at *3 (S.D.N.Y. Feb. 22, 2021). While "[t]here is no rigid rule as to what constitutes the same series of transactions or occurrences,"

courts "repeatedly have interpreted the phrase 'same transaction' to encompass 'all logically related claims.'" *North Jersey Media Group, Inc.*, 312 F.R.D. at 115.

Here, the Intellectual Property Counterclaims do not arise out of the same set of transactions or occurrences as the Defamation Counterclaims. Indeed, the Intellectual Property Counterclaims do not allege facts related to the use of bots, false advertising or Skillz's assertion that Papaya uses bots in the operation of its games. They share not a single fact in common with the Defamation Counterclaims or the False Advertising Counterclaims.

Papaya improperly attempts to tie-in the Intellectual Property Counterclaims to the rest of this case by characterizing the underlying facts as "another facet of Skillz's efforts to unfairly compete with the highly successful Papaya Games." ECF No. 46 ¶¶ 262–98. But there is no logical relationship between the purported similarities in the games themselves (alleged in support of the Intellectual Property Counterclaims), which Skillz does not even design or develop, and the statements alleged in support of the Defamation and False Advertising Counterclaims.

### 2. The Intellectual Property Counterclaims present no common questions of law or fact

For the same reasons, Papaya's Intellectual Property Counterclaims also do not present any common questions of law or fact with its other counterclaims such that consolidation would conserve judicial resources or avoid prejudice. *Ndugga v. Bloomberg L.P.*, 2024 WL 3755564, at *3 (S.D.N.Y. Aug. 12, 2024) (severance appropriate where claims "share no overlap.").

### 3. Severance would serve the interests of judicial economy

Because the allegations against Skillz are completely distinct from those made in the Complaint and the False Advertising and Defamation Counterclaims, considerations of judicial economy and fairness would not be upheld if all counterclaims were resolved in a single suit. This Court has held that the requirements of Rule 20 are to be interpreted liberally to promote judicial

economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *Jem Accessories, Inc.,* 2021 WL 706646, at *3.

Continuing to litigate Papaya's unrelated Intellectual Property Counterclaims is likely to hinder settlement because there are five additional and necessary parties charged in those unrelated claims who have not been served and have not appeared. No judicial economy will be gained from joining Papaya's unrelated counterclaims because each claim, and defendant, requires their own legal strategies, witnesses, and defenses such that they would proceed as functionally separate actions. *See id*. at *5. Thus, the Intellectual Property Counterclaims will serve only to delay and stall this proceeding, with no likelihood of swift resolution. Severing these claims would allow each party to fully litigate each claim and reduce the potential for prejudice that could arise from the confusion of factual issues that do not pertain to the unrelated claims. *See id*.

### 4.  Severance would avoid prejudice to Skillz

Skillz will be prejudiced if the Intellectual Property Claims remain in the current litigation because Papaya only asserted them to intentionally delay resolution of Skillz's original claims. The parties' short history in this litigation to date demonstrates that obfuscation is Papaya's only strategy: Skillz filed the Complaint on March 4, 2024 alleging causes of action surrounding Papaya's use of bots that are being falsely portrayed as human players (ECF No. 1 ¶¶ 1, 58); Papaya accepted service of the Complaint and therefore gained additional time to answer or move to dismiss; Papaya further requested that Skillz refrain from filing a preliminary injunction with the assurance that the platform ceased using bots after this litigation was filed (ECF No. 44); Papaya then refused to provide any actual evidence (other than the opaque and narrow report of a hired litigation expert) that it had ceased using bots. In the meantime, Papaya continues to reap the

24

benefit of its anticompetitive behavior to Skillz's detriment. Papaya should not be allowed to bog down this litigation for economic gain.

### 5. The Intellectual Property Counterclaims require discovery from different witnesses and different documentary evidence

Finally, the Defamation Counterclaims and the Intellectual Property Counterclaims require different witnesses and documentary proof, thus justifying severance. *Oram*, 979 F. Supp. 2d at 502–03 (2013). In the first instance, resolving Papaya's Intellectual Property Counterclaims requires discovery from *five* unrelated developers that Papaya joined as counterclaim defendants. Moreover, the advertising, coding, and customer reviews raised in Papaya's Answer and Counterclaim do not pertain to any of the documents or witnesses identified in Skillz initial disclosures. ECF No. 39. Even of the four Papaya-employee witnesses Papaya included in its Initial Disclosures, only one has any relevant knowledge about the Intellectual Property Counterclaims; all non-Papaya witnesses identified are related solely to the other counterclaims. *Id*. Therefore, keeping the Intellectual Property Counterclaims in this action would unduly broaden the case to require witnesses and documents well beyond the scope of discovery for the principal claims at issue in this matter.

All facts presented by both Skillz and Papaya weigh in favor of severance. In the interest of judicial efficiency and fairness, this Court should sever the Intellectual Property Counterclaims so that they may litigate separately without causing further delay in this action.

## V. CONCLUSION

For the foregoing reasons, Skillz respectfully submits that the Court should sever and dismiss Papaya's counterclaims.

Dated: September 4, 2024

KING & SPALDING LLP

By: */s/ Craig Carpenito*

Craig Carpenito
ccarpenito@kslaw.com
Jessica Benvenisty
jbenvenisty@kslaw.com
Amy Nemetz
anemetz@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036-2601
Tel: (212) 556-2100
Fax: (212) 556-2222

Lazar P. Raynal (*pro hac vice*)
lraynal@kslaw.com
Michael A. Lombardo (*pro hac vice*)
mlombardo@kslaw.com
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333
Fax: (312) 995-6330

*Attorneys for Skillz Platform Inc.*

# Exhibit 5

State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308086165059
Filing Date/Time: 08/08/2023 10:00 AM
Effective Date/Time: 08/08/2023 10:00 AM

**FAIR PLAY FOR MOBILE GAMES**
**ARTICLES OF INCORPORATION**

Case 1:25-cv-00470-MSN-IDD    Document 1-5    Filed 03/14/25    Page 2 of 5 PageID# 92

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308086165059
Filing Date/Time: 08/08/2023 10:00 AM
Effective Date/Time: 08/08/2023 10:00 AM

**FAIR PLAY FOR MOBILE GAMES**
**ARTICLES OF INCORPORATION**

The undersigned, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:**      The name of the Corporation is "Fair Play for Mobile Games" (the "Corporation").

**SECOND:**   This Corporation is organized and operated exclusively for social welfare purposes within the meaning of section 501(c)(4) of the Internal Revenue Code of 1986. The purpose of the Corporation is to educate the general public about mobile gaming companies that promise fair competition but instead use gaming bots to scam players. The Corporation will advocate for fair play and to help consumers who have been the victims of mobile gaming fraud.

No part of the net income of the Corporation shall inure to the benefit of, or be distributed to, any director, officer, or other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this Corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:**     The Corporation shall have no members.

**FOURTH:**  The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy occurs on the Board of Directors, the vacancy

may be filled by vote of a majority of the Directors in attendance at a meeting of the Board called for such purpose.

The Corporation's initial director is:

Josh Levin
1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**FIFTH:**      The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation located in the County of Chesterfield, that is authorized to transact business in Virginia.

**SIXTH:**     The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA  23314

**SEVENTH:**  The Corporation's initial principal office address is:

1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**EIGHTH:**    The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the organization, including the distribution of the remaining funds of the organization consistent with the purposes stated herein.

Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes or for social welfare purposes as described in section 501(c)(4) or dispose of excess funds in accordance with

Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any corresponding provision of any future United States Internal Revenue law, and any other applicable state or federal law.

**IN WITNESS WHEREOF** the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are his and to the best of his knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

*Michael Garcar*

Michael Garcar, Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, AUGUST 8, 2023

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

# Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

# CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective August 8, 2023.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 6

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

# THEGOBERGROUP

GO

## ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE

Fair Play for Mobile Games ("Client")

_____ By initiating here, I acknowledge that I am authorized by Client to enter into an agreement between The Gober Group PLLC and Client for legal services.

___ By initialing here, I acknowledge that I have visited **www.qoberqrouP.com./terms_and** have read The Gober Group's Terms of Service. I further acknowledge that I understand The Gober Group's Terms of Service, and that I agree that the attorney-client relationship between The Gober

s

_____ By in herb,e a 'eddge h Thaveread e a ached fee schedule(s), I understand the pricing specified in such fee schedule(s), and I agree to the pricing terms specified in such fee edule(s).

_____ By initialing here, I acknowledge that Client will pay a refundable security deposit in the amount of $1,500 to be held in The Gober Group's IOLTA as security against future unpaid fees ("Security Deposit"). In the event one or more of Client's invoices remain unpaid for more than 30 days after Clients receipt of such invoices(s), The Gober Group may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require Client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of Client. Upon termination of the attorney-client relationship between The Gober Group and Client, The Gober Group will return the remaining funds from the Security Deposit, if any, to Client following the payment of all unpaid invoices.

_____ By initialing here, I acknowledge that Client will be charged a flat fee of $6,000 for The Gober Group to execute the nonprofit formation for Client, and that The Gober Group will charge hourly (see attached fee schedule) for all communications and other legal services on behalf of Client. Note, however, that the flat fee will be discounted to $4,500 if Client promptly notifies The Gober Group that Client will "self-declare" its 501(c)(4) status, meaning The Gober Group will not have to prepare the IRS Form 1024, Application for Recognition of Exemption Under Section £ 1

_____ B initialin here I acknowled e that durin each ear of our re presentation The Gober Group will provide Client with an "Annual Update Letter," which will provide you details about Clients Board of Directors meetings, filing deadlines, and other compliance obligations. Rather than billing hourly, we will minimize your costs by charging a $500 flat fee, invoiced in the month you receive the Annual Update Letter, to cover the time and labor associated with maintaining your file and preparing the letter. Please note that, because it is imperative for organizations to

T  202.417.3529          W   G›GoberGroup

F  877.437.5755          @   GoberGroup.com

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE
PAGE 2 OF 2

practice good organizational hygiene, in addition to meeting their filing deadlines, the preparation of the Annual Update Letter is a standard part of our representation.

