```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- X
                                   :
PAPAYA GAMING, LTD.,               :
                                   :
                    Plaintiff,     :          25cv5573 (DLC)
          -v-                      :
                                   :          OPINION AND
FAIR PLAY FOR MOBILE GAMES, et al.,:            ORDER
                                   :
                    Defendants.    :
                                   :
---------------------------------- X
```

APPEARANCES:

For plaintiff Papaya Gaming, Ltd.:

Anthony Joseph Dreyer
Jordan Adam Feirman
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

David B. Leland
Margaret E. Krawiec
Michael A. McIntosh
Todd D. Kelly
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005

For defendants Fair Play for Mobile Games, Josh Levin, Square
Strategies LLC, Mavan Group, Inc., and Valor Public Strategies
LLC:

Ari Micah Selman
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178

Elizabeth Herrington
Morgan, Lewis & Bockius LLP
110 N. Wacker Dr.
Suite 2800

Chicago, IL 60606

Jordan McCrary
Morgan, Lewis & Bockius LLP
300 S. Grand Ave
Twenty-Second Flr
Los Angeles, CA 90071-3132

Patrick Alan Harvey
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave, NW
Washington, DC 20004

For defendants Lacie Newton and Assemble the Agency LLC:

Amy Epstein Gluck
Pierson Ferdinand LLP
601 Pennsylvania Ave., N.W.
Ste. 900
Washington, DC 20004

Christina Heather Bost Seaton
Pierson Ferdinand LLP
1270 Avenue of the Americas
7th Floor--1050
New York, NY 10020

Daniel Messeloff
Pierson Ferdinand, LLP
1468 West 9th Street
Suite 100
Cleveland, OH 44101

DENISE COTE, District Judge:

On February 7, 2025, counterclaims filed by Papaya Gaming, Ltd. ("Papaya") against Skillz Platform Inc. ("Skillz"), in litigation between the parties in this district were dismissed. Papaya promptly moved to amend those counterclaims and also asserted essentially identical claims in a new action it filed in the Eastern District of Virginia ("Virginia Action"). That

duplicative litigation has been transferred to this Court and its defendants request dismissal of the Virginia Action and the imposition of sanctions on both Papaya and its counsel.  For the following reasons, the defendants' motions are granted.

## Background

Papaya was founded in 2016 and entered the real-money skill-based mobile gaming ("RMSB") market in 2019.  In RMSB games, players are matched by the platform with other users and compete to win cash prizes or for game rewards.  Papaya ran multi-player tournaments in which as many as six or more players competed against each other for these rewards.  Papaya did not disclose to those that used its platform, however, that it employed bots in its multi-player tournaments; indeed, on occasion all the "players" in the tournaments were bots with the exception of a single human player.  Papaya's business grew exponentially.  Skillz is a direct competitor to Papaya and it had entered the market earlier, in 2012.  In Skillz's tournaments, only two users of its platform play against each other.

On March 4, 2024, Skillz sued Papaya in federal court for violations of the Lanham Act and New York General Business Law ("New York Action").  Skillz asserted that Papaya used bots in its tournaments without disclosing that use to consumers, and as

a result, its advertisements regarding its games were false and misleading.  See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2025 WL 3012836, at *3 (S.D.N.Y. Oct. 27, 2025).

For a time, Papaya resisted discovery on the ground that it would violate Israeli law to produce its records.  When that position was rejected, Skillz, 753 F. Supp. 3d 347 (S.D.N.Y. 2024), reconsideration denied, 2024 WL 4839405 (S.D.N.Y. Nov. 20, 2024), Papaya engaged in discovery and admitted that it had used bots in its tournaments until 2024.

Papaya also filed counterclaims and amended them.  Those counterclaims included claims concerning the 4FairPlay website ("Website"), which Papaya asserted was set up and operated by Skillz and its co-conspirators to injure Papaya.  On February 7, 2025, Papaya's Lanham Act, New York General Business Law § 349, defamation, and civil conspiracy counterclaims concerning the Website were dismissed.  Skillz, 2025 WL 438387 (S.D.N.Y. Feb. 7, 2025) ("Counterclaim Decision").  That Counterclaim Decision is incorporated by reference and familiarity with it is assumed. In brief, and insofar as it is relevant here, the decision dismissed claims related to Skillz's creation of a "false-front" organization called 4FairPlay, which maintained the Website from

September 2023 to February 2024.  Papaya asserted that Skillz funded and controlled the Website.

According to Papaya, the Website encouraged visitors to file complaints about Papaya and other mobile gaming companies with state attorneys general.  It provided a pre-filled form for users to submit a complaint against either Papaya or two other companies.  The Website's home page included a banner showing a counter that purported to display an increasing number of complaints filed with state law enforcement about these companies.  The counter was not accurate.  Instead, each time a visitor arrived at the website, it would display the same number and then increase the number every few seconds, giving the false impression that it was incorporating accurate, live updates. The homepage also presented a map of the United States, purporting to show the number of complaints submitted from each state.  Like the counter, however, the map's data stayed the same over time and were not connected to any live database.

The Counterclaim Decision dismissed the claims based on the Website.  It found, inter alia, that Papaya had failed to plausibly plead (1) that consumers were confused or misled, as is necessary to challenge a statement that is not literally false; and (2) that the counter, a graph and the map were not substantially true.  Id. at *7, *8.

5

On March 3, Papaya filed a motion for leave to amend its counterclaims for a second time. Papaya alleged that Skillz had added stock language to the complaints individuals submitted to state law enforcement offices through the Website. That stock language included the statement that "I would like to make you aware of a mobile game that is defrauding consumers like me out of their hard-earned money. I strongly believe the following games use AI or 'bots' to scam players by pretending that those are real players." Papaya alleged that Skillz added this language even though most of the complaints that 4FairPlay received did not mention bot use.