Understood and agreed to by:

Josh Levin

_____
Print Name of Client Representative

_Josh Levin_
54B5F88A2F084FE...
_____
Signature of Client Representative

Executive DIrector
_____
Title of Client Representative

8/7/2023
_____
Date

T  202.417.3fi29         M  G›GoberGroup
8  877.437.5755          @  GoberGroup.com

JL - 0033

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

# THEGOBERGROUP
G



## RATE SHEET FOR HOURLY FEES

**ATTORNEYS**

- Karen Blackistone Oaks: $750
- Tracey Frazier Wigglesworth: $625
- Chris Gober: $850
- Jenny Kim: $675
- Anna Mackin: $500
- Shannon O'Leary: $500
- Loree Anne Paradise: $500
- Eric Wang: $650

**OF COUNSEL ATTORNEYS**

- Steven Burk: $600
- Michael Garcar: $450

- Bryan Jacoutot: $350                8/7/2023
- Diane LaRoss: $450
- Audrey Perry Martin: $625
- Bryan Tyson: $675

**SENIOR COMPLIANCE DIRECTORS**

- Kristen Lippstreu: $350
- Ashlyn Maeoka: $350
- Garret Scronce: $325

**LAW CLERK**

- Sara Cutter: $250

**PARALEGALS/RESEARCH SPECIALISTS**

- Universal Rate: $275

Security Deposit Policy

It is the Firm's policy to charge new clients a refundable deposit to be held in the Firm's "IOLTA" trust account as security against future unpaid fees ("Security Deposit"). The amount of the Security Deposit, which will be specified in a separate "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement executed by the client, varies based upon the client type and the anticipated scope of work. In the event one or more of the client's invoices remain unpaid for more than 30 days after the clients receipt of such invoices(s), the Firm may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require the client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of the client.

Commencement of Work Policy

It is the Firm's policy to not commence work until a new client has: (i) executed the Firm's "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement; AND (ii) paid the Security Deposit.

*Updated as of April 11, 2025*

T | 800.825.17B0          C    |#GoberGroup

JL - 0034

F | 877.437.5755          @  | GoberGroup.com

JL - 0034

DocuS!gn Envelope iD: 44FDF253-518D-4064-97D5-3A8178CAB62B

•:...:*THE GOBER GROUP
GO *further*

8/7/2023

# FLAT FEE SCHEDULE FOR ESTABLISHING NONPROFIT ORGA!\JIZATIONS

To provide our clients with additional transparency and budgetary certainty, The Gober Group offers a one-time fldt fee to complete cenain steps in the nonprofit formation process. While the following rate schedule does not contemplate every aspect of forming a nonprofit, it does cover the minimum requirements customarily performed by a law firm to establish the organization and begin operations.

| 501(c)(3) | 501(c)(4) | 501(c)(6) |
|-----------|-----------|-----------|
| $7,500    | $6,000    | $7,500    |

| Included | Legal Services and Out-of-Pocket Fees Not Included in Flat Fee |
|----------|-------------------------------------------------------|
| ✓ Two initial conferences to determine type(s) of organization(s) necessary to accomplish goals | ✗ Customized bylaws (although generic bylaws will be provided) |
| ✓ Articles of Incorporation or a similar organizational document | ✗ Insurance policies |
| ✓ IRS Employer Identification Number (EIN) | ✗ State-specific research, documents, and requests for tax exemption |
| ✓ Generic bylaws | ✗ State-specific research, documents, and registrations for fundraising activities |
| ✓ Conflicts of Interest Policy, Whistleblower Policy, and Document Retention Policy | / Lobbying research, registrations, and reports |
| ✓ Agenda, resolutions, and supporting documents for organizational board meeting | ✗ Responses to follow-up questions from the IRS regarding the Application for Recognition of Exemption |
| ✓ Corporate minutes for the organizational board meeting | ✗ Ongoing legal compliance |
| ✓ IRS Form 1023/1024 - Application for Recognition of Exemption (as applicable) | ✗ Out-of-pocket fees and expenses, such as the IRS's filing fee for the Application of Recognition of Exemption ($600); state incorporation and registration fees; registered agent services; insurance premiums; and lobbying registration fees |
| ✓ IRS Form 8976 - Notice of Intent to Operate Under Section 501(c)(4) (as applicable) | |

Please note the flat fee does not include a retainer fee and/or security deposit that may be required of new clients. Our pricing also assumes that the legal services included in the flat fee will be completed within 90 days of the client executing our engagement letter. Unless the delays are caused by our firm, any legal services performed beyond this 90-day window, regardless of whether they are normally included in the flat fee, will be billed at our standard hourly rates.



JL - 0035

# Exhibit 7

State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308236220521
Filing Date/Time: 08/23/2023 10:11 AM
Effective Date/Time: 08/23/2023 10:11 AM

## Fictitious Name - Fictitious Name Certificate

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Fair Play for Mobile Games | Entity Type: | Nonstock Corporation |

### Fictitious Name

Fictitious Name:   4 Fair Play

### Signature Information

Date Signed: 08/23/2023

| Printed Name | Signature | Title |
|---|---|---|
| Rocky Matthews | Rocky Matthews | Chair |

Case 1:25-cv-00470-MSN-IDD    Document 41-8    Filed 08/18/25    Page 158 of 244
Case 1:25-cv-00470-MSN-IDD    Document 18    Filed 03/14/25    Page 1 of 5 PageID#
103
Case 1:25-cv-00470-MSN-IDD    Document 20-8    Filed 04/04/25    Page 1 of 5 PageID#
335

# Exhibit 8

State Corporation Commission
Office of the Clerk
Entity ID: 11657083
Filing Number: 2402156861518
Filing Date/Time: 02/15/2024 02:58 PM
Effective Date/Time: 02/15/2024 02:58 PM

**ADVANCING COMMUNITY VALUES**
**ARTICLES OF INCORPORATION**

The undersigned, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:**    The name of the Corporation is "Advancing Community Values" (the "Corporation").

**SECOND:**    This Corporation is organized and operated exclusively for social welfare purposes within the meaning of section 501(c)(4) of the Internal Revenue Code of 1986. The purpose of the Corporation is to educate policymakers and influencers about environmental policy and its impacts on local communities throughout the United States.

No part of the net income of the Corporation shall inure to the benefit of, or be distributed to, any director, officer, or other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this Corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:**    The Corporation shall have no members.

**FOURTH:**    The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy occurs on the Board of Directors, the vacancy may be filled by vote of a majority of the Directors in attendance at a meeting of the Board called for such purpose.

DocuSign Envelope ID: 0398B313-4BF5-47B8-8A10-A56A9023631

The Corporation's initial director is:

Josh Levin
1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**FIFTH:**       The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation located in the County of Chesterfield, that is authorized to transact business in Virginia.

**SIXTH:**    The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA  23314

**SEVENTH:**  The Corporation's initial principal office address is:

1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**EIGHTH:**    The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the organization, including the distribution of the remaining funds of the organization consistent with the purposes stated herein.

Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes as described in Section 501(c)(3) of the Internal Revenue Code or for social welfare purposes as described in Section 501(c)(4) of the Internal Revenue Code, or dispose of excess funds in accordance with Section 501(c)(4) of the Internal Revenue or any

ADVANCING COMMUNITY VALUES
ARTICLES OF INCORPORATION                    PAGE 2 OF 3

corresponding provision of any future United States Internal Revenue law, and any other applicable state or federal law.

**IN WITNESS WHEREOF** the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are his and to the best of his knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

*MICHAEL GARCAR*

Michael Garcar, Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, FEBRUARY 15, 2024

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

## Advancing Community Values

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

## CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective February 15, 2024.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 9

State Corporation Commission
Office of the Clerk
Entity ID: 11314734
Filing Number: 2212215286344
Filing Date/Time: 12/21/2022 09:39 AM
Effective Date/Time: 12/21/2022 09:39 AM

## Nonstock Corporation - Articles of Termination

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Mobile Gaming Fairness | Entity Type: | Nonstock Corporation |
| Entity ID: | 11314734 | Formation Date: | 12/07/2021 |
| Status: | Active | | |

### Signature Information

Date Signed: 12/21/2022

☑ The corporation has not commenced business.

☑ No debt of the corporation remains unpaid.

☑ The net assets of the corporation remaining after winding up have been distributed.

◉ A majority of the initial directors authorized the dissolution.

○ Initial directors were not named in the articles of incorporation and have not been elected, and a majority of the incorporators authorized the dissolution.

| Printed Name | Signature | Title |
|---|---|---|
| Joshua Levin | Joshua Levin | Director |

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, DECEMBER 21, 2022

The State Corporation Commission has found the articles of termination submitted on behalf of

Mobile Gaming Fairness

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF TERMINATION

be issued and admitted to record with the articles of termination in the Office of the Clerk of the Commission, effective December 21, 2022.

STATE CORPORATION COMMISSION

By

Judith Williams Jagdmann
Commissioner

# Exhibit 10

**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

**IRS**

| | |
|---|---|
| **Date:** | 07/19/2022 |
| **Employer ID number:** | 87-4007913 |

**Person to contact:**
Name: Customer Service
ID number: 31954
Telephone: (877)-829-5500

**Accounting period ending:**
December 31

**Form 990/990-EZ/990-N required:**
Yes

**Effective date of exemption:**
December 7, 2021

**Contribution deductibility:**
No

**Addendum applies:**
No

**DLN:**
26053453004482

MOBILE GAMING FAIRNESS
C/O KAREN BLACKISTONE
2308 MT VERNON AVE SUITE 762
ALEXANDRIA, VA 22301

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code
(IRC) Section 501(c)(4). This letter could help resolve questions on your exempt status.
Please keep it for your records.

Donors cannot deduct contributions they make to you under IRC Section 170(c)(2).

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show
you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form
990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt
status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of
this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities.
Enter "4221-NC" in the search bar to view Publication 4221-NC, Compliance Guide for Tax-Exempt
Organizations (Other than 501(c)(3) Public Charities and Private Foundations), which describes your
recordkeeping, reporting, and disclosure requirements.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

*Stephen A. Martin*

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

**Letter 948 (Rev. 3-2020)**
Catalog Number 35151E

112

**Date:** 07/19/2022

**Employer ID number:** 87-4007913

**Person to contact:**
Name: Customer Service ID number: 31954
Telephone: (877) 829-5500 Accounting period ending: December 31

**Form 990/990 EZ/990 N required:** Yes

**Effective date of exemption:** December 7, 2021 **Contribution deductibi lily:** No

**Addendum applies:** No

**DLN:** 26053453004482

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code (IRC) Section 501(c)(4). This letter could help resolve questions on your exempt status. Please keep it for your records.