Papaya's proposed amendments to its counterclaims also added that the Website maligned Papaya on a page titled "What Players are Telling Us." That page displayed six short quotations from consumers complaining about Papaya's games. Another page showed six other quotes one or two sentences long, attributed to consumers identified only by initials and a state of origin. Papaya alleged that Skillz had drafted or edited some of these testimonials.

The proposed amendments also included a description of another scheme, the Interview Scheme. Papaya alleged that Skillz, working through 4FairPlay, hired an organization to obtain confidential information about Papaya from Papaya

employees.  Portraying itself as a public policy group
conducting research, the organization contacted Papaya employees
using LinkedIn, offered $300 to participate in interviews, and
encouraged the employees to describe Papaya's use of bots.  Two
former Papaya employees participated.  Even though both had
signed agreements prohibiting them from disclosing sensitive
company information, they explained when and why bots were used.
See Skillz, 2025 WL 918411, at *2 (S.D.N.Y. Mar. 26, 2025)
("Amendment Decision").

On March 26, 2025, the motion to amend was denied.  Id. at
*7.  The Amendment Decision held, inter alia, that the
allegations regarding Skillz adding stock language to complaints
forwarded to law enforcement failed to plead that the addition
caused any reputational harm to Papaya since Papaya did not
allege that any consumer ever saw the additions.  And, since
Papaya did not deny that it had made undisclosed use of bots in
its tournaments, it did not plead that the additional language
about its bot use impugned its integrity.  Id. at *4.

The Amendment Decision also denied the amendments relating
to the Website as futile.  Papaya failed to plead that the
content of the testimonials, which accuse Papaya of using bots,
were false.  The misattribution allegations, which relate to the

7

use of initials to identify complainants, did not plausibly plead a materially false statement.  Id. at *5.

As for the Interview Scheme, the Amendment Decision described the allegation as an accusation that Skillz had used a surreptitious practice to confirm that Papaya was deceiving consumers by using bots to compete against Skillz without disclosing that practice.  The Decision explained why that failed to plead the disclosure of a trade secret or that Skillz had engaged in unfair competition as defined under the law.  Id. at *6.

On March 14, shortly after it had filed its motion to amend its counterclaims, but before it received the March 26 Amendment Decision, Papaya filed the Virginia Action.  It sued Fair Play for Mobile Games or 4 Fair Play ("Fair Play"), asserting that it is a "front company" for Skillz in Virginia that sponsored the Website.  It also sued defendants who operated or conducted work on behalf of Fair Play.  Each of these defendants had been identified in Papaya's proposed amended counterclaims in the New York Action.

Shortly after the Amendment Decision was issued in the New York Action and after having been warned by its adversaries that they would seek sanctions if Papaya did not promptly dismiss the Virginia Action, Papaya filed an amended complaint in the

8

Virginia Action ("FAC").  Papaya deleted various allegations
from the FAC in an apparent attempt to circumvent the preclusion
doctrines that its adversaries had identified in correspondence
threatening sanctions.[1]  The FAC filed in the Virginia Action
nonetheless reasserted core allegations about the Website and
the Interview Scheme that Papaya had attempted to plead in the
New York Action.

    The FAC brought these claims under Virginia law.  They are
claims of business conspiracy in violation of Va. Code. Ann. §
18.2-499, tortious interference with contract, and common law
conspiracy.  The first claim arises out of both the Website and
the Interview Schemes.  The other claims only pertain to the
Interview Scheme.

    On May 2, three sets of motions were filed in the Virginia
Action.  Fair Play and four other defendants, referred to as the
MLB Defendants,[2] filed motions to dismiss the FAC for failure to

---

[1] Some of the deleted allegations document Skillz's relationships
with the defendants and its direct involvement in the schemes.
For example, Papaya deleted an allegation that Skillz's
leadership instructed its staff not to take written notes about
the Website when it was discussed in meetings.  It deleted an
allegation that Skillz admitted to providing funding for Fair
Play and deleted references to the defendants having "knowingly
conspired with Skillz" and having fabricated complaints about
Papaya "at Skillz's behest."

[2] The MLB Defendants are Fair Play for Mobile Games, Josh Levin,
Square Strategies LLC, Mavan Group, Inc., and Valor Public
Strategies LLC.

state a claim and for failure to join Skillz as a necessary and indispensable party.  The MLB Defendants also filed motions to transfer the case or stay proceedings pending resolution of the New York Action, and for judicial notice of the New York Action docket.  Two defendants, referred to as the Assemble Defendants,[3] filed a motion to dismiss, or alternatively to strike, transfer, or stay the action, and a request for judicial notice of the New York Action.  The Assemble Defendants filed a motion for sanctions on June 5 and filed additional requests for judicial notice on June 5 and June 13.  The defendants' motions to dismiss became fully submitted on June 13.  The Assemble Defendants' motion for sanctions became fully submitted on June 26.

At a hearing on July 2, 2025, the Hon. Michael S. Nachmanoff, United States District Judge for the Eastern District of Virginia, granted the defendants' requests for judicial notice and motions to transfer.  In explaining the basis for the ruling to transfer this action, Judge Nachmanoff stated, "Papaya has blatantly attempted to get a second bite at the apple by pursuing different but clearly related defendants in a different forum after Judge Cote conclusively rejected

---

[3] The Assemble Defendants are Assemble the Agency LLC and Lacie Newton.

Papaya's counterclaim and motion for leave to file a second amended counterclaim on virtually identical claims."

The case was transferred to this district on July 7, 2025. It was accepted as related and reassigned to this Court on July 18. The defendants in the Virginia Action filed a motion for sanctions on August 18. The motion incorporates the Assemble Defendants' motion for sanctions in its entirety. That motion became fully submitted on September 9.