Donors cannot deduct contributions they make to you under IRC Section 170(c)(2).

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-NC" in the search bar to view Publication 4221-NC, Compliance Guide for Tax-Exempt Organizations (Other than 501(c)(3) Public Charities and Private Foundations), which describes your recordkeeping, reporting, and disclosure requirements.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

Letter 948 (Rev. 3-2020)
Catalog Number 35151E

# Exhibit 11

**View:**





**Secretary of State Shirley N. Weber, Ph.D.**

| SECRETARY OF STATE | ELECTIONS | CAMPAIGN & LOBBYING | BUSINESS PROGRAMS | STATE ARCHIVES | REGISTRIES |

**Cal-Access Search**

*Cal Access*

Quarterly reports are required for any quarter in which the person spends $5,000 or more to influence legislative or administrative action. Links to legislative bills or state agencies lobbied are also available.

# FAIR PLAY FOR MOBILE GAMES

**2023-2024 LEGISLATIVE SESSION**

General Information
● Financial Activity/Filing History

## Legislative Session

● 2023 through 2024

| LOBBYING PAYMENTS MADE | | | |
|---|---|---|---|
| SESSION | QUARTER | TOTAL OF PAYMENTS TO INFLUENCE | P.U.C. LOBBYING |
| 2023-2024 | 3rd | $41,287.01 | $0.00 |

| BILLS AND AGENCIES LOBBIED | | |
|---|---|---|
| SESSION | QUARTER | BILLS/AGENCIES LOBBIED (AS FILED) |
| 2023-2024 | 3rd | Attorney General action relating to mobile gaming |

To Search For The Full Text Of Bills, Resolutions, And Constitutional Amendments Click Here.

**ELECTRONIC FILINGS**

**REPORT OF PERSON SPENDING $5,000 OR MORE TO INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION (F645)**

| FILING PERIOD: 07/01/2023 - 09/30/2023 | FILED ON: 10/31/2023 6:34:26 PM |
|---|---|
| FILING NUMBER: 2855086 | ORIGINAL FILING |

# REPORT OF PERSON SPENDING $5,000 OR MORE TO
## INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION
(Government Code Section 86116)

1/5

**FORM 645**

**1993**

**REPORT COVERS PERIOD FROM** 07/01/2023 **THROUGH** 09/30/2023

**CUMULATIVE PERIOD BEGINNING** 01/01/2023

**TYPE OR PRINT IN** INK

For information required to be provided to you pursuant to the Information Practices Act of 1977, see Information Manual on Lobbying Disclosure Provisions of the Political Reform Act.

**FOR OFFICIAL USE ONLY**

A

B

NAME OF FILER:

FAIR PLAY FOR MOBILE GAMES

| BUSINESS ADDRESS: (Number and Street) | (City) | (State) | (Zip Code) | TELEPHONE NUMBER: |
|---|---|---|---|---|
| | ARLINGTON | VA | 22209 | |

**PART I - LEGISLATIVE OR STATE AGENCY ADMINISTRATIVE ACTIONS ACTIVELY LOBBIED DURING THE PERIOD**
(See instructions on reverse.)

Attorney General action relating to mobile gaming

### SUMMARY OF PAYMENTS THIS PERIOD

A. Total Activity Expenses (Part II, Section A) .......................................................... $ 0.00

B. Total Other Payments to Influence (Part II, Section B) ......................................... $ 41287.01

Total (A + B above) ................................................................................................ $ 41287.01

C. Total Payments in Connection with PUC Activities (Part II, Section C) ............... $ 0.00

CAMPAIGN CONTRIBUTIONS: ☐ Part III completed and attached   ☒ No campaign contributions made this period

### VERIFICATION

**I have used all reasonable diligence in preparing this Report. I have reviewed the Report and to the best of my knowledge the information contained herein and in the attached schedules is true and complete.**

**I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

| Executed on (Date) 10/31/2023 | At (City and State) Chicago IL | By (Signature of Filer or Responsible Officer) Josh Levin |
|---|---|---|

| Name of Filer or Responsible Officer (Type or Print) Josh Levin | Title Director |
|---|---|

GG - 0033

CAL2PDF Version3.8

PERIOD COVERED: _____07/01/2023_____09/30/2023_____

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

PART II - PAYMENTS MADE THIS PERIOD

**A. ACTIVITY EXPENSES**

|  |  |  | $ |  | $ |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

☐ $

B. ☐

$ _____

2.    PAYMENTS $ _____

$

C.

$

GG 0034

2/5

GG - 0034

PERIOD COVERED: 07/01/2023 --09/30/2023

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

---

**PART III - CAMPAIGN CONTRIBUTIONS MADE** (Monetary and non-monetary campaign contributions of $100 or more made to or on behalf of state candidates, elected state officers and any of their controlled committees, or committees supporting such candidates or officers must be reported in A or B below.)

A.  If the contributions made by you during the period covered by this report, or by a committee you sponsor, are contained in a campaign disclosure statement which is on file with the Secretary of State, report the name of the committee and its identification number, if any, below.

Name of Major Donor or Recipient Committee Which Has Filed A Campaign Disclosure Statement:

Identification Number if Recipient Committee: _____

B.  Contributions of $100 or more which have not been reported on a campaign disclosure statement, including contributions made by an organization's sponsored committee, must be itemized below.

| Date | Name of Recipient | I.D. Number if Committee | Amount |
|------|-------------------|-------------------------|--------|
|      |                   |                         | $      |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |
|      |                   |                         |        |

☐  If more space is needed, check box and attach continuation sheets.

NOTE:    Disclosure in this report does not relieve a filer of any obligation to file the campaign disclosure statements required by Gov. Code Section 84200, et seq.

GG - 0035

CAL2PDF Version3.8

(Attachment to Form 635 or Form 645)

4/5

PERIOD COVERED: __07/01/2023 -- 09/30/2023__

NAME OF FILER: __FAIR PLAY FOR MOBILE GAMES__

| | | |
|---|---|---|
| _____ | | |
| | | |
| 1. | .......................................................................... | $ _____ |
| 2. | .............................................. | $ _____ |
| 3. | ................................ | $ _____ |
| 4. | ............................ | $ _____ |
| 5. | ............................ | $ 1    1 |

| | | |
|---|---|---|
| | | |
| | $1 | $1 |
| - | $ | $ |
| Washington | $ | $ |
| | $1 | |

GG - 0036

GG - 0036

(Continuation Sheet)

5/5

PERIOD COVERED:   07/01/2023 -- 09/30/2023

NAME OF FILER:   FAIR PLAY FOR MOBILE GAMES

| | | |
|---|---|---|
| - | 1 | 1 |
| 1    15 | 1 | 1 |
| | | |
| | $     1 | |

GG - 0037

**Attachment Form 640**

# Exhibit 12

GG - 0037

# Exhibit 12

**Don't Get Scammed By Bots This Holiday Season**

It's the holidays and everyone's in the yearly mad scramble, spending money on gifts and decorations to make the season festive. Many might have a side hustle to afford the extras right now, including turning to their smartphones and mobile games that promise to pay.

Commented [1]: Attempting to make it timely so they will be more likely to accept it

The advertising is enticing – who wouldn't want to play games and earn real money? But player beware. Not every real money mobile game is legit. Sadly, over the last few months, we've heard from thousands of Americans who've been defrauded out of their hard-earned money from gaming companies they thought they could trust.

Real money games are mobile skill-based games, like Solitaire or Bingo, where people play against real players in tournaments on their phone. They pay the entry fee and are matched with a player at their skill level. The winning player gets the cash.

Or at least that's the way it's supposed to work. But in many cases, players are getting scammed into believing they're playing real people and that they'll get paid real money when they win.

The real money mobile gaming industry has exploded over the last few years; it's a $10 billion market that is outpacing growth of the greater gaming sector. This rapid growth means more and more Americans could fall victim to unfair practices. While there are gaming companies that are good players in the market, newer companies have popped up over the years that – unfortunately for the consumer – don't abide by the rules of fair play.

We're learning more everyday of how some companies use false advertising and bots to unfairly cheat unsuspecting players out of their money. On November 20, NY Post ~~reported~~**reported** that AviaGames — makers of Bingo Tour and Solitaire Clash — "has been slapped with a class-action lawsuit that claims users were duped into playing against bots instead of similarly skilled human players." Likewise, ~~VentureBeat~~**VentureBeat** recently reported that players are suing AviaGames for "racketeering for disguising bots as humans in skill-based games."

As an organization dedicated to bringing attention to the issue of unfair game play, we launched a webpage earlier this year where players could submit complaints to their state Attorney General offices if they felt they'd been scammed by a real money mobile game.

In just a few months, we collected over 12,700 complaints from every state in the country – 600 of those complaints came from residents here in Nevada. The stories were devastating. People who were barely making ends described how their money had been stolen by games secretly matching them against bots. This practice, paired with advertising that falsely claims to match players with real people, amounts to fraud - plain and simple.

Commented [2]: This can be updated to wherever we want to submit first (NY, NJ, etc). Chose Nevada since the audience might be more familiar with gaming and we're already shopping the first op-ed in California.

Even worse, the games we received the most complaints about are some of the most popular on the App Store – Bingo Cash and Solitaire Cash (owned and operated by Papaya Games) and Bingo Clash (owned and operated by AviaGames).

Consumers should protect themselves – and their wallets – by doing their due diligence on the games they play now or plan to play in the future. Visit gaming company websites to get a sense of their commitment to fair play. And be alert when you're playing – if something seems suspicious, sounds too good to be true or customer service is non-existent, it's best to pass that game by.

Thankfully for those who enjoy playing real money games, there are good companies in this space. A recent article in the Daily Mail **Daily Mail** took companies who use gaming bots to task but also noted some bright spots in the industry, including Big Run Studios and Skillz, the maker of Blackout Bingo and Solitaire Cube, which is credited as a "legitimate company which does not use bots." These are gaming companies that have been operating for years and by all accounts offer games that play by the rules, have a track record of positive reviews online and display their consumer practices transparently and prominently on their websites.