Meanwhile, discovery has been completed in the New York Action. Summary judgment and Daubert motions have been resolved, and trial on Skillz's claims against Papaya in the New York Action begins on April 13, 2026. Skillz seeks hundreds of millions of dollars in damages from Papaya.

## Discussion

The defendants move to dismiss the Virginia Action on the merits and as precluded by the decisions entered in the New York Action. Because those motions are granted, it is unnecessary to reach the defendants' remaining arguments for dismissal.[4] The motion for sanctions is also granted and will be discussed last.

---

[4] Among the arguments that will not be discussed are the motions to dismiss for claim splitting and failure to join Skillz, and the motion to strike allegations in the FAC derived from discovery received in the New York Action.

I.   Motions to Dismiss

The standard for addressing a motion is dismiss is well-established.  To defeat a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678).  In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party."  Doe, 100 F.4th at 94 (citation omitted).

Papaya's first claim is for a violation of Virginia Code Ann. § 18.2-499.  That law makes it unlawful for "[a]ny two or more persons" to "combine, associate, agree, mutually undertake or concert together" for the purpose of "willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever."  Va. Code Ann. § 18.2-499(A).

To plead a claim of business conspiracy, the plaintiff must plead "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business; and (2) resulting damage to plaintiff." Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 214 (2014) (citation omitted).  To establish that the defendants acted with malicious intent, a plaintiff must show "that the conspirators acted with legal malice, i.e., intentionally, purposely, and without lawful justification." Id. at 215 (citation omitted).

Since there can be no conspiracy to do an act that the law allows, an allegation of conspiracy "must at least allege an unlawful act or an unlawful purpose." Id. (citation omitted). The unlawful act required for a business conspiracy claim can be either a criminal act or an intentional tort. Id. at 219. Examples of predicates for this cause of action include tortious interference with contract, tortious interference with business expectancy, and fraud. See id. at 218; Mission Integrated Techs., LLC v. Clemente, 158 F.4th 554, 565 (4th Cir. 2025).

A plaintiff must show that it sustained damages "as a result of an act this is itself wrongful or tortious." Dunlap, 287 Va. at 215.  "No cause of action exists without the resulting injury, and the damage produced must arise as the

effective result of the conspiracy." Id. at 214 (citation omitted).

It is unsettled in the Fourth Circuit whether the heightened pleading standard set forth in Rule 9(b) applies to this claim. The weight of authority, however, suggests that where the claim is premised on acts of fraud, the claim must be pleaded with the particularity required by Rule 9(b). See, e.g., Am. Airlines, Inc. v. Shahi World & Travels, LLC, No. 1:20-CV-17 (RDA/WEF), 2023 WL 3952332, at *19 (E.D. Va. June 12, 2023); BHR Recovery Communities, Inc. v. Top Seek, LLC, 355 F. Supp. 3d 416, 425 (E.D. Va. 2018); Gov't Emps. Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700, 706 (E.D. Va. 2004).

Papaya's second claim is for tortious interference with contract.

> In Virginia, the elements of a claim for tortious interference with contractual relations are typically recited as (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

Schaecher v. Bouffault, 290 Va. 83, 106 (2015).

Finally, Papaya pleads a claim of common law conspiracy. "[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as

a result of an act that is itself wrongful or tortious."
<u>Dunlap</u>, 287 Va. at 215.

Papaya's claim for business conspiracy rests on underlying unlawful acts concerning both the Website and the Interview Scheme and is brought against all defendants.  As for the Website, the claim asserts that the defendants made material, false statements.  It also describes the submission to law enforcement of the complaints collected through the Website as unlawful under 18 U.S.C. § 1001.[5] and N.Y. Penal Law § 175.30.[6] The business conspiracy claim also asserts that the defendants defamed Papaya through the operation of the Website and tortiously interfered with its contracts through the Interview Scheme.

---

[5] 18 U.S.C. § 1001 prohibits the making of "any materially false, fictitious, or fraudulent statement or representation" to officials "within the jurisdiction of the executive . . . branch of the Government of the United States."  18 U.S.C. § 1001(a)(2).

[6] Under N.Y. Penal Law § 175.30, a person

> is guilty of offering a false instrument for filing in the second degree when, knowing that a written instrument contains a false statement or false information, he offers or presents it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant.

The second and third claims relate to the Interview Scheme only.  They are claims for tortious interference with contract and common law conspiracy.

A.  Business Conspiracy Claim:  The Website

The FAC fails to plead a business conspiracy claim predicated on the operation of the Website because it has not pleaded an underlying unlawful act.  The FAC does not plead that the defendants made any materially false or defamatory statements about Papaya or its platform either through the stock language added to the consumer complaints submitted on the Website and forwarded to law enforcement or through the displays and testimonials posted on Website.  These failures are largely due to FAC's failure to deny that Papaya used bots on its platform.[7]  In addition, the FAC does not plead that the Website's complaint counter, pie chart, or map of complaints are false or defamatory because it does not allege that multiple consumers had not complained about Papaya or that such complaints were not increasing with time.  Nor does it allege

---

[7] In the New York Action, it is now undisputed that Papaya used bots in its games from 2019 until at least November 2023.  None of Papaya's individual deposition witnesses denied the historic use of bots, as each asserted his Fifth Amendment right against self-incrimination rather than testifying in a deposition.

that the counter speed or authorship of the testimonials would
be material to a consumer.  Without a plausible allegation of
any underlying unlawful or tortious conduct, the business
conspiracy claim premised on the Website fails under Virginia
law.  Papaya's business conspiracy claim regarding the Website
fails for the additional reasons that the FAC does not plausibly
allege the necessary elements of malicious intent or injury.