And last, if you believe you've been scammed by a real money mobile game, protect yourself and others by reporting your experience to your state's consumer protection agency. Our website, 4fairplay.org**4fairplay.org**, has an easy form that will send your complaint directly to your state Attorney General's office. Or visit usa.gov/state-attorney-general**usa.gov/state-attorney-general** to find your AGs web page and file a complaint directly through their portal.

The more people who shine a light on this issue and call for lawmakers to investigate, the faster we can restore fairness and protect players from fraudulent and deceptive practices.

- *Josh Levin is the director of 4 Fair Play, an organization dedicated to promoting fair and transparent policies and practices for mobile gaming users across the country.*

**Don't Get Scammed By Bots This Holiday Season**

It's the holidays and everyone's in the yearly mad scramble, spending money on gifts and decorations to make the season festive. Many might have a side hustle to afford the extras right now, including turning to their smartphones and mobile games that promise to pay.

The advertising is enticing — who wouldn't want to play games and earn real money? But player beware. Not every real money mobile game is legit. Sadly, over the last few months, we've heard from thousands of Americans who've been defrauded out of their hard-earned money from gaming companies they thought they could trust.

Real money games are mobile skill-based games, like Solitaire or Bingo, where people play against real players in tournaments on their phone. They pay the entry fee and are matched with a player at their skill level. The winning player gets the cash.

Or at least that's the way it's supposed to work. But in many cases, players are getting scammed into believing they're playing real people and that they'll get paid real money when they win.

The real money mobile gaming industry has exploded over the last few years; it's a $10 billion market that is outpacing growth of the greater gaming sector. This rapid growth means more and more Americans could fall victim to unfair practices. While there are gaming companies that are good players in the market, newer companies have popped up over the years that — unfortunately for the consumer — don't abide by the rules of fair play.

We're learning more everyday of how some companies use false advertising and bots to unfairly cheat unsuspecting players out of their money. On November 20, NY Post reported that AviaGames — makers of Bingo Tour and Solitaire Clash — "has been slapped with a class-action lawsuit that claims users were duped into playing against bots instead of similarly skilled human players." Likewise, VentureBeat recently reported that players are suing AviaGames for "racketeering for disguising bots as humans in skill-based games."

As an organization dedicated to bringing attention to the issue of unfair game play, we launched a webpage earlier this year where players could submit complaints to their state Attorney General offices if they felt they'd been scammed by a real money mobile game.

In just a few months, we collected over 12,700 complaints from every state in the country — 600 of those complaints came from residents here in Nevada. The stories were devastating. People who were barely making ends described how their money had been stolen by games secretly matching them against bots. This practice, paired with advertising that falsely claims to match players with real people, amounts to fraud — plain and simple.

---

**Lacie Newton**
Attempting to make it timely so they will be more likely to accept it

Reply

**Lacie Newton**
This can be updated to wherever we want to submit first (NY, NJ, etc). Chose Nevada since the audience might be more familiar with gaming and we're already shopping the first op-ed in California.
December 05, 2023, 3:09 PM

Reply

Even worse, the games we received the most complaints about are some of the most popular on the App Store — ▐ ▐ Bingo Cash and Solitaire Cash (owned and operated by Papaya Games) and Bingo Clash (owned and operated by AviaGames).

Consumers should protect themselves — and their wallets — by doing their due diligence on the games they play now or plan to play in the future. Visit gaming company websites to get a sense of their commitment to fair play. And be alert when you're playing — if something seems suspicious, sounds too good to be true or customer service is non-existent, it's best to pass that game by.

Thankfully for those who enjoy playing real money games, there are good companies in this space. A recent article in the Daily Mail took companies who use gaming bots to task but also noted some bright spots in the industry, including Big Run Studios and Skillz, the maker of Blackout Bingo and Solitaire Cube, which is credited as a "legitimate company which does not use bots." These are gaming companies that have been operating for years and by all accounts offer games that play by the rules, have a track record of positive reviews online and display their consumer practices transparently and prominently on their websites.

And last, if you believe you've been scammed by a real money mobile game, protect yourself and others by reporting your experience to your state's consumer protection agency. Our website, 4fairplay.org, has an easy form that will send your complaint directly to your state Attorney General's office. Or visit usa.gov/state-attorney-general to find your AGs web page and file a complaint directly through their portal.

The more people who shine a light on this issue and call for lawmakers to investigate, the faster we can restore fairness and protect players from fraudulent and deceptive practices.

- → *Josh Levin is the director of 4 Fair Play, an organization dedicated to promoting fair and transparent policies and practices for mobile gaming users across the country.*

# Exhibit 13

| | |
|---|---|
| **From:** | Fair Play for Mobile Games <thanks@4fairplay.org> |
| Sent: | Wednesday, November 1, 2023 3:31 PM |
| To: | U |
| Subject: | Re: Thank you for speaking up! |

Thank you for sending this email.What games ao you play that you think use botst And **would you** be **open to telling your story** to **a memberotthe press?**

We've been hearing afot of interest from reporters on this issue tThis Daily Hail story just came out a few days ago! REVEALED: G    e company if     ers u                              never win in 'iltegatgambling operation') and eveiyone asks us if there's a harmed customer that would be willing to talk with them. Let me know if you're open to us sharing your feedback below and/or putting you in touch with a reporter who wants to learn more about this issue.

Let us know and thank you for your help!
Lacie @ 4FairPlay

On Wed, Oct25, 2023. at6:10 PN,         II         ote:

> I have wasted so much money. If I am going to vet and I lose that's on me. I know that can happen. But when I'm playing against a computer and I know it isn't fair then that ruins any sort of fun. I know for a fact those games cheat.   You will get unbearable hands and finish the game in record breaking times. Untillyou deposit money. Then it's one lose after another. And foolish enough I keep going even deposit more money. They are so evil.
>
> On Tue, Oct 24, 2023, 8:18AN "4 Fair Play"                              > wrote:
>
> Thankyoufortakingac Gon,     !
>
> **Please help us spread** the **word by sharing this** campaign **with people you** know:
>
> —The 4 Fair Play team

Powered by New/Mode
Launch ¥aucomi car»aaigr    a

# Exhibit 14

State Corporation Commission
Office of the Clerk
Entity ID: 11083744
Filing Number: 2107163466099
Filing Date/Time: 07/16/2021 11:21 AM
Effective Date/Time: 07/16/2021 11:21 AM

## Nonstock Corporation - Annual Report

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Citizens for a Fair Economy | Entity Type: | Nonstock Corporation |
| Entity ID: | 11083744 | Formation Date: | 07/24/2020 |
| Jurisdiction: | Virginia | | |
| Status: | Active | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Entity | RA Qualification: | BUSINESS ENTITY THAT IS AUTHORIZED TO TRANSACT BUSINESS IN VIRGINIA |
| Name: | COGENCY GLOBAL INC. | Registered Office Address: | 250 Browns Hill Ct, Midlothian, VA, 23114 - 9510, USA |
| Locality: | CHESTERFIELD COUNTY | | |

### Principal Office Address

Address:     PO BOX 320183, Alexandria, VA, 22320 - 1328, USA

### Principal Information

☐ **No Officers:** If the corporation does not have officers because an organizational meeting has not been held.

☐ **No Directors:** If the corporation does not have directors because (i) initial directors were not named in the articles of incorporation and an organizational meeting of the corporation has not been held or (ii) the board of directors has been eliminated by a written agreement signed by all of the shareholders, or by the adoption of provision in the articles of incorporation or bylaws that was approved by all of the shareholders.

| Title | Director | Name | Address |
|---|---|---|---|
| President | Yes | Lacie Newton | PO BOX 320183, Alexandria, VA, 22320 - 1328, USA |

### Signature Information

Date Signed: 07/16/2021

| Printed Name | Signature | Title |
|---|---|---|
| Lacie Newton | Lacie Newton | President |

# Exhibit 15

Case 1:25-cv-04091-NID Document 11-20-15 Filed 09/16/25 Page 192 of 244
Case 1:25-cv-04055-SDG Document 41-5 Filed 08/18/25 Page 192 of
filed PageID 04/04/25 commonwealth of Virginia Page 2 of 4 Page ID#
130362

State Corporation Commission
Office of the Clerk
Entity ID: 11083744
Filing Number: 200724891612
Filing Date/Time: 07/24/2020 10:08 AM
Effective Date/Time: 07/24/2020 10:08 AM

# CITIZENS FOR A FAIR ECONOMY
## ARTICLES OF INCORPORATION

---

THE UNDERSIGNED, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:**   The name of the Corporation is Citizens for a Fair Economy.

**SECOND:**   This Corporation is organized and operated exclusively for social welfare purposes within the meaning of Internal Revenue Code section 501(c)(4). The purpose of the Corporation is to further the common good and general welfare of the citizens of the United States by educating the public on how tax payer dollars are used and the impacts on individual citizens and communities, while encouraging the public to become engaged in creating a fairer economy for all.

No part of the net income of the Corporation shall inure to the benefit of or be distributed to its directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:**   The Corporation shall have no members.

**FOURTH:**   The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy shall occur on the Board of Directors, the vacancy may be filled by a majority of the Directors in attendance at a meeting of the Board of Directors called for such purpose.

**FIFTH:**   The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation that is authorized to transact business in Virginia.

**SIXTH:** The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA 23114
(Chesterfield County)

**SEVENTH:** The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board of Directors called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the Corporation, including the distribution of the remaining funds of the Corporation consistent with the purposes stated herein.

Upon the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes or for social welfare purposes as described in section 501(c)(4), or dispose of excess funds in accordance with Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any corresponding provision of any future United States Internal Revenue law, and applicable state or federal law.

IN WITNESS WHEREOF, the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are her's and to the best of her knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

Karen Blackistone Oaks
Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, JULY 24, 2020

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

# Citizens for a Fair Economy

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

# CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective July 24, 2020.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Mark C. Christie
Commissioner

# Exhibit 16

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

# CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("Agreement") is entered into by and between Fair Play for Mobile Games, a 501(c)(4) nonprofit and non-stock corporation ("Organization") and Square Strategies, LLC ("Consultant").

## SECTION 1: SERVICES AND RELATIONSHIP

1.1.   Services. Consultant will perform the following services ("Services") for Organization: Consultant's employee ("Josh Levin") will serve as executive director of the Organization.  Additionally, Consultant will perform all the duties and obligations as may be provided and determined in the Articles of Incorporation and Bylaws of the Organization, as the same may be amended from time to time by the Board of Directors.