In opposition to the motion to dismiss this claim, Papaya
makes essentially two sets of arguments:  One regarding the
complaints forwarded to law enforcement authorities; the other
regarding the displays on the Website.  In each case, it
emphasizes that its claims of falsity and materiality do not
turn on whether Papaya had made an undisclosed use of bots in
its tournaments.  It contends that "whether Papaya used bots is
irrelevant" to its claims and that "[n]othing depends on whether
Papaya in fact used bots."  Papaya submits instead that it has
adequately pleaded falsity and materiality through its
allegations that defendants exaggerated the number of consumers
complaining about Papaya's employment of bots in its
tournaments.

1.  Complaints Forwarded to Law Enforcement

Regarding the consumer complaints forwarded to law
enforcement, and Skillz's addition of boilerplate language about

Papaya's use of bots to those complaints, Papaya argues that the
fact that a "handful of consumers" had grievances about its bot
use or wanted government officials to take action against Papaya
misses the point.  Papaya explains that it has pleaded that the
defendants ran a process "designed to leave government officials
with the false impression that thousands of customers wanted the
government to take action against Papaya over its alleged bot
use."

     In analyzing this argument, which Papaya did not articulate
in the New York Action, it is helpful to recognize what Papaya
is not arguing.[8]  It is not suggesting that it was malicious or
unlawful for the defendants to submit consumer complaints about
Papaya's use of bots to law enforcement authorities.  Papaya's
undisclosed use of bots in tournaments on its platform may have
violated or assisted in the violation of various laws, including
the laws regulating gambling, tax laws related to gambling, and
consumer protection laws.  Similarly, Papaya is not asserting
that the defendants invented thousands of complaints about
Papaya or that consumers had not submitted thousands of
complaints about Papaya to the Website to be forwarded to law
enforcement authorities.  Therefore, the issue is not whether it

---

[8] Papaya makes this argument in its May 30, 2025 brief filed in
the Virginia Action.  By that time, the Amendment Decision in
the New York Action had been filed.

was "malicious" of the defendants (and Skillz) to make reports, in good faith, of Papaya's alleged illegal practices but whether it was "malicious" to exaggerate to law enforcement the extent to which consumers were specifically complaining about Papaya's use of bots.

It goes without saying that citizens may not make false statements to law enforcement.  Law enforcement authorities may, of course, bring charges against individuals who make false statements to them, and Papaya's FAC recites a federal and a New York State statute authorizing those criminal charges.  Here, however, the issue is whether Papaya has pleaded a violation of the Virginia business conspiracy statute in claiming that the defendants helped Skillz to exaggerate the number of complaints consumers were making about an allegedly illegal practice in which Papaya no longer disputes it engaged.  Put another way, the issue is whether Papaya may recover damages in a civil lawsuit for the exaggeration of the extent to which consumers had blamed Papaya for an allegedly illegal practice.  Even if it is assumed that such conduct violates the Virginia statute, at the very least Papaya must plead that it was injured by the

exaggeration and not by the reporting of the allegedly illegal practice.[9]  This Papaya has not done.

Papaya has pleaded that the dissemination of the "fabricated" customer complaints to government officials caused it "substantial and ongoing harm."  It alleges that it paid legal fees "after receiving a cease-and-desist letter from a state gaming control board that, upon information and belief, stemmed at least in part from complaints submitted to state law enforcement via 4 Fair Play."

This is not an adequate pleading of an injury on which Papaya may recover.  It would be against public policy for a party to claim damages in a civil action for a defendant's good faith reporting to law enforcement authorities that the plaintiff had apparently violated the law.  See Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 895 (1984); Bill Edwards Oldsmobile, Inc. v. Carey, 219 Va. 90, 99-100 (1978).  Understandably, therefore, Papaya does not suggest that it could recover damages under the Virginia business conspiracy statute with such a claim.  Put another way, Papaya does not assert that it can seek

---

[9] Because Papaya has failed to plausibly plead an injury from the defendants' exaggeration of the number of consumer complaints, it is unnecessary to further explore whether a plaintiff may bring a civil action premised on the existence of a law enforcement investigation of its allegedly unlawful practices where the plaintiff does not dispute that it engaged in the practice under investigation.

damages from the defendants, including the recovery of legal
fees it has incurred, due to the defendants' reporting to either
law enforcement authorities or a state gaming commission that
Papaya used bots in its tournaments and that consumers were
complaining about it.  As a result, the FAC's threadbare recital
fails to state a claim, under the Virginia business conspiracy
law, that it was the exaggeration of the number of consumer
complaints that injured Papaya.  No cause of action can exist
under Virginia law unless the claimed damages "arise as the
effective result of the conspiracy."  Dunlap, 287 Va. at 214
(citation omitted).  For this and all the reasons already
recited, this prong of Papaya's claim fails to state a case of
action.

2. Content of Website

To support its claim that the content of the Website
itself violated the Virginia business conspiracy statute, Papaya
argues that the FAC adequately pleads that the defendants'
misattribution of some of the posted testimonials to consumers
and the Website's overstatement of the volume of complaints
would have a material effect on an RMSB consumer.  The FAC
fails, however, to plausibly plead that by themselves the speed
at which the graphics were updated on the Website or the use of

initials to identify which consumer wrote a posted testimonial would have defamed or injured Papaya.