1.2.   Legal Compliance. Consultant represents to Organization that Consultant is knowledgeable of Organization's legal and compliance obligations, and Consultant agrees to comply with applicable laws, rules, and regulations in performing Services. Consultant further agrees to consult with Organization's legal counsel in the event Consultant has questions regarding the application of any federal, state, and/or local laws, rules, or regulations to Services.

1.3.   Relationship of the Parties. Consultant is an independent contractor for Organization, not an employee. Unless stated in this Agreement or explicitly authorized by Organization in the future, Consultant does not have the authority to act for or on behalf of Organization, or to bind Organization to any legally binding agreement, written or oral, or to take any other legal act in the name of Organization without the prior approval of the Board of Directors or its designee.

## SECTION 2: TERM

2.1.   **Commencement.** The terms of this Agreement will become effective upon its execution by both parties **("Commencement Date").**

2.2.   Termination. Either party may terminate this Agreement, at any time, by providing 30 days' written notice to the other party, and all accrued compensation and/or properly approved expenses incurred by Consultant up to and through this notice period will be paid and/or reimbursed by Organization. Organization may terminate this Agreement immediately for "Cause" (defined below), at any time, by providing written notice to Consultant, and Consultant will only be entitled to accrued compensation and/or properly approved expenses incurred by Consultant as of such notice. "Cause" means:

2.2.1.   Consultant's material breach of Consultant's obligations under this Agreement, not cured after 10 days' notice issued by Organization;

2.2.2.   Consultant's gross negligence in the performance of Services or intentional nonperformance of Services; or

2.2.3.   Consultant's conviction of, pleading guilty or nolo contendere to, or commission of an act involving Consultants lack of honesty, misappropriation, fraud, or moral turpitude.

## SECTION 3: COMPENSATION AND EXPENSES

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

3.1.     Compensation. For the performance of Services in accordance with the terms of this Agreement, Organization agrees to pay Consultant $5,000, per month.

**3.2.**     **Reimbursement of Expenses.** The Organization will reimburse Consultant for the business expenses that are reasonable, necessary, and incurred by the Consultant while performing Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as the Organization may reasonably require. Any expenditure exceeding $500 must be pre-approved in writing by the Organization's Board of Directors or its designee(s) prior to incurring such expense, and the Organization reserves the right to reject any such proposed expenditure.

## SECTION 4: OWNERSHIP AND CONFIDENTIALITY

4.1.     Exclusive Ownership. The Organization retains and reserves the right of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Consultant's Services. Consultant and Organization agree that the work described in Section 1.1. will be considered a "work for hire" for the purpose of the U.S. copyright law, 17 U.S.C. § 101 ef seq., and that Consultant hereby irrevocably assigns and transfers to Organization all rights, title, and interest in and to Consultants work and Services to Organization and agrees to execute all documents reasonably requested by Organization for the purpose of applying for and obtaining any patent and copyright registrations.

4.2     Confidential Information. Consultant agrees to use "Confidential Information" (defined below) only in the performance of the Services, to hold such information in confidence and trust, and not to engage in any unauthorized use or disclosure of such information during the engagement and for so long thereafter as such information qualifies as Confidential Information; provided, however, that if under applicable law a post-employment time limitation on the foregoing restriction is necessary for enforcement as to Confidential Information that does not qualify as a trade secret, then such restriction will be limited to a period of five years following the termination of the engagement for the information that does not qualify as a trade secret. Trade secret information will remain protected for as long as it qualifies as a trade secret, and nothing in this Agreement shall be construed to reduce or eliminate Organization's rights and remedies related to information that would qualify for trade secret protection absent this Agreement. In this Agreement, "Confidential Information" means an item or compilation of information in any format, whether written or oral, whether marked "confidential" or not, as described in paragraph 4.2.1. below, disclosed to or learned by Consultant as a result of Consultant's engagement with Organization:

4.2.1.     Confidential Information includes all non-public information of a private, proprietary, or confidential nature that Organization insists remain private or confidential, including, but not limited to, the business affairs of Organization and other information that is not generally available to the public.

4.2.2.     Confidential Information does not include any information which Consultant can establish: (i) is or becomes publicly known and made generally available in the public domain through no action or inaction of Consultant; (ii) is already rightfully in the possession of Consultant at the time of disclosure, as shown by Consultants files and records immediately prior to the time of disclosure; (iii) is obtained by Consultant from a third party without a breach of such third party's obligations of confidentiality; (iv) is independently developed by Consultant without

*[Link-to-previous setting changed from on in original to off in modified.].*

*[Link-to-previous setting changed from on in original to off in modified.].*

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

use of or reference to Confidential Information, as shown by documents and other competent evidence in Consultants possession; (v) is excluded by other provisions of this Agreement; or (vi) is required or legally authorized to be disclosed by law or regulation, provided that Consultant abides by the terms set forth in section 4.3.

**4.3.**    **Disclosures Required by Law or Regulation.** If Consultant is served with a subpoena, court order, or similar legal document requiring the disclosure of Confidential Information, Consultant will provide Organization as much notice as is possible (presumably five business days or more) before disclosure so that Organization may take legally permitted steps to protect the Confidential Information, unless such notice is prohibited by law.

4.4.    Return or Destruction of Confidential Information. Upon termination of Consultant's engagement with Organization, unless otherwise instructed by Organization in writing (such as through a litigation hold notice), Consultant must destroy all documents and other materials constituting Confidential Information in Consultant's possession upon termination of Consultant's engagement with Organization. If requested by Organization, Consultant will promptly (i) deliver to Organization all documents and other materials comprising Confidential Information in the possession or under its control, together with all copies and summaries thereof; and/or (ii) certify to Organization in writing that all such information and materials have been delivered or destroyed and not retained in accordance with the terms of this Agreement. Upon request, Consultant will provide Organization reasonable means to access and verify that no Confidential Information has been retained by Consultant on personal computers, cell phones, email or cloud storage accounts, or in any other place that is subject to Consultant's ownership or control.

## SECTION 5: INDEMNIFICATION

5.1.    Mutual Indemnification. Organization  and Consultant, each an "Indemnifying Party," agree to indemnify, defend, and hold harmless the other party, including such party's shareholders, officers, directors, members, partners, employees, and other agents (collectively, "Indemnified Party") from and against all claims, liabilities, causes of action, damages, judgments, attorneys' fees, court costs, fines and expenses of whatever kind, including reasonable attorneys' fees incurred by Indemnified Party (collectively, "Losses") which arise out of or are related to: (i) breach or non-fulfillment of any provision of this Agreement by Indemnifying Party; (ii) Indemnifying Party's failure to perform job functions or duties as required, or result from conduct while engaging in any activity outside the scope of this Agreement; (iii) any negligent or more culpable act or omission of Indemnifying Party, including any reckless or willful misconduct, in connection with the performance of its obligations under this Agreement; (iv) any bodily injury, death of any person, or damage to real or tangible personal property caused by the negligent or more culpable acts or omissions of Indemnifying Party, including any reckless or willful misconduct; or (v) any failure by Indemnifying Party to comply with any applicable federal, state, or local laws, regulations, or codes in the performance of its obligations under this Agreement.

5.2.    Notice of Third-Party  Claims. Indemnified Party will give notice to Indemnifying Party ("Claim Notice") within 10 days after obtaining knowledge of any Losses or discovery of facts on which Indemnified Party intends to base a request for indemnification under Section 5.1. Indemnified Party's failure to provide a Claim Notice to Indemnifying  Party under this Section 5.2. does not relieve Indemnifying Party of any liability that Indemnifying Party may have to Indemnified Party, but in no

event will Indemnifying Party be liable for any Losses that result directly from a delay in providing a Claim Notice, which delay prejudices the defense of the related third-party claim. Indemnifying Party's duty to defend applies immediately, regardless of whether Indemnified Party has paid any sums or incurred any detriment arising out of or relating, directly or indirectly, to any third-party claim.

5.3.    Indemnified Party's Control of Defense. Notwithstanding anything to the contrary in this Section 5, Indemnified Party may select its own legal counsel to represent its interests, and Indemnifying Party will: (i) reimburse Indemnified Party for its costs and attorneys' fees immediately upon request as they are incurred; and (ii) remain responsible to Indemnified Party for any Losses indemnified under Section 5.1.

5.4.    Settlement of Indemnified Claims by Indemnifying Party. Indemnifying Party will give prompt written notice to Indemnified Party of any proposed settlement of a claim that is indemnifiable under Section 5.1. Indemnifying Party may not, without Indemnified Party's prior written consent, settle or compromise any claim or consent to the entiy of any judgment regarding which indemnification is being sought hereunder.

## SECTION 6: MISCELLANEOUS

6.1.    Complete Agreement. This Agreement represents the complete and entire agreement between Organization and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof. Notwithstanding the foregoing, any agreement between Organization and Consultant specifically pertaining to confidentiality and nondisclosure is intended to supplement and will not replace, modify, or eliminate this Agreement.

**6.2.    No Assignment.** This Agreement will not be assigned by either party without the prior written approval of the other party.

6.3.    Modification and Waiver. No terins of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and is signed by both parties. The failure or omission of a party to require the other party's strict compliance with any terms of this Agreement, or to exercise any of its rights or remedies, will not constitute a waiver or relinquishment of any duties or rights under this Agreement, or otherwise affect the interpretation of this Agreement.

6.4.    Notices. All notices required by this Agreement must be in writing and delivered to the other party by: (i) hand delivery; (ii) certified mail with return receipt; (iii) overnight delivery with delivery confirmation; and/or (iv) e-mail at the following address:

[Link-to-previous setting changed from on in original to off in modified.].

[Link-to-previous setting changed from on in original to off in modified.].

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

If to Organization:
Fair Play for Mobile Games
Attn: Rocky Matthews
Attn: Jenny Kim
1501 Wilson Blvd, Ste1050
Arlington, VA  M209
RockybmatthewsAgmail.com
fairplayformobilegames@gobergroup.com

[Link-to-previous setting changed from on in original to off in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

If to Consultant:
Square Strategies, LLC
Attn: Josh Levin
PO Box 47028
Chicago, IL 60647

Joshi isyuare-strate ie co

Notice will be deemed to be given: (i) on the date of actual delivery for hand delivery and overnight delivery; (ii) on the fifth calendar day after the postmark date for certified mail; and (iii) on the date of transmission for e-mail. Notice will not be deemed to be given if an attempted notice is returned to sender as undeliverable.