Papaya continues to face an insuperable barrier, in this, its third, iteration of this claim. Without denying that it made an undisclosed use of bots in its tournaments, it is impossible for Papaya to allege that the content of the Website defamed Papaya, which is its chosen predicate for this portion of its business conspiracy claim. The extent of the challenge that Papaya faces in trying to state a viable claim based on a defamation theory is exposed by the concession it makes in its opposition to this motion to dismiss. Papaya bluntly concedes that its claim is not based on any allegation that the statements that it used bots were false or immaterial. But the most obvious way to plead an injury due to the content of the Website would be to plead that it was the Website's accusations that Papaya's tournaments included bots that caused an injury to Papaya's reputation. Once Papaya acknowledges that it used bots and once it abandons any claim that this was the source of its injury, the FAC fails to plead that Papaya's reputation was harmed or that it sustained any injury at all due to the particular graphics on the Website or the particular initials associated with a testimonial about that bot usage.

B.    The Interview Scheme

The claims related to the Interview Scheme fare no better.
Papaya has failed to plead that it was harmed by that scheme.

While Papaya argues that the mere sharing of information in
breach of a confidentiality agreement is sufficient to state a
claim, it is wrong.  The FAC must plausibly plead damages.  In
making this argument, Papaya relies on Cap. One Fin. Corp. v.
Sykes, No. 3:20CV763, 2021 WL 2903241 (E.D. Va. July 9, 2021).
In Sykes, however, the plaintiff provided "[u]ncontroverted
evidence" of its damages.  Id. at *12.

Informed in part by documents produced in discovery in the
New York Action, the FAC alleges that the defendants
participated in the Interview Scheme, through which two of
Papaya's former employees -- in violation of their
confidentiality agreements with Papaya -- disclosed aspects of
Papaya's matchmaking processes, its methods of conducting
customer research, and its protocols for customer outreach.  The
FAC adds that the defendants handed the information to Skillz,
which used the information to focus its advertising and
marketing efforts and in statements to a reporter.  For the
following reasons, this does not plausibly allege that any
reputational or financial damage resulted from that scheme.

23

To begin with, the FAC acknowledges that the accusations that it deployed bots predated the two interviews of its former employees. According to the FAC, the defendants' Website was making that accusation at least two months before the interviews. Read as a whole, the FAC describes a competitive landscape in which Papaya's use of bots in its tournaments was the subject of inquiry and complaint by Skillz before the Interview Scheme commenced. Not surprisingly then, Papaya does not suggest in opposing this motion that it had any right to confidentiality regarding its use of bots. Papaya does not argue that it would be able to seek damages from the disclosure of any allegedly unlawful practice through enforcement of a confidentiality agreement, particularly where that information was already known. Therefore, to state a claim for tortious interference with contract, Papaya is required to plead that the defendants' efforts to obtain confidential information about Papaya were either unconnected to an effort to learn more about Papaya's employment of bots or that in undertaking the effort to learn about Papaya's use of bots Skillz obtained unrelated confidential and valuable information which it then used to compete against Papaya. This Papaya has failed to plead.

Instead, Papaya has kept its allegations vague. A comparison of Papaya's pleading of the Interview Scheme in the

24

New York Action reveals Papaya's pleading strategy.  Papaya has scrubbed many of the allegations regarding bots from the Virginia Action's pleading of the Interview Scheme.

The references to bots permeated the pleading of the Interview Scheme in Papaya's proposed second amendment to its counterclaims in the New York Action.  For instance, the New York pleading asserts that the campaign to gather evidence from Papaya's former employees was for evidence of Papaya's proprietary "matchmaking practices **and alleged bot usage;**"[10] the first step in the scheme was to identify former Papaya employees most likely to have information **"about Papaya's alleged bot use"**;[11] Skillz executives provided feedback on the questions **"regarding bots"**;[12] former Papaya employee "Feldman disclosed **Papaya's use of bots** to address player liquidity";[13] **"Feldman stated that bots are typically used to fill a round"**;[14] as revealed in Skillz's February 26, 2024 Pitch, Skillz intended to tell reporters that **"Skillz has reason [] to believe that Papaya . . . has been running rigged games by using bots disguised as human players."**;[15] "former Papaya employees informed Skillz's

---

[10] Proposed Second Amended Complaint in New York Action at paragraph 257.  Compare with FAC at paragraph 184.
[11] Id. ¶ 261.  Compare with FAC ¶ 188.
[12] Id. ¶ 277.  Compare with FAC ¶ 203.
[13] Id. ¶ 284.  Compare with FAC ¶ 209.
[14] Id. ¶ 284.  Compare with FAC ¶ 209.
[15] Id. ¶ 288.  Compare with FAC ¶ 214.

business decisions regarding user acquisition strategy.  For
example, a December 18, 2023 user acquisition strategy deck
states, **'Avia and Papaya's solitaire games stole the top spots
in the casino category by using unfair bots to defraud players.'
As a result, Skillz aimed to convey the message that '[o]nly on
Solitaire Cube you play with real players for real prizes.'";**[16]
on "January 24, 2024, the User Acquisition team noted that
**'Bingo and Solitaire feel the hardest for us at the moment (due
to bot/competitors)'";**[17] and **"a presentation titled 'Skillz
Champions' identified competitors like Papaya having 'a cost
advantage (bots/unfair play)'".**[18]  Papaya deleted each of the
bolded passages from the Virginia Action's FAC.

Accordingly, the general allegations of injury in the FAC
due to the Interview Scheme are insufficient to overcome a Rule
12(b)(6) motion.  See Iqbal, 556 U.S. at 678.  Without a
plausible pleading of injury resulting directly from the
defendants' conduct, Papaya's business conspiracy, tortious
interference with contract, and civil conspiracy claims must be
dismissed.

---

[16] Id. ¶ 292.  Compare with FAC ¶ 216.
[17] Id. ¶ 292.  Compare with FAC ¶ 216.
[18] Id. ¶ 292.  Compare with FAC ¶ 216.