**6.5.** **Survival** and Remedies. Sections 4 and 5 of this Agreement will survive the expiration or termination, for any reason, of this Agreement. Consultant agrees not to challenge the enforceability or scope of Sections 4 and/or 5 of this Agreement. The parties recognize and affirm that in the event of a breach or threatened breach of Sections 4 and/or 5 of this Agreement, money damages would be inadequate and Organization would not have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of Sections 4 and/or 5 of this Agreement, Organization may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof without posting a bond or other security.

6.6.    AHorneys' Fees. In the event either party must bring suit for any reason under this Agreement, the prevailing party will be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

6.7.    Choice of Law and Venue. Organization and Consultant agree that the terms of this Agreement will be deemed to be made under, governed by, and construed in accordance with, the laws of Virginia without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions may only be instituted in Arlington County.

6.8.    Dispute Resolution. Any dispute arising out of, or relating to, this Agreement will be finally settled **by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbihation Rules then in effect to be held in Dallas** County, and judgment on the **award rendered by the arbitrator(s) may be entered in** any **court having jurisdiction thereof. If the** amount in controversy exceeds $500,000, arbitration will be conducted under the Procedures tor **Large, Complex Commercial Disputes.**

6.9.    Severability and Reformation. If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions will continue in full force and effect, and the invalid, void, or unenforceable provisions will be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement are held to be excessively broad as to duration, activity, or subject, then it will be reformed by limiting and reducing it to the minimum extent necessary so as to be enforceable to the extent compatible with

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

applicable law.

**6.10.** **Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties. This Agreement may be executed via electronic means, and the signatures of the parties via electronic means will be deemed to be their original signatures for all purposes.

[REST OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

Case 1:25-cv-00470-MSN-IDD    DocuSign Envelope
DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

By signing below, each party acknowledges that it has carefully read and fully understands this Agreement, and it agrees to be bound by the terms of this Agreement.

Fair Play for Mobile Games

Dated: _____8/18/2023_____    Signature: _____

Print Name: _____Rocky Matthews_____

Title: _____Board Member_____

For Square Strategies:

Dated: _____8/18/2023_____    Signature: _____

Print Name: _____Josh Levin_____

# Exhibit 17

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

To:        Fair Play for Mobile Games Board of Directors

From:      Josh Levin

Re:        Conflict of Interest

Date:     August 14, 2023


Dear Directors,

As you are aware, Fair Play for Mobile Games (the "Corporation") has a Conflict of Interest policy contained within the Corporation's Bylaws. This provision requires that any director who believes they have an actual or possible conflict of interest with the Corporation disclose the existence and nature of the interest.

The purpose of this letter is to inform you of a potential conflict of interest that exists between myself as a director of the Corporation and Square Strategies, LLC ("Square Strategies"), a company that I have an ownership interest in which is also interested in entering into a consulting agreement with the Corporation.

I am the sole owner of Square Strategies. Square Strategies is uniquely positioned to provide the type of consulting services the Corporation is in search of given my company's experience and subject matter expertise pertaining to the mobile gaming industry.

Given the conflict of interest, I will recuse myself from any discussions or deliberations pertaining to the proposed agreement. If you need additional material facts about this proposed agreement or the conflict of interest, please put such a request in writing, and I will do my best to answer questions promptly.

Very truly yours,

DocuSigned by:

*Joshua Levin*

SdB5F88A2F08dFE...

Josh Levzn       8/18/2023

# Exhibit 18

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

# FAIR PLAY FOR MOBILE GAMES
## UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

Pursuant to the Virginia Nonprofit Corporation Act, the undersigned, being the duly authorized disinterested directors of the Board of Directors (the "8oard") of Fair Play for Mobile Games, a Virginia non-stock corporation (the "Corporation"), hereby consent to the adoption of the following resolutions by unanimous written consent in lieu of a meeting of the Board.

## Resolution 1

WHEREAS, the Corporation wishes to enter into an agreement with a consultant to oversee the operations of the Corporation under the director of the Board (the "Consulting Services");

WHEREAS, the Board wishes to enter into an agreement Square Strategies, LLC ("Square Strategies") to provide the Consulting Services to the Corporation and believes that such a decision is in the best interest of the Corporation given Square Strategies experience and subject matter expertise in the mobile gaming industry;

WHEREAS, Director Levin is the sole owner of Square Strategies;

WHEREAS, pursuant to Article VII of the Corporation's Bylaws, the Board is prohibited from entering into an agreement with an Interested Person unless the appropriate procedures for addressing the conflict of interest are taken;

WHEREAS, in examining the material facts, the Board determines that a conflict of interest does exist;

WHEREAS, after conducting due diligence, the Board has determined that a more advantageous agreement that would not give rise to a conflict of interest is not reasonably attainable; and

WHEREAS, the Board believes that entering into a consulting agreement with Square Strategies is in the best interest of the Corporation.

BE IT RESOLVED, that Director Levin has disclosed the existence and nature of the conflict of interest and that the Board acknowledges that Director Levin is considered an Interested Person for purposes of the proposed Square Strategies agreement.

Case 1:25-cv-00470-MSN-IDD    DocuSign Envelope
DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

FURTHER RESOLVED, that Director Levin has recused himself from the deliberation and voting on this resolution.

FURTHER RESOLVED, that the Board has conducted due diligence and made the determination that a more advantageous agreement with an entity not giving rise to a conflict of interest is not reasonably attainable.

FURTHER RESOLVED, the majority of disinterested Directors approves the agreement with Square Strategies for the purposes of providing Consulting Services, attached hereto and incorporated by reference herein as if restated in its entirety.

BE IT RESOLVED, that Director Matthews is authorized and directed to take any and all actions to enter into the consulting agreement with Square Strategies and to effectuate the purpose of this resolution.

IN WITNESS WHEREOF, the undersigned have executed this Consent:

*Rock Matthews*
—Signed by:
8A0DJD0Dd3784A2...

Rocky Matthews

8/18/2023

Date

# Exhibit 19



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2730
Terms: Net 10
Invoice date: 08/17/2023
Due date: 08/27/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | | **Professional Services** | Two months retainer | $10,000.00 |
| 2. | 08/11/2023 | **Billable Expenses** | New/Mode contact tools | $3,784.00 |
| 3. | 08/09/2023 | **Billable Expenses** | Domain registration | $29.34 |

### Ways to pay

BANK

| | |
|---|---|
| Total | **$13,813.34** |
| Payment | -$13,813.34 |
| **Balance due** | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2731
Terms: Net 10
Invoice date: 09/07/2023
Due date: 09/17/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 09/06/2023 | **Billable Expenses** | Fastmail email service | $50.00 |
| 2. | 08/25/2023 | **Billable Expenses** | Hotjar analytics tools | $39.00 |
| 3. | 08/19/2023 | **Billable Expenses** | WP Engine hosting service | $261.60 |
| 4. | 09/06/2023 | **Billable Expenses** | WP Engine hosting service | $406.16 |
| 5. | 08/30/2023 | **Billable Expenses** | Google ads | $10.00 |
| 6. | 08/30/2023 | **Billable Expenses** | Google ads | $200.00 |
| 7. | 08/30/2023 | **Billable Expenses** | Google ads | $350.00 |
| 8. | 09/01/2023 | **Billable Expenses** | Google ads | $439.81 |
| 9. | 09/01/2023 | **Billable Expenses** | Google ads | $500.00 |
| 10. | 09/02/2023 | **Billable Expenses** | Google ads | $500.00 |
| 11. | 09/03/2023 | **Billable Expenses** | Google ads | $500.00 |
| 12. | 09/04/2023 | **Billable Expenses** | Google ads | $500.00 |
| 13. | 09/05/2023 | **Billable Expenses** | Google ads | $500.00 |

nses          Google ads          ~~149~~ **381**          $500.00

| | |
|---|---|
| **Total** | **$4,756.57** |
| Payment | -$4,756.57 |
| **Balance due** | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2732
Terms: Due on receipt
Invoice date: 09/14/2023
Due date: 09/14/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 09/13/2023 | **Billable Expenses** | Google ads, Sept 7-13 | $3,500.00 |

### Ways to pay

BANK  |  P PayPal  |  venmo

#### Note to customer
Please let me know if you'd like receipts for each individual Google
charge. They bill in $500 increments, so there are seven documents.

| | |
|---|---|
| **Total** | **$3,500.00** |
| Payment | -$3,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2733
Terms: Due on receipt
Invoice date: 09/19/2023
Due date: 09/19/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 09/19/2023 | **Billable Expenses** | Google ads, Sept 14-18 | $8,500.00 |

### Ways to pay

BANK

| | |
|---|---|
| **Total** | **$8,500.00** |
| Payment | -$8,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2734
Terms: Net 10
Invoice date: 09/21/2023
Due date: 10/01/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 09/21/2023 | **Billable Expenses** | Google ads, Sept 19-21 | $5,500.00 |
| 2. | 09/21/2023 | **Professional Services** | Processing costs @ 2% | $110.00 |

### Ways to pay



| | |
|---|---|
| **Total** | **$5,610.00** |
| Payment | -$5,610.00 |
| **Balance due** | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2735
Terms: Due on receipt
Invoice date: 09/26/2023
Due date: 09/26/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 09/26/2023 | **Billable Expenses** | Google ads, Sept 21-26 | $10,000.00 |
| 2. | 09/26/2023 | **Professional Services** | Processing costs @ 2% | $200.00 |
| 3. | 09/25/2023 | **Billable Expenses** | Hotjar site analytics | $39.00 |

#### Ways to pay

BANK

| | |
|---|---|
| Total | **$10,239.00** |
| Payment | -$10,239.00 |
| Balance due | **$0.00** |

**Paid in Full**

billing@square-strategies.com
+1 (312) 882-2277



es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2736
Terms: Net 10
Invoice date: 10/03/2023
Due date: 10/13/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 10/02/2023 | **Billable Expenses** | Google ads thru 10/2 | $3,075.56 |
| 2. | 10/02/2023 | **Professional Services** | Processing at 2% | $61.51 |
| 3. | 09/30/2023 | **Billable Expenses** | Hover - domain name expense | $18.17 |