II.  Issue Preclusion

Relying on the doctrine of issue preclusion, the defendants contend that Papaya's FAC in the Virginia Action must also be dismissed because it is premised on allegations that this Court has twice ruled fail to state a claim.  They are correct. Facing an adverse ruling in the New York Action, Papaya's recourse is to appeal the dismissal of its counterclaims to the Court of Appeals for the Second Circuit; it was precluded from filing duplicative litigation in Virginia.

The doctrine of issue preclusion is well established.

Issue preclusion, or collateral estoppel, which applies not to claims or to causes of action as a whole but rather to issues, bars litigation of an issue when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

Proctor v. LeClaire, 715 F.3d 402, 414 (2d Cir. 2013) (citation omitted).

The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion.  In contrast, the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with the party opposing the application of issue preclusion.

Id. (citation omitted).

As the Supreme Court explained in B & B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138 (2015), "[a]llowing the same issue to be decided more than once wastes litigants' resources and adjudicators' time, and it encourages parties who lose before one tribunal to shop around for another." Id. at 140. The doctrine of issue preclusion "is designed to prevent this." Id. In sum, "a losing litigant deserves no rematch after a defeat fairly suffered." Id. at 147 (citation omitted).

Each of the four factors essential to issue preclusion is present here. First, there is an identity of issues. Papaya simply reasserted in the Virginia Action the allegations it pleaded in counterclaims it had filed or attempted to file in the New York Action. The only differences were the statutes it invoked and the defendants it named. Neither of those differences prevents application of the doctrine of claim preclusion.

The remaining three factors are also quickly addressed. The same issues regarding the Website and the Interview Scheme were actually litigated and addressed in the Counterclaim and Amendment Decisions, and their resolution was necessary to those decisions. Papaya does not dispute that it had a full and fair opportunity to defend its pleading of its counterclaims in the New York Action. Lastly, final judgment in the New York Action,

28

which will be entered after the completion of the April trial on
Skillz's claims, will include the rulings in Skillz's favor on
Papaya's counterclaims and be subject to appeal.

Papaya does not contest that two of the four factors
essential to claim preclusion exist. It does not contest that
the issues regarding the Website and the Interview Scheme were
necessary to the dismissal of Papaya's counterclaims filed in
the New York Action or that it was provided with a full and fair
opportunity to litigate those issues in the context of the
motions to dismiss and amend. It does contest, however, that
there is an identity of issues between the counterclaims it
brought in the New York Action and its claims in the Virginia
Action; it disputes as well that the dismissal of its
counterclaims is final.

A. Identity of Issues

Papaya does not dispute that the allegations in the
Virginia Action concern the same two activities -- the Website
and the Interview Scheme -- at issue in its counterclaims in the
New York Action. Papaya contends, however, that the issues are
not identical because the claims in the Virginia Action arise
under Virginia law, which have different elements than the
claims asserted in the New York Action. This argument fails.
The fact that Papaya based its claims on different laws is

29

immaterial here.  The claims brought under Virginia law necessarily rest on one or more issues fully resolved against Papaya in the Counterclaim and Amendment Decisions.  See Skillz, 2025 WL 438387, at *6, *8; Skillz, 2025 WL 918411, at *4, *5.

Among other issues they shared was Papaya's obligation to plead that it was injured due to the conduct of which it complained.  It is a basic principle of tort law that a party seeking damages must prove that it was injured by the tortfeasor's conduct.  See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 329 (2020); Doe v. Chao, 540 U.S. 614, 621 (2004).  Papaya did not plausibly plead injury in its counterclaims in the New York Action, and the doctrine of claim preclusion barred it from filing the Virginia Action in which it sought damages premised on the same conduct.

In support of its argument that a difference in legal theories by itself prevents the application of claim preclusion even when the "factual setting of both suits may be the same," Papaya relies on B&B Hardware, 575 U.S. 138.  But in B&B Hardware, the Court explained that "it does not matter" if the two proceedings "are governed by different statutory provisions."  Id. at 154.  What matters is whether the two tribunals apply the same standard on an issue.  Id.  In B&B Hardware, the Court held that a likelihood of success

30

determination in a trademark registration proceeding precluded a contest over that issue in a trademark infringement proceeding. Id. at 146-47.  B&B Hardware cautioned that the "issues" at stake in an issue preclusion analysis "must be understood broadly enough to prevent repetitious litigation of what is essentially the same dispute."  Id. at 157.

Turning to the claims it asserted in the Virginia Action, Papaya first asserts that the focus of its Virginia business conspiracy claim is different than what it pleaded in its New York counterclaims.  Papaya argues that the focus of this Virginia claim, insofar as it concerns the Website, is Skillz's fabrication or alteration of the letters consumers submitted through the Website for transmission to law enforcement authorities.  This attempt to distinguish Papaya's claims in the two lawsuits fails for at least two reasons.  First, the argument unfairly circumscribes its claim in the Virginia Action by ignoring the bulk of the Virginia Action's FAC.  The FAC contains essentially all of the allegations about the Website contained in the New York counterclaims.  In any event, even if it were appropriate to narrow one's focus to one aspect of Papaya's business conspiracy claim, to wit, the alterations of the consumer complaint letters (which was the addition of a statement about Papaya's use of bots that had not been included

31

by the consumers in their submissions), this attempt to differentiate the issues litigated in the two actions also fails.

When Papaya sought to amend its counterclaims in the New York Action, it added allegations about the insertion of the very statements that it now argues distinguish the Virginia business conspiracy claim from those counterclaims. The Amendment Decision held that those insertions, which concerned Papaya's use of bots, did not state a claim because, inter alia, Papaya did not plead that the substantive content of the stock language added to the consumer complaints was false and thus did not "amount to any allegation of harm, reputational or otherwise." Skillz, 2025 WL 918411, at *4. This same deficiency has prevented Papaya from successfully pleading a claim under Virginia law for participation is a business conspiracy. Without a denial in its pleading that it used bots and a denial that consumers were indeed complaining about its use of bots, Papaya has failed to plead that it was injured.