## Ways to pay

BANK

| | |
|---|---|
| Total | **$3,155.24** |
| Payment | -$3,155.24 |
| Balance due | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2737
Terms: Net 10
Invoice date: 10/09/2023
Due date: 10/19/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 10/08/2023 | **Billable Expenses** | Google ads, 10/3 to 10/8 | $3,000.00 |
| 2. | 10/08/2023 | **Professional Services** | Processing at 2% | $60.00 |
| 3. | 10/06/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

### Ways to pay

BANK

| | |
|---|---|
| Total | **$3,714.00** |
| Payment | -$3,714.00 |
| Balance due | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2738
Terms: Net 10
Invoice date: 10/25/2023
Due date: 11/04/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 10/01/2023 | **Professional Services** | October management fee | $5,000.00 |
| 2. | 10/25/2023 | **Billable Expenses** | Google ads 10/9-10/23 | $1,500.00 |
| 3. | 10/25/2023 | **Professional Services** | Processing fee @ 2% | $30.00 |

### Ways to pay

BANK

| | |
|---|---|
| **Total** | **$6,530.00** |
| Payment | -$6,530.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

Case 1:25-cv-03473-NSC-IDD   Document 11   Filed 06/18/25   Page 222 of 244
Case 1:25-cv-03473-NSC-IDD   Document 11   Filed 06/18/25   Page 222 of 445
1920-19



billing@square-strategies.com
+1 (312) 882-2277

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2739
Terms: Net 10
Invoice date: 11/08/2023
Due date: 11/18/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 11/01/2023 | **Professional Services** | November management fee | $5,000.00 |
| 2. | 11/07/2023 | **Billable Expenses** | WP Engine hosting | $654.00 |
| 3. | 11/01/2023 | **Billable Expenses** | Google ads, Oct 24 to Nov 1st | $213.02 |

### Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,867.02** |
| Payment | -$5,867.02 |
| **Balance due** | **$0.00** |

**Paid in Full**

billing@square-strategies.com
+1 (312) 882-2277



es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2740
Terms: Net 10
Invoice date: 12/01/2023
Due date: 12/11/2023

| # | Date | Product or service | Description | Amount |
|---|------|--------------------|-------------|--------|
| 1. | 12/01/2023 | **Professional Services** | Management fee, December | $5,000.00 |

### Ways to pay

BANK

| | |
|---|---|
| Total | **$5,000.00** |
| Payment | -$5,000.00 |
| Balance due | **$0.00** |

**Paid in Full**



billing@square-strategies.com
+1 (312) 882-2277

**es (deleted)**

**1501 Wilson Boulevard**
**Suite 1050**
**Arlington, VA 22209**

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

Invoice details
Invoice no.: 2741
Terms: Net 10
Invoice date: 12/22/2023
Due date: 01/01/2024

| | | | | |
|---|---|---|---|---|
| 2. | 12/07/2023 | **Billable Expenses** | Zoom premium service | $14.81 |
| 3. | 12/07/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,668.81** |
| Payment | -$5,668.81 |
| **Balance due** | **$0.00** |
| | **Paid in Full** |



billing@square-strategies.com
+1 (312) 882-2277

**es (deleted)**

**1501 Wilson Boulevard**
**Suite 1050**
**Arlington, VA 22209**

es (deleted)

1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2742
Terms: Net 10
Invoice date: 02/28/2024
Due date: 03/09/2024

| | | | | |
|---|---|---|---|---|
| 2. | 03/01/2024 | **Professional Services** | March monthly management fee, reduced | $1,000.00 |
| 3. | 02/06/2024 | **Billable Expenses** | WP Engine hosting | $32.70 |

#### Ways to pay

BANK

| | |
|---|---|
| Total | **$2,032.70** |
| Payment | -$2,032.70 |
| **Balance due** | **$0.00** |

**Paid in Full**

# Exhibit 20

Case 1:25-cv-00470-JDD Document 20-20 Filed 03/16/25 Page 227 of 244
Case 1:25-cv-00470-JDD Document 11-2 Filed 03/10/25 Page 227 of 244
Virginia PageID# 04/04/25 Page 2 of 3 PageID# Commonwealth of Virginia
162394

State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2403086946851
Filing Date/Time: 03/08/2024 08:48 AM
Effective Date/Time: 03/08/2024 08:48 AM

## Nonstock Corporation - Articles of Dissolution

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Fair Play for Mobile Games | Entity Type: | Nonstock Corporation |
| Entity ID: | 11578266 | Formation Date: | 08/08/2023 |
| Status: | Active | | |

### Jurisdiction of Formation

Jurisdiction (Country): United States

Jurisdiction (State): Virginia

Date of Formation:

### Adoption and Vote

**Date of Adoption**

Date Articles were adopted: 03/01/2024

By the directors.

  Statement as to why member action was not required.

  Organization has no members

### Signature Information

Date Signed: 03/07/2024

| Printed Name | Signature | Title |
|---|---|---|
| Josh Levin | Josh Levin | Chairman and President |

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, MARCH 8, 2024

The State Corporation Commission has found the articles of dissolution submitted on behalf of

## Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

## CERTIFICATE OF DISSOLUTION

be issued and admitted to record with the articles of dissolution in the Office of the Clerk of the Commission, effective March 8, 2024.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 21

**From:** Michael Lombardo

**To:** McIntosh, Michael A (WAS); 'Noltie, Lisa'; Krawiec, Margaret E (WAS); 'Adam Hosmer-Henner'; 'Emily M. Dennis'

**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A 24 891941 C

**Date:** 7/1/2024 11:59:00 AM

**CC:** Lazar Raynal; 'Hostetler, Jennifer'

**BCC:**

**Message:**

Hi Mike,

As you are aware, Nevada R. Civ. P. 45(c)(1) offers protections to the recipients of subpoenas and requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court that issued the subpoena must enforce this duty and may impose an appropriate sanction—which may include lost earnings and reasonable attorney fees—on a party or attorney who fails to comply." Courts across the country interpreting identical language in Federal Rule of Civil Procedure 45 have repeatedly held that requests seeking "all communications and documents" are overbroad and do not comport with Rule 45. *E.g. Gropper v. David Ellis Real Estate, L.P.*, No. 13-CV-2068 (ALC) (JCF), 2014 WL 518234, at *4 (S.D.N.Y. Feb. 10, 2014) (request for "any and all" documents is inherently overbroad); *Rice v. Reliastar Life Ins. Co., Civ. A. No. 11-44-BAJ-CN*, 2011 WL 5513181, at *2 (M.D. La. Nov. 10, 2011) ("a request for 'any and all documents' relating to a particular subject is overbroad and amounts to little more than a fishing expedition"); *Badr v. Liberty Mut. Grp., Inc.*, No. 3:06CV1208 (AHN), 2007 WL 2904210, at *3 (D. Conn. Sept. 28, 2007) (finding request for "any and all" documents overly broad); *Franzon v. Massena Mem'l Hosp.*, 189 F.R.D. 220, 222 (N.D.N.Y. 1999) (finding request for "any and all documents" overbroad); *Richmond v. UPS Serv. Parts Logistics*, No. IP01-1412-C-H/G, 2002 WL 745588, at *4 (S.D. Ind. Apr. 25, 2002) (finding request for "any and all" employment records overbroad "on its face"). Nevada courts consider federal cases strong persuasive authority when interpreting parallel provisions of the Nevada Rules of Civil Procedure." *Dep't of Tax'n v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 136 Nev. 366, 369, 466 P.3d 1281, 1284 (2020).

With this legal framework in mind, Skillz has offered to provide the information actually sought by Papaya's subpoena: documents sufficient to show (1) Skillz's relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play. Skillz maintains that the invoices it agrees to produce provides this information. And, despite being informed of Skillz's position since June 13, Papaya has not articulated any reason for why Skillz's proposed production is insufficient to determine Skillz's involvement in 4Fairplay.org; Papaya simply repeats its demand for "all documents and communications" without consideration of the overbreadth and burden associated with such requests. Accordingly, Papaya's position does not comport with Nevada R. Civ. P. 45. Again, if Papaya can articulate a specific category of documents beyond the invoices Skillz agreed to produce that Papaya believes is necessary to determine Skillz's involvement in Fair Play for Gaming and/or 4fairplay.org, Skillz will consider Papaya's position. But Skillz does not agree to Papaya's overbroad requests for "[a]ll communications and documents," which Papaya has refused to narrow.

As to your question regarding the First Amendment privilege, Skillz maintains that Papaya's subpoena violates the First Amendment but has already disclosed to Papaya that it provided monetary funds to Fair Play for Mobile Gaming and agreed to produce invoices detailing the same in an effort to resolve

disputes without the need to burden a Nevada court with this dispute.  Thus, Skillz is not withholding documents on the basis of First Amendment privilege for purposes of responding to Papaya's subpoena. Best,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 27, 2024 11:13 AM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A 24 891941 C

| CAUTION: MAIL FROM OUTSIDE THE FIRM |
| --- |

Mike,

Papaya's position has been clear from the outset:  it is entitled to all documents responsive to the subpoena. Skillz's position appears to have shifted multiple times over the past several weeks.  First, it refused to produce any responsive documents.  Then, it offered to produce "documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen."  And now it has reworked its position once more to offer to produce "invoices . . . sufficient to show:  (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play."

The common thread has been Skillz's refusal to produce all documents responsive to the subpoena, as it is required to do under Nevada law.  Please provide us with the legal basis for Skillz's position that it need not produce all responsive documents within its possession, custody, or control.  Alternatively, if we misunderstand Skillz's position, please confirm that it agrees to produce all documents responsive to the subpoena.

Please also advise whether Skillz continues to withhold responsive documents based on a supposed First Amendment privilege.

If Skillz does not agree to produce all documents responsive to the subpoena, Papaya will file a motion to compel and seek a court order requiring Skillz to fully comply with the subpoena.  Please provide your response by 12:00 p.m. EDT on Monday, July 1.  If you do not respond by that time, we will presume that Skillz refuses to produce responsive documents and that it cannot offer a justification for that refusal, and we will proceed accordingly.

Thanks,

Mike

Michael A. McIntosh
Counsel
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Wednesday, June 26, 2024 5:47 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike,

I am a bit perplexed about what you are seeking to move to compel. Your purported need for a subpoena to Skillz is to identify what role Skillz had with Fair Play for Mobile Games and 4fairplay.org. The information Skillz is agreeing to produce provides exactly that. Specifically, the invoices Skillz agrees to provide will provide documents sufficient to show: (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play.