Next, Papaya seeks to distinguish its claims regarding the Interview Scheme made in the Virginia Action from those it made in the New York Action. It points out that it brought a claim for tortious interference with contract under Virginia law but a claim of unfair competition under New York law. Papaya argues

32

that its Virginia claim for tortious interference is adequately
pleaded when it alleged that confidential information was
surreptitiously obtained from its two former employees and
conveyed to Skillz, a competitor, even in the absence of an
allegation that Skillz used that information and that Papaya was
injured by that use.  But, as already explained, an employee's
breach of a duty is insufficient to obtain damages from a third
party.  Papaya is required to plead damages to state a claim
under Virginia law for tortious interference with contract.
And, as the Amendment Decision explained, "without any facts
suggesting that Skillz did anything with the sensitive
information it allegedly purloined, Papaya cannot state a
claim."  Id. at *6.

To summarize, in the New York Action, Papaya claimed that
it was injured by the operation of the Website and by the
Interview Scheme.  Since Papaya does not deny that it in fact
employed bots during the relevant time period, however, the
Counterclaim and Amendment Decisions explained that Papaya did
not plausibly allege harm.  If Papaya disagreed with those
Decisions, its recourse under the law is the appeal of those
Decisions when final judgment is entered in the New York Action.

Finally, Papaya argues that there is additional information
that it will now be able to add to its Virginia claims, and that

that new information was not considered in the New York Action.
The "new" information is that consumers "never saw" the stock
language that Skillz added to their complaints when it forwarded
the complaints to law enforcement.  Papaya's suggestion that
this might now entitle it to bring duplicative litigation fails.
First of all, this is not a materially new fact.  As the
Amendment Decision explained, "Papaya's argument that the
misleading stock language caused it reputational harm and
resulting lost profits cannot succeed given the PSAC's failure
to allege that any customer or potential customer ever saw it."
Id. at *4.  Moreover, even if Papaya added this additional
allegation to its pleadings in the Virginia Action that addition
would not impact the claim preclusion analysis.  As the
Amendment Decision explained, because Papaya failed to plead
that the "substantive content" that Skillz added to the
complaints was false, the addition did "not amount to any
allegation of harm."  Id.

   B. Final Decision

   Papaya also asserts that the dismissals of its
counterclaims in the New York Action were not final decisions
because they have not been embodied in a judgment.  This
argument fails as well.

34

The fourth prong of the issue preclusion doctrine requires that the issues "have been necessary to support" a valid and final judgment on the merits in the earlier case.  Bifolck v. Philip Morris USA Inc., 936 F.3d 74, 82 (2d Cir. 2019) (citation omitted).  "An issue is necessary or essential only when the final outcome hinges on it.  This requirement protects against unfairness by ensuring that the issue was really disputed and that the loser put out his best efforts."  Id. (citation omitted).

While the resolution of an issue must be necessary to the eventual entry into a final judgment, the resolution need not already have been embodied in a judgment to have preclusive effect.  As the Court of Appeals explained decades ago,

> Whether a judgment, not "final" in the sense of 28 U.S.C. § 1291, ought nevertheless be considered "final" in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review. "Finality" in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.

Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89 (2d Cir. 1961).  Lummus is the "leading modern case" on the issue of finality in the context of issue preclusion.  18A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 4434 (3d

ed.).  As explained in the Restatement, a "final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."  Restatement (Second) of Judgments § 13 (1982) (citation omitted).  Relying on these principles, the Court of Appeals has found that a liability ruling made by the district court prior to the entry of a judgment was "sufficiently final" to be entitled to preclusive effect. United States v. Alcan Aluminum Corp., 990 F.2d 711, 719 (2d Cir. 1993).

Papaya's counterclaims were dismissed (or denied in a rejection of its proposed amendments) through two decisions applying the Rule 12(b)(6) standard.  Under Rule 41(b), Fed. R. Civ. P., an involuntary dismissal of claims "operates as an adjudication on the merits."  The Supreme Court has instructed that such a dismissal constitutes a "dismissal with prejudice." Lomax v. Ortiz-Marquez, 590 U.S. 595, 600-01 (2020).  In other words, the counterclaim issues litigated in the New York Action resulted in a final adjudication on the merits and were dispositive.  Papaya will have the opportunity to appeal the dismissal of its counterclaims (and the denial of its motion to amend those counterclaims) following the April trial on Skillz's claims.  The fact that it was unable to appeal immediately did

not render the New York Action dismissals nonfinal for the
purposes of preclusion or permit Papaya to file duplicative
claims in Virginia.

   III. Sanctions

      The defendants in the Virginia Action have moved for the
entry of sanctions against Papaya and its counsel at Skadden,
Arps, Slate, Meagher & Flom LLP ("Skadden").  They seek to
recover their attorneys' fees and costs incurred in defending
the Virginia Action.  They argue that Papaya and Skadden
violated Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 by prosecuting
the claims in bad faith after the claims were already dismissed
twice in the New York Action.  They also invoke the Court's
inherent power.  Their request is granted.

      Rule 11 states that an attorney who presents "a pleading,
written motion, or other paper" to the court thereby "certifies"
that to the best of his knowledge, information, and belief
formed after a reasonable inquiry, the filing is not presented
for any improper purpose, "such as to harass, cause unnecessary
delay, or needlessly increase the cost of litigation."  Fed. R.
Civ. P. 11(b)(1).  A court may sanction an attorney, law firm,

or party that violates Rule 11(b) upon a motion filed by a party to the litigation.  Fed. R. Civ. P. 11(c)(2).[19]

"Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy."  Kiobel v. Millson, 592 F.3d 78, 83 (2d Cir. 2010) (citation omitted).  "Once a court determines that Rule 11(b) has been violated, it may in its discretion impose sanctions limited to what is sufficient to deter repetition of such conduct."  Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157, 166 (2d Cir. 1999) (citation omitted).

Section 1927 addresses unreasonable multiplication of litigation.  It provides that

> Any attorney or other person admitted to conduct cases
> in any court of the United States or any Territory
> thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the
> court to satisfy personally the excess costs,
> expenses, and attorneys' fees reasonably incurred
> because of such conduct.

28 U.S.C. § 1927.

---

[19] The parties do not dispute that the "safe harbor" requirement in Rule 11 has been met or that Papaya was otherwise afforded adequate notice and opportunity to be heard.  See Fed. R. Civ. P. 11(c)(2).  Papaya in fact complains that the Virginia Action defendants repeatedly threatened it with a motion for the imposition of sanctions.

When a district court invokes its power "to punish actions by an attorney that are taken on behalf of a client, the district court must make an explicit finding of bad faith." Rossbach v. Montefiore Med. Ctr., 81 F.4th 124, 143 (2d Cir. 2023) (citation omitted).  A finding of bad faith must be supported by a "high degree of specificity in the factual findings."  Id. at 141 (citation omitted).  Bad faith may be inferred, however, "where the action is completely without merit."  Id. at 144 (citation omitted).

Finally, a court has "the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct."  Shepherd v. Annucci, 921 F.3d 89, 97 (2d Cir. 2019).  That inherent power includes the power to sanction an attorney or a party who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Rossbach, 81 F.4th at 141 (citation omitted); see Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 235 (2d Cir. 2020).

Papaya and Skadden are sanctioned under Rule 11(b)(1), § 1927, and this Court's inherent authority.  As stated above, the issues Papaya presented in the Virginia Action had already been litigated twice before this Court.  The allegations were virtually identical to those asserted and dismissed in the New York Action.  Although the FAC brings claims under Virginia law

39

instead of the federal or New York law claims asserted in the
New York Action, that distinction is immaterial.

Papaya and its counsel operated in bad faith in filing the
Virginia Action.  The duplicative and vexatious nature of this
litigation cannot be ignored.  Evidence of their bad faith can
be seen in their ineffective scrubbing of the Virginia FAC to
make it appear less duplicative and in their strained arguments
on their attempt to distinguish the two litigations.  Instead of
waiting to appeal the dismissal of the counterclaims to the
Court of Appeals for the Second Circuit, Papaya filed virtually
identical claims in Virginia.  Papaya pursued the Virginia
claims against affiliates of Skillz to place pressure on Skillz
and thereby unreasonably increased the cost of litigation.  As
Judge Nachmanoff found, Papaya "blatantly attempted to get a
second bite at the apple."  That effort imposed unnecessary
costs on two federal courts, the Virginia Action defendants and
their counsel.  Accordingly, the Virginia Action defendants have
shown that they are entitled to an award of attorneys' fees and
costs incurred in defending this vexatious litigation.  Those
costs are imposed on both Papaya and its counsel Skadden.

Papaya argues that neither Papaya nor Skadden acted in bad
faith because the Virginia Defendants have failed to show that
Papaya's claims had no chance of success.  That argument misses

the point.  The Virginia Action was multiplicitous litigation.
It repeated in all material respects the counterclaims Papaya
filed or attempted to file in the New York Action.  If this
Court erred in dismissing those counterclaims, Papaya's remedy
is to appeal that decision when a final judgment is entered in
the New York Action.  The remedy was not to bring essentially
identical claims against Skillz affiliates in another federal
district court.  The Virgina claims were a blatant attempt to
unreasonably increase the expense and burden of litigation on
Skillz.

When faced with the adverse ruling in the Counterclaim
Decision, Papaya and Skadden had at least two options.  They
could move for reconsideration; they did not.  They could also
seek to amend the counterclaims, which is the route they took.
When the Amendment Decision rejected Papaya's second attempt to
amend its counterclaims, they again could have moved for
reconsideration; they did not.  At that point, Papaya's recourse
was to wait for entry of final judgment and seek reversal of the
Counterclaim and Amendment Decisions in the Court of Appeals for
this Circuit.  Pursuit of vexatious litigation in Virginia was
not a legally permissible option.

Papaya's motivation to increase the cost of litigation to
Skillz has become clearer over time.  Skillz intends to seek

over $700 million in damages from Papaya on Skillz's Lanham Act claims.  See Skillz, 2025 WL 3012836, at *9.  Thus, the stakes in this litigation are high.  But large potential damages figures cannot excuse litigation tactics that improperly and unfairly increase the burden of litigation.

Imposition of sanctions is not to be undertaken lightly. It is particularly difficult to do so when attorneys of unblemished reputation and a distinguished law firm are among the sanctioned parties.  But reluctance to enter sanctions cannot excuse a failure to impose them when they are warranted. If the filing of duplicative, vexatious litigation were allowed to escape sanction, the costs would exceed those imposed on the defendants here.  Courts and other parties may be encouraged to undertake burdensome and duplicative litigation.  The administration of justice would suffer.

## Conclusion

The defendants' May 2, 2025 motions to dismiss the claims filed in the Virginia Action are granted.  The Assemble Defendants' June 5, 2025 and the defendants' August 18, 2025 motions for sanctions to be imposed against Papaya and Skadden are granted.  A Scheduling Order will be issued to resolve the amount of attorneys' fees that are owed jointly and severally by

Papaya and Skadden.

Dated:     New York, New York
           February 27, 2026

                              _____
                                  DENISE COTE
                              United States District Judge