To the extent Papaya chooses to proceed with frivolous claims against Skillz related to 4fairplay.org, Papaya is free to bring such claims, the parties can engage in discovery, and Skillz will address Papaya's claims in the litigation and reserves all rights regarding same. Papaya's attempt, however, to impose unilateral, burdensome discovery on Skillz through a "John Doe" complaint to obtain documents it does not need to identify Skillz's role in 4fairplay.org is inappropriate.

If Papaya believes there is specific information not within Skillz's proposed production that it believes it needs to determine Skillz's role in Fair Play for Mobile Games and/or 4fairplay.org, please identify what you believe you need and why, and we will consider it because what you are currently planning to move to compel is wholly unclear. We can also finalize the confidentiality agreement so Skillz can make its proposed production, and Papaya can confirm it has what it needs.

Lastly, as you know, I emailed you almost 2 weeks ago informing you we would be willing to make a production. It is unproductive for you to respond weeks after receiving our position with demands to respond to you within 48-hours' notice, especially during a time you know attorneys and clients are often on vacation.

To the extent you want to discuss the subpoena further on a call, I am currently pretty open on Friday other than 12 – 2 pm CT.

Best,

Mike

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Tuesday, June 25, 2024 3:42 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

CAUTION: MAIL FROM OUTSIDE THE FIRM

Mike,

Thanks for your email.  We note at the outset that producing "documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen" is not sufficient to satisfy Skillz's obligations under the subpoena.  Accordingly, we still intend to file a motion to compel Skillz to fully comply with the subpoena unless Skillz agrees by 5:00 p.m. EDT Thursday to produce all responsive documents.

We are willing to enter into a reasonable and appropriate confidentiality agreement to govern the production of the documents noted in your email.

Finally, we are not aware of the supposed "data directly rebutting the allegations" in Papaya's underlying complaint to which you refer.  We stand by the allegations in Papaya's complaint, including that 4fairplay.org posted false representations and fabricated data as outlined in the complaint.  Those allegations, and the corresponding claims, are amply supported.

Thanks,

Mike

Michael A. McIntosh
Counsel
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 13, 2024 9:16 AM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel:  Following up from our meet-and-confer, to resolve the issues raised during our call, Skillz agrees to produce documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen.  Is there a confidentiality agreement in this matter?  I can send over these documents today once we reach agreement on the confidential treatment of the financial information in these documents.

I also note that it is my understanding that the entities and/or individuals operating 4fairplay.org already provided you with data directly rebutting the allegations in your Virginia complaint that the content of 4fairplay.org was somehow fabricated.  To the extent litigation is pursued against Skillz related to 4fairplay.org, Skillz reserves all rights related to any decision to pursue the frivolous claims included in Papaya's current complaint, which you now know are unsupported.

I am free this afternoon or tomorrow to discuss Skillz's proposed production and the confidential treatment of same.

Thanks,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 1:02 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

---

CAUTION: MAIL FROM OUTSIDE THE FIRM

Thanks, Mike.  That time works for us.  We'll circulate an invite later this afternoon.

**Michael A. McIntosh**
Counsel
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 6, 2024 12:32 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike— we are unavailable tomorrow for a meet and confer.  Does 2:30 pm PT on Monday work for you?

Best,

---

**Michael Anthony Lombardo (Mike)**
*Senior Associate*
T: +1 312 764 6900 | E: MLombardo@KSLAW.com | Bio | vCard

King & Spalding LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606

kslaw.com

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 11:11 AM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Michael Lombardo <MLombardo@KSLAW.com>; Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

> CAUTION: MAIL FROM OUTSIDE THE FIRM

Ms. Hostetler, Mr. Raynal, and Mr. Lombardo:
Following up on the below, please let us know your availability to meet and confer tomorrow.
Thank you,

Mike

**Michael A. McIntosh**
Counsel
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** McIntosh, Michael A (WAS)
**Sent:** Wednesday, June 5, 2024 5:24 PM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Adam Hosmer-Henner <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>

**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** RE: [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel:

Please see the attached correspondence on behalf of Papaya.  Please let us know your availability to meet and confer tomorrow or Friday.
Thank you,

Mike

Michael A. McIntosh
Counsel
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Noltie, Lisa <LNoltie@lewisroca.com>
**Sent:** Thursday, May 30, 2024 5:29 PM
**To:** Diaz, Shirley (WAS) <Shirley.Diaz@skadden.com>; McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; Kelly, Todd D (WAS) <Todd.Kelly@skadden.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Leland, David B (WAS) <David.Leland@skadden.com>
**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

For your information and file, please see the attached copy courtesy with regard to the above-referenced matter.

Thank you,

Lisa Noltie
Legal Administrative Assistant

LNoltie@lewisroca.com
D. 702.949.8248

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
lewisroca.com
LEWIS ROCA ROTHGERBER CHRISTIE LLP

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

--------------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.
Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
================================================================================

King & Spalding Confidentiality Notice:
This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error.
Click here to view our Privacy Notice.

--------------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.
Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
================================================================================

--------------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named

herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

====================================================================== =========

-------------------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

====================================================================== =========

# Exhibit 22

**CALENDAR YEAR 2023**

**REPRESENTED ENTITIES, GOVERNMENTAL AFFAIRS AGENTS AND PERSONS COMMUNICATING WITH THE GENERAL PUBLIC**
**LISTED BY EXPENDITURES RANKING**

| FORM | DATE | FILER | EXPENDITURES RANKING |
|------|------|-------|----------------------|
| L-2 | 2/1/2024 | BPS DEVELOPMENT COMPANY LLC | 13,500.00 |
| L-2 | 2/8/2024 | CITY OF TRENTON | 12,947.00 |
| L1-L | 2/12/2024 | ALLIANCE FOR PROFESSIONALISM IN DOG TRAINING | 12,775.79 |
| L1-A | 2/12/2024 | PILLSBURY WINTHROP SHAW PITTMAN LLP- AMENDED | 12,775.79 |
| L-2 | 2/12/2024 | SEPHORA USA INC | 12,630.50 |
| L-2 | 2/12/2024 | ASSOCIATION OF PERIOPERATIVE REGISTERED NURSES | 12,366.00 |
| L1-G | 2/15/2024 | FAIR PLAY FOR MOBILE GAMES | 12,075.77 |
| L-2 | 2/9/2024 | CATHOLIC CHARITIES, DIOCESE OF TRENTON | 12,000.00 |
| L-2 | 2/9/2024 | CORE5 INDUSTRIAL PARTNERS LLC O/B/O CP LAND NORTH URBAN RENEWAL LLC | 12,000.00 |
| L1-A | 2/14/2024 | DAVID MAYER | 12,000.00 |
| L-2 | 2/13/2024 | EARLY CHILDHOOD EDUCATION ADVOCATES (ECEA) | 12,000.00 |
| L-2 | 2/15/2024 | EMD PERFORMANCE MATERIALS | 12,000.00 |
| L-2 | 2/5/2024 | FEDWAY ASSOCIATES INC | 12,000.00 |
| L-2 | 1/23/2024 | NATIONAL ASSOCIATION OF THEATER OWNERS OF NEW JERSEY INC | 12,000.00 |
| L-2 | 2/15/2024 | NJ DENTAL HYGIENISTS ASSOCIATION | 12,000.00 |
| L-2 | 1/22/2024 | NJ OCCUPATIONAL THERAPY ASSOCIATION | 12,000.00 |
| L-2 | 2/16/2024 | OCEAN GROVE CAMP MEETING ASSOCIATION- AMENDED | 12,000.00 |
| L-2 | 2/14/2024 | SECURED FINANCE NETWORK | 12,000.00 |
| L-2 | 2/15/2024 | WESTERN UNION | 12,000.00 |
| L-2 | 2/14/2024 | ZOETIS | 12,000.00 |
| L1-A | 1/16/2024 | BREIDINGER & ASSOCIATES LLC | 11,884.43 |
| L-2 | 2/1/2024 | FRIENDS OF HATIKVAH | 11,325.00 |
| L-2 | 2/15/2024 | NW FINANCIAL GROUP LLC- AMENDED | 11,000.00 |
| L1-L | 1/31/2024 | HOUSING & COMMUNITY DEVELOPMENT NETWORK OF NJ | 10,997.11 |
| L-2 | 2/14/2024 | NJ CENTER FOR TEACHING & LEARNING INC (NJCTL) | 10,500.00 |

This summary data reflects the information as reported on the Annual Lobbying reports covering calender year 2023, received as of 10:00 am on 02/22/2024

Page 32 of 38

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Papaya Gaming, Ltd.

**DEFENDANTS**

Fair Play for Mobile Games, Josh Levin, Square Strategies LLC, Lacie Newton, ~~and~~ Assemble the Agency LLC, Mavan

**(b)** County of Residence of First Listed Plaintiff    N/A
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Arlington
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Todd Kelly, Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW, Washington, DC 20005
(202) 371-7000

Attorneys *(If Known)*

N/A

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [x] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [x] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
~~15~~28 U.S.C. § ~~1125(a)(1)~~1332

Brief description of cause:
~~False Advertising under Lanham Act;~~ VA Business Conspiracy (Va. Code Ann. § 18.2-499); Common Law Conspiracy; ~~Defamation~~Tortious Interference with Contract

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $    More than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

**VIII. RELATED CASE(S)**

IF ANY                    *(See instructions):*    JUDGE    Denise Cote (S.D.N.Y.)                    DOCKET NUMBER  1:24-cv-01646-DLC

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|------|-------------------------------|
| Mar 14**Apr 4**, 2025 | /s/ Todd D. Kelly |

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III. Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. Origin. Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

| Summary report: Litera Compare for Word 11.10.0.38 Document comparison done on 7/24/2025 2:17:55 PM | |
|---|---|
| **Style name:** MLB Set 1 | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2025-03-14 - [001] Plaintiff's Complaint (1).pdf | |
| **Modified filename:** 13961100_#50639341v1_2025-04-04 - [020] Plaintiff's Amended Complaint.pdf | |
| **Changes:** | |
| **Add** | 1291 |
| Delete | 1442 |
| Move From | 143 |
| Move To | 143 |
| **Table Insert** | 3 |
| Table Delete | 3 |
| Table moves to | 1 |
| Table moves from | 1 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 3027 